# Exhibit 1

# COPY

## BY FAX

**SUM-100**

### SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California

DEC 26 2019

Sherri R. Carter, Executive Officer/Clerk of Court

By _____, Deputy
Steven Drew

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
Bayer Healthcare Pharmaceuticals Inc., Bayer Pharma AG; Bayer Corporation;
Bayer Healthcare LLC, --Additional Parties Attachment Form is Attached--

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Michael Deuschel

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: (Número del Caso): |
|---|---|
| (El nombre y dirección de la corte es): | **19STCV46368** |

Los Angeles County Superior Court, Stanley Mosk Courthouse
111 North Hill St., Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Michael Deuschel, ~~P.O. Box 1054, El Segundo, CA 90245~~ 406 Hawthorne St. South Pasadena CA 91030

| DATE: | Sherri R. Carter, Clerk | Clerk, by | , Deputy |
|---|---|---|---|
| (Fecha) ~~December 17, 2019~~ **DEC 26 2019** | | (Secretario) STEVEN DREW | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): **Bayer Corporation**

   under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
   ☐ other (specify):
4. ☐ by personal delivery on (date)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al. | 19STCV46368 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

McKesson Corporation, McKesson Medical Surgical Inc., Merry X-Ray Chemical Corporation, and Does 1 through 50, inclusive.

Page __1__ of __1__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Electronically Received 08/02/2022 11:13 AM

1  Hoyt E. Hart II SBN 125088
   **ATTORNEY AT LAW**
2  P.O. Box 675670
   Rancho Santa Fe, CA  92067
3  Tel:  858.756.1636
   Fax:  858.756.1407
4  hoyth@prodigy.net

5  Michael Deuschel
   406 Hawthorne Street
6  South Pasadena, CA  91030
   Tel:  323.620.1231
7  mdeuschel@yahoo.com

8  Attorneys for, MICHAEL DEUSCHEL

9

**FILED**
Superior Court of California
County of Los Angeles

**08/02/2022**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Molinar _____ Deputy

10           **SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

11           **COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

12

| 13 MICHAEL DEUSCHEL, | Case No.: 19STCV46368 |
|---|---|
| 14       Plaintiff, | |
| 15    vs. | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| 16 BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PARMA AG, BAYER CORPORATION; BAYER HEALTHCARE, LLC, McKESSON MEDICAL SURGICAL, INC. MERRY X-RAY CHEMICAL CORPORATION, and DOES 1 through 50, Inclusive, | |
| 17 | |
| 18 | **DEMAND FOR JURY TRIAL** |
| 19 | |
| 20       Defendants. | |
| 21 | |

22

23        COMES NOW Plaintiff, Michael Deuschel (hereinafter "Plaintiff"), and alleges as

   follows:
24  ///

25  ///

26

27                                         - 1 -

   Deuschel vs. Bayer Healthcare etc.                    LACSC Case No. 19STCV46368
28  First Amended Complaint

**PARTIES:**

*Plaintiff:*

1.     Plaintiff Michael Deuschel is a resident of the city of El Segundo, within Los Angeles County, in the State of California.

2.     Plaintiff suffers from Gadolinium Toxicity (Gd Tx). Gadolinium Toxicity is an incurable, painful disease. Plaintiff contracted Gd Tx when he received a Magnetic Resonance Arthrogram (MRA) using intravenous injections of a gadolinium-based contrast agent (GBCA) known as Magnevist.

*Manufacturing Defendants:*

3.     Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC and Does 1 through 20, inclusive (collectively referred to as the "Manufacturing Defendants"), manufacture, market, and sell Magnevist, a gadolinium-based contrast agent ("GBCA") that was injected into Plaintiff's body.

4.     Defendant Bayer Pharma AG is a foreign company domiciled in Germany. Bayer Pharma AG is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017).

5.     Defendant Bayer Healthcare Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in New Jersey. Defendant Bayer Healthcare Pharmaceuticals Inc.is the Untied States pharmaceuticals unit of Bayer Healthcare LLC. Bayer Healthcare Pharmaceuticals Inc. is engaged in the business of designing, licensing,

- 2 -

manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017).

6.     Defendant Bayer Corporation is an Indiana corporation with its headquarters located in Pennsylvania. Defendant Bayer Corporation is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017). Defendant Bayer Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County. Said Defendant has elected to establish an agent for service of process in the State of California.

7.     Defendant Bayer HealthCare LLC is a Delaware LLC with its headquarters located in New Jersey. Bayer HealthCare LLC is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities.

- 3 -

1    This court has personal jurisdiction over said Defendant under the doctrine of specific

2    jurisdiction because said Defendant purposely availed itself of the benefits and protections

3    of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related

4    activities. Specifically, Defendant conducted clinical trials of Magnevist within California,

5    which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose

6    v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal.

7    June 27, 2017). Defendant Bayer HealthCare LLC is duly authorized to conduct business

8    in the State of California and does business in Los Angeles County. Said Defendant has

9    elected to establish an agent for service of process in the State of California.

10       8.      Defendants Bayer is a global pharmaceutical company and rakes in more

11   than $40 billion dollars per year. In 2016, Bayer merged with Monsanto to gain a footing in

12   agriculture or "Crop Science." The German based company's parent company IG Farben

13   had extensive ties to the Nazi Third Reich. It built a plant at Auschwitz and used prisoners

14   for slave labor and participated in human experiments on victims of concentration camps,

15   including the famous case of the 10 years old twins, Eva and Miriam. Bayer resolved that

16   lawsuit with a $5 billion fund for the, "Foundation of Remembrance." In 1913, Bayer

17   promoted Heroin use in children. In 1980 Bayer's division Cutter Biological sold HIV-

18   contaminated blood clotting medicines. Cutter made a heat-treated medication for

19   Americans but continued to sell the tainted medication in Argentina and parts of Asia. The

20   medication infected thousands in the U.S. and abroad with HIV and hepatitis-C. Many

21   died. Contemporaneously, Bayer has been repeatedly, successfully sued for defective

22   drugs and products including Yaz/Yasmin, a female hormonal birth control and Essure, the

23   female sterilization device. Here, at all times relevant to this complaint, the Manufacturing

24   Defendants advertised, promoted, marketed, distributed, and sold their linear GBCA

25   Magnevist in California and nationwide.

26       9.      The true names and capacities of those Defendants designated as DOES 1-

27   50 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 1-20

- 4 -

1    manufactured GBCAs that were injected into Plaintiff and/or manufactured MRA machines

2    with which MRAs were performed on Plaintiff using GBCAs. Plaintiff alleges on information

3    and belief that each of these fictitiously named defendants bears some legal responsibility

4    for events and damages set forth in this complaint.

5        10.    Plaintiff alleges on information and belief that DOES 1-20 were and are

6    companies authorized to do and are doing business in the State of California and have

7    regularly conducted business in the County of Los Angeles, State of California.

8        11.    Plaintiff will amend the Complaint if necessary to show the identity of each

9    fictitiously named defendant when they have been ascertained.

10        12.    The Manufacturing Defendants, along with DOES 1-20, are collectively

11    referred to as the Manufacturing Defendants.

12    ***Distributor Defendants***

13        13.    Defendant McKesson Corporation ("McKesson") distributes Magnevist and

14    other GBCAs in California and elsewhere. Plaintiff alleges that McKesson distributed the

   Magnevist and/or other GBCAs that were injected into Plaintiff.

15        14.    Defendant McKesson Corporation is a Delaware corporation with its principal

16    place of business and headquarters at One Post Street, San Francisco, San Francisco

17    County, California.

18        15.    McKesson Corporation is duly authorized to conduct business in the State

19    of California and does business in Los Angeles County.

20        16.    At all times relevant to this complaint, McKesson Corporation sold Magnevist

21    and other GBCAs in California and elsewhere. Plaintiff alleges that McKesson Medical-

22    Surgical, Inc. distributed the Magnevist and/or other GBCAs that were injected into

23    Plaintiff.

24        17.    Defendant McKesson Medical-Surgical, Inc. is a Virginia corporation with its

25    principal place of business and headquarters at One Post Street, San Francisco, San

26    Francisco County, California.

27                            - 5 -

Deuschel vs. Bayer Healthcare etc.                                   LACSC Case No. 19STCV46368

28   First Amended Complaint

18.     Defendant McKesson Medical-Surgical, Inc. is duly authorized to conduct business in the State of California and does business in Los Angeles County.

19.     At all times relevant to this Complaint, Defendant McKesson Medical-Surgical, Inc. sold Magnevist and/or other GBCAs in Los Angeles County and elsewhere.

20.     Defendant Merry X-Ray Chemical Corporation ("Merry X-Ray") distributes Magnevist and/or other GBCAs in California and elsewhere. Plaintiff alleges that Merry X-Ray distributed the Magnevist and/or other GBCAs that were injected into Plaintiff.

21.     Defendant Merry X-Ray Chemical Corporation is a California corporation with its principal place of business and headquarters at 4444Viewridge Avenue, San Diego, California.

22.     Merry X-Ray Chemical Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County.

23.     At all times relevant to this Complaint, Merry-X-Ray sold Magnevist and/or other GBCAs in Los Angeles County.

24.     The true names and capacities of those Defendants designated as DOES 21-30 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 21-30 distributed GBCAs that were injected into Plaintiff. Plaintiff alleges on information and belief that each of these fictitiously named Defendants bear some legal responsibility for the events and damages set forth in this Complaint.

25.     Plaintiff alleges on information and belief that DOES 21-30 were and are companies authorized to do and are doing business in the State of California and have regularly conducted business in the County of Los Angeles, State of California.

26.     Plaintiff will amend this Complaint if necessary to show the identity of each fictitiously named defendant when they have been ascertained.

27.     McKesson, McKesson Medical-Surgical, Inc., and Merry X-Ray, along with DOES 21-30, are collectively referred to as the Distributor Defendants.

- 6 -

28.     The  Manufacturing  Defendants  and  the  Distributor  Defendants  are collectively referred to as the Defendants.

### JURISDICTION AND VENUE:

29.     Jurisdiction and venue are both proper in Los Angeles Superior Court, in the State of California. This Court has personal jurisdiction over all parties named herein, as described above. Plaintiff is a resident of California. Three of the Defendants are residents of the State of California. Many of the acts and omissions related to Defendants liability occurred in California.

30.     Diversity jurisdiction, as is required in federal district court for a case of this nature, does not exist here. Diversity jurisdiction requires "complete diversity," which does not exist if any plaintiff is from the same State as any defendant. 28 U.S.C. § 1332. Here, Plaintiff is a California resident. Defendants McKesson Corporation, McKesson Medical-Surgical, Inc., and Merry X-Ray are also California Residents. Therefore, there is not complete diversity of the parties and diversity jurisdiction does not apply.

31.     Removal of this case to federal court would be improper due to the lack of diversity. Furthermore, this venue is convenient to the parties and is an appropriate venue for a multiple party product liability action.

### FACTS COMMON TO ALL CAUSES OF ACTION:

### THE SCIENCE OF A PHARMACOLOGICAL CRISIS:

32.     This complaint concerns the FDA-approved linear gadolinium-based contrast agent (GBCA) Magnevist administered to patients intravenously by radiologists to enhance the quality of magnetic resonance imaging. When contrast dye is used, the magnetic resonance imaging procedure is referred to as a Magnetic Resonance Arthrogram (MRA).

33.     Because Gadolinium is highly paramagnetic, it is effective for use in MRAs, and GBCAs have been developed as a 'safe' means of introducing gadolinium into the body in order to enhance the diagnostic imaging. Gadolinium is a chemical element that

- 7 -

does not naturally occur within the human body. The only known route for gadolinium to enter the human body is injection of the GBCA. Gadolinium is highly toxic.

34.   Because raw Gadolinium is highly toxic, it must be coated. GBCAs are actually a composite, or, "chelated" chemical construct. The Gadolinium is bound to a protective outer shell, not unlike M&M candies' interior chocolate is bound by an exterior hard-shell candy so not to melt in your hands. Yet, everyone knows what happens if they are held onto for too long.

35.   Chelation is designed to protect the body by keeping the toxic heavy metal from coming into contact with human tissue. There are two types of contrast agents differentiated by their chemical structure: linear and macrocyclic agents. The main difference is that the linear agents do not fully surround the gadolinium ion, whereas the macrocyclic agents form a complete ring around it which creates a much more difficult bond to break. Defendants' Magnevist is a linear agent. Linear GBCAs are far less stable and more prone to separation of the raw Gadolinium from its chelated compound than the macrocyclic GBCAs. Greater safety due to stronger bonds of the macrocyclic contrast agents as compared to their linear contrast counterparts has been well established by scientists. (Huckle, et al. 2016).

36.   When GBCAs are in the human body, chelation may separate from gadolinium. This process is called "de-chelation." Once the GBCA is de-chelated, the patient is exposed to the naturally raw, highly toxic Gadolinium, which then binds to tissue or cells in the human biological structure; it even breaches the natural blood-brain-spinal-cord barrier.

37.   This bio-chemical transfer process is known as, "Transmetallation." It occurs because essential metals in the body such as copper, iron and zinc compete for GBCA's outer "chelate" layer (Huckle, et al. 2016). Furthermore, emerging science demonstrated the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) becomes very weak and separates easily in low pH conditions such as those found in many

- 8 -

1    compartments of the human body including extracellular fluid spaces. Therefore, chelation

2    fails for a variety of reasons, and soon thereafter, the "free" Gadolinium poisons the

3    patient-victim; s/he suffers Gadolinium Toxicity.

4         38.    Gadolinium Toxicity (Gd Tx) is a man-made disease. It only occurs in

5    patients who have received a GBCA for an MRA. Once de-chelation starts, not even

6    healthy kidneys can clear/excrete the "free" Gadolinium fast enough to prevent poisoning.

7    Gadolinium Toxicity does not discriminate and extends it reach to all patients exposed to

8    de-chelated linear GBCAs. Consistent with this toxicology, decreased renal performance is

9    not a pre-requisite for contraction of the disease, Gd Tx, though it increases susceptibility.

10        **RENAL PERFORMANCE, GBCAs AND GADOLINIUM TOXICITY:**

11        39.    Renal function of the patient is divided into six classes, normal/healthy and

12   then five stages of impairment. Impaired renal function has been correspondingly

13   classified into five categories: mildly impaired Chronic Kidney Disease, class 1 and 2;

14   moderately impaired Chronic Kidney Disease, class 3; and severely impaired Chronic

15   Kidney Disease Class 4 and 5.

16        40.    Kidneys play a vital role in the clearance/excretion of GBCAs but in

17   themselves do not "cause" the toxicity, which is why the terminology for the deadly end

18   range of Gd Tx, "Nephrogenic Systemic Fibrosis (NSF)" is medically misleading and

19   semantically flawed. [1]    41.    Consistent with Nephrology, patients with reduced renal

20   performance (kidney function) are at risk of reduced/slower clearance/excretion of GBCAs.

---

[1] NSF is a horrible disease where patients' skin and vital organs fibrose, become hardened. It is nick-named the "Rock Disease," because victims incur such severe limitations in their movement, they grow sedentary likes rocks as their skin hardens and scales, appearing "rock-like," while their internal organs suffer the same fate. Over five hundred (500) NSF cases were reported and it is estimated to be well over a thousand non-reported cases. Over 500 lawsuits were filed against GBCA manufacturers. All of them settled before trial except Decker vs. GE (Omniscan), which resulted in a $5 million-dollar verdict for Mr. Decker but not before he died from NSF.

Deuschel vs. Bayer Healthcare etc.                                    LACSC Case No. 19STCV46368
First Amended Complaint

This fact in turn increases the risk of de-chelation of the bonded GBCA occurring within the patient, because extended retention of the GBCA allows more time for de-chelation through Transmetallation to occur. This results in the creation of a new, unintended, toxic Gadolinium compound that can be retained within the body. The de-chelated deposited Gadolinium can remain for weeks, months and even years, while the patient-victim suffers Gd Tx, or awaits the release of the time-bomb.

**THE DEFENDANTS' FALSE INSISTENCES AND OMISSIONS:**

41.   In 1988, the FDA approved Magnevist for public consumption and Defendants and the FDA *insisted* linear GBCA Magnevist was safe for everyone. Yet, Defendants did not share all of its research with the FDA at the time of its approval and during subsequent revisions of its "Black Label Warnings."

42.   In 2007, almost 20 years later, Defendants and the FDA *insisted* only patients at the *end stages of renal disease classified in CKD, Class 4 and 5, with severely compromised kidney function*, were at risk. Indeed, de-chelated linear GBCAs caused the often-fatal end range of Gd Tx, namely, NSF. Yet, through their false insistence and omissions, Defendants and the FDA placed the *majority of patients* at high risk of the broader spectrum of Gd Tx.

43.   Ten years later, December 2017, almost 30 years after its approval, Defendants and the FDA recognized the beginning range of Gd Tx, namely Gadolinium Deposition Disease (GDD) but *insisted* only patients with *normal to mildly impaired renal function, including those classified in CKD, Class 1 and 2*, were at risk. Worse, Defendants and the FDA *insisted* no causal relationship exists between the notorious toxin, Gadolinium, and GDD patient-victims' injuries, whose symptomology may be milder than the devastating NSF but still debilitating.

44.   Now, almost 35 years later, and continuing, as the pharma-sponsored toxic semantics war continues, Defendants and the FDA *insist* the group sandwiched between the two recognized sub-sets of Gd Tx is not worthy of acknowledgement, let alone title.

- 10 -

45.    Notwithstanding their insipid, biased denial of causality, the tenets of logic and science including continuity, based upon his extensive medical evidence, **Plaintiff insists** that patients in the middle of those two recognized end points, not unlike the middle finger saddled between the two sets of outside fingers, *those patients classified in CKD class 3, with moderate impairment*, also suffer the linear GBCA-induced disease, Gd Tx. Indeed, patient-victims with *moderately impaired renal function, CKD, class 3*, develop persistent symptoms of Gd TX that arise minutes/hours/months/years after the administration of the linear GBCA Magnevist.

46.    *Yet, for 35 years and continuing,* Defendants and the FDA **insist** on piecemealing their supposed scientific admissions to slowly reveal Defendants' latest culpability.

47.    *For 35 years and counting,* Defendants and the FDA decided who deserved consideration and through their *false insistences and omissions,* refused to acknowledge the spectrum or continuity of toxicity and corresponding symptomology for the de-chelated, free, raw, highly toxic Gadolinium introduced to the patient-victims by the linear GBCA Magnevist, be it deposited or transitory. Yet, as is typical and consistent with all known tenets of toxicology, the middle range does exist, as did the entire range of susceptibility, all along.

**DEFENDANTS' DISCRIMINATORY AND TOXIC SEMANTICS WAR:**

48.    Defendants not only caused Plaintiff's key disability but for the last thirteen years, they discriminated against him because of it. Their restrictive definition and 13-year campaign to deny Plaintiff a valid diagnosis is discriminatory in that Defendants' animus and blatant denial of valid warning services is based upon and further aggravates Plaintiff's disabilities. Refusal to acknowledge his true disease/cause of disabilities/key disability, in fact caused by their linear GBCA, Magnevist, is a blatant denial of service and failure to fully-equally-fairly accommodate him. Their on-going campaign has had deleterious effect on Plaintiff's health and health care.

- 11 -

49.     Contrary to Defendants' *discriminatory, exclusionary and oppressive* false definition of Gd Tx's semantic predecessor, NSF, and Defendants' incessant disinformation campaign, a patient-victim does not have to be diagnosed with *pre-existing, severely impaired* renal performance, nor classified as CKD, class 4 or 5, in order to contract NSF. The toxin will readily pummel the kidneys into submission and sufficiently oppress performance.

50.     Gadolinium delivers a deadly combo-punch. The first chemical punch struck Plaintiff's kidneys. In fact, Plaintiff suffered, "*Transient Degradation*." His renal performance temporarily dropped from CKD, class 3, to CKD class 4. He suffered Renal Failure. The second chemical punch poisoned him as the stunned kidneys and stone-restricted urinary system could not clear/excrete the de-chelating GBCA. As the Kaiser radiologist confirmed, the dye was trapped for at least three days in his bladder. Within minutes, de-chelation began and by one hour, the toxin, Gadolinium, was released and poisoned its patient-victim. Gadolinium, and by extrapolation, its manufacturers and distributors profiting from systemized toxic-agent attacks, as well as intimidation and oppression, is/are two-faced terrorists: both suppressant and toxin.

51.     NSF, GDD and any and all false insistences and omissions constitute a toxic game of semantics. NSF is the only toxin pathology that omits the known toxin from its terminology—a deception perpetrated by those responsible for the poisoning of patient-victims.

52.     As with Lead Poisoning, Bayer's Roundup's Glyphosate cancerous herbicide, or Massengill's famous 1937 Elixir Sulfanilamide, when the FDA was overhauled due to its failings, the entire world, but for the terrorist-culprits, are better served by healthier, transparent semantics and inclusion of the properly identified toxin in the name of the toxicological disease as in this catastrophic iatrogenic injury, therefore better known as Gadolinium Toxicity, Gd Tx.

- 12 -

53.     Medical and scientific communities' reticence to acknowledge the absurdity of intravenously injecting a notorious toxin into humans, humans already ill, or else they would not be receiving MRAs to diagnose their medical conditions, informs the tragic origin of Gd Tx. There also exists industry and FDA bias and institutionalized reluctance to acknowledge there exists a safer option—if it has to be used at all.

## A SUPERIOR SAFER PRODUCT EXISTS:

54.     A superior product that could achieve the same radiological results but place the patient at less health risk is macrocyclic GBCAs. Yet advocacy to replace linear GBCAs with macrocyclic GBCAs sorely lags the evidence. Though the FDA and medical, scientific communities were misled by the manufacturers of linear GBCAs, they grew so individually and collectively complacent and invested in the use of the linear GBCAs, they forfeited the will to protect the public and advocate for use of the safer, readily available macrocyclic GBCA.

55.     In 1992, the FDA approved the first macrocyclic GBCA, ProHance. Hence, macrocyclic GBCAs have long been readily available as alternatives to their linear counterpart. They are more stable, less prone to de-chelation, and represent a safer alternative to liner GBCAs—if they must be used at all. Therefore, Defendants knew or should have known about the different risks and safety between the two types of GBCA products. Yet, for 35 years and counting, they chose not to warn the FDA and medical community and failed to alter the design of the linear GBCA to comport with that of their macrocyclic competitors. Instead, the nearly four decades of patient-victim poisoning is perpetrated for profit—the result of corporate avarice.

## DEFENDANTS' LINEAR GBCA MAGNEVIST IS DEFECTIVE:

56.     Defendants' linear GBCA Magnevist was not reasonably fit, suitable or safe for its intended purpose, i.e., use on ill patients receiving MRAs for medical diagnostic purposes. The substantial incidence and severe degree of injury inherently distinguishes this toxicity crisis from a mere rare occurrence or an occasional accident. It is a medical

- 13 -

disaster of epic proportions with tragic consequences for the patient-victim of the disease, Gadolinium Toxicity. Defendants concealed relevant information during the FDA approval process and subsequent reevaluations and revisions of its Black-Label Warning. Defendants' product deviated from specifications, formulae or performance standards of manufacturing or from otherwise identical units manufactured to the same specifications or formulae (manufacturing defect), failed to contain adequate warning (warning defect), and was designed in a defective manner (design defect).

57.     Defendants' linear GBCA was defective, the defect existed when the product left the defendants' control, and, the defect caused Plaintiff's injury—the reasonably foreseeable user of the defective medical product. Defendants had a duty to warn and it rendered its own product defective—in addition to its design defect—by failing to adequately warn all foreseeable users that the product can cause injury to them. Defendants' failures to warn constitute a breach of duty. They had a duty to warn intended users about any and all risk related to their product that it knew or ought to have known. Yet, Defendants published no such warning.

58.     The risk posed by Defendants' linear GBCA Magnevist outweighs its intended utility, and, the product could have been designed in a readily-available safer alternative manner such as the design of macrocyclic GBCAs, so to minimize the risk of harm. Defendants' failure to implement the known, affordable and available changes to its design and manufacturing practice, namely, design of macrocyclic GBCA, a feasible and safer alternative design, and its omission by Defendants, rendered the linear GBCA Magnevist to be unreasonably unsafe. Defendants drug danger and risk to foreseeable consumer's health are the direct result of its chemical design and active ingredient, Gadolinium. If defendants' linear GBCA Magnevist had been designed without defect, Plaintiff's injuries would have been avoided.

59.     Defendants' linear GBCA Magnevist caused Plaintiff to contract the disease Gd Tx, known as GDD at the beginning stage of the toxicological spectrum and NSF and

- 14 -

the end stage of the continuity of poisoning. Plaintiff suffered a complex symptomology detailed below because Defendants failed to warn him of the health risks associated with their medical product.

60.     In their course of business, Defendants breeched their expressed warranty. Defendants made an affirmative promise in their description of Magnevist that their product was safe. In the competitive pharmaceutical industry, Defendants' promise was an integral element of their marketing and eventual sale of their product to medical professionals and subsequent use of it in patients during MRAs. Alas, the product fell far short of their promises of utility and safety. They represented that their linear GBCA was generally safe to use on all patients; that the linear GBCA is not any less safe than Macrocyclic GBCAs; that linear GBCAs are contraindicated only in patients with *pre-existing, severe chronic renal impairment*; that retention of de-chelated Gadolinium in patients without severe chronic kidney disease is *harmless*.

61.     Yet, clinical features of Gadolinium Toxicity include persistent headaches, bone and joint pain, clouded mental activity, cerebral and neuropathic disorders, orthopedic disorders and dermatological disorders, subcutaneous soft-tissue thickening that clinically appears somewhat spongy or rubbery, painful and thickened tendons and ligaments in a comparable distribution; excruciating pain, typically in the distal distribution but may also be in the torso and ribs or generalized, often described as feeling like sharp pins and needles, cutting and burning. Gd Tx often progresses to painful inhibition of the ability to use the arms, legs, hands, feet and other joints. Gd Tx is a progressive disease for which there is no known cure.

### PLAINTIFF'S JOURNEY OF GD TX HORRORS:

62.     In June 2009, while FDA quibbled over the appropriate black label warning to require the manufacturers/distributors of the linear GBCA Magnevist to apply to their product box—for about a six-week period—when Plaintiff received the MRA and was injected with the linear GBCA Magnevist—there was no black label or an inadequate

- 15 -

1  warning on its product box. It did not warn Plaintiff or his medical providers of the danger

2  their product posed to him and patient-victims like him, namely, the risk of contracting Gd

3  Tx for CKD, class 3 patients.

4      63.    Prior to June 12, 2009, Plaintiff completed and submitted his Kaiser

5  Permanente MRI/MRA Questionnaire; he listed his Chronic Kidney Disease, (CKD) class

6  3. Plaintiff had pre-existing moderately impaired renal dysfunction, CKD, class 3, and a

7  history of kidney stones. He also inquired with the MRI staff and asked if he should receive

8  a blood test to confirm his renal function. They declined and assured him he faced no

9  health risk from the MRA.

10     64.    June 12, 2009, Plaintiff received the MRA to rule out an acoustical neuroma

11  during a differential diagnosis to ascertain the cause of his tinnitus, ringing in the ear. He

12  was intravenously injected with the linear GBCA, Magnevist. Upon the injection, he felt a

13  burning sensation throughout his body. Less than an hour after the injection, Plaintiff

14  collapsed and suffered overwhelming, debilitating symptoms. He returned to the same

    Kaiser medical center.

15     65.    Yet, Kaiser Permanente immediately initiated an adversarial campaign

16  against Plaintiff. It initially refused to admit Plaintiff into the ER and left him to suffer in

17  excruciating pain until a contingency of fellow ER patients advocated on his behalf for

18  admission.

19     66.    The next day, Kaiser insisted Plaintiff's injury was caused by a one-millimeter

20  kidney stone lodged in his urethra and advised surgery to extract it. He received the

21  surgery but his kidneys continued to fail; his GFR dropped from 52 to 28. Such renal

22  failure is an unusual renal response to stone extraction—something else was wrong. For

23  the week, Kaiser drugged Plaintiff into a semi-conscious state to conceal their fault, when

24  dialysis was in order. (In contrast, two years earlier, Plaintiff received surgery to extract

25  kidney stones that were 5mm in size. His renal performance swiftly returned to their

26  baseline after the stones extraction.)

27                                          - 16 -

67.     Plaintiff's initial symptoms included renal failure, excruciating pain, delirium, debilitation, numbness and sharp, painful tingling sensation throughout his body, severe fatigue, restless leg-type syndrome, limb and rib pain, memory loss and cognitive impairment.

68.     In Plaintiff's case, no preexistent disease or subsequently developed disease of an alternate known process is present to account for his symptoms. He experiences symptoms consistent with the known toxic effect of *de-chelated and retained* Gadolinium, Gd Tx.

## PLAINTIFF'S SUSTAINED INJURIES:

69.     Had Plaintiff and/or his medical provider been warned about the risks associated with the linear GBCA Magnevist, he would not have been administered Magnevist and would not have been inflicted with the disease, Gadolinium Toxicity.

70.     As a direct and proximate result of being administered GBCA Magnivest, Plaintiff has been rendered permanently disabled and has suffered and continues to suffer:

(1) *Brain/Head Neurological Injuries* including Cerebral Atrophy; Cranial Nerve Root Damage including Trigeminal and Occipital Neuralgias; Vestibular Disorders, Neuro-Ophthalmological Disorders; Hearing Loss, exacerbated Tinnitus, Atrophied and Scarred Vocal Cords; Oral, dental and jaw injuries; Pituitary Adenoma/Rathe Cyst and sinus polyps;

(2) *Spinal Injuries, both Orthopedic and Neurological Injuries* including Adhesive Arachnoiditis, Cervical Vertebral and Intervertebral Disc Degradation and Bilateral Peripheral Radiculopathy; Dorsal Arachnoid Web and resulting severe thoracic spinal cord compression; Schmorl's Nodes; Tarlov Cysts; Hemangioma; Herniated Discs; Sacroiliitis;

(3) *Heart Disorders* including Sick Sinus Node Syndrome and Chronotropic Incompetence;

(4) *Vascular Disorders* including Deep Venus Reflux Disease, arterial blockage and varicocele;

- 17 -

(5) *Pulmonary Disorders* including Restricted Breathings;

(6) *Orthopedic Disorders and Injuries* including Osteoporosis; Osteoarthritis; Bilateral Shoulder and Hip Injuries; Bone and Joint Pain;

(7) *Systemic and Tissue Disorders and Injuries* including Ankylosing Spondylitis; calcified tendons; carpal tunnel and cubital ulnar nerve impingement; stenosing tenosynovitis; dermatological/fibrotic disorders with ulcerated rashes, excessive scarring and deformed skin.

71.    From 2009 through 2022, as a direct and proximate result of being administered GBCA Magnevist, Plaintiff has received about forty major surgeries and about sixty minor procedures including two brain surgeries, revision cranioplasty; five neurostimulator surgeries, three vocal cord surgeries; two nasal-polyp surgeries; multiple oral surgeries; two cardiological implant surgeries; four cervical spine surgeries; four pelvic surgeries; three lower abdominal surgeries; bilateral varicocelectomies, bilateral carpal tunnel surgeries.

72.    More than 50% of his surgeries are delayed, on average, for 3.75 years, while providers deny him the appropriate, timely surgeries due to bias, disbelief and Medi-Cal's abysmally low reduced reimbursement rate, extending his suffering to abhorrent levels of torture.

73.    As a direct and proximate result of being administered linear GBCA Magnevist, Plaintiff has been prescribed about eleven more surgeries, including: (1) cervical spine revision surgery—denied for 2 ½ years, (2) thoracic spinal cord surgery—denied for 5 years, (3/4) bilateral shoulder surgeries—denied for 9 years; (5/6) bilateral elbow surgeries—denied for 8 years, and (7/8) bilateral hip surgeries—denied for 9 years; (9) neurostimulator replacement surgery—denied for 5 years; (10) oral surgeries—denied for 9 years; and (11) bunion surgery—denied for 2 years. To treat Plaintiff's exacerbated disabilities caused by Gd Tx disease, he has received and is pending approximately 111 procedures.

- 18 -

74.     As a direct and proximate result of being administered GBCA Magnevist, Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future and has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

### THE CAMPAIGN TO OPPRESS PLAINTIFF:

75.     June 12, 2009 through August 10, 2010, Kaiser conspired against Plaintiff and lied to him about the chemical they injected into him during the MRA. In the attempt to expire the California one-year statute of limitation for medical negligence, for the fourteen months following the tragic injection, they repeatedly falsely asserted they administered an *iodine-based-contrast-dye* on June 12, 2009.

76.     August 2010, Plaintiff obtained the real Radiology report and learned Kaiser injected him with the linear *Gadolinium-Based-Contrast-Agent,* Magnevist. Kaiser's physicians concealed a second critical fact for the same fourteen months: Three days after the Magnevist injection, the radiologist confirmed the contrast dye remained trapped in Plaintiff's bladder.

77.     The GBCA's chelation began to break-down after only a few hours, poisoning Plaintiff, promptly. This explains why he balled up in a fetal position in his hospital bed and howled in pain for seven days.

78.     From 2009 through 2013, Kaiser's Nephrologists, Allergists, Dermatologists, Endocrinologists, Orthopedists, Primary Care Providers and Toxicologists at three separate medical centers refused Plaintiff testing of gadolinium in either his blood, skin or bone specimens that were extracted from him during his surgeries. Kaiser confirmed they retained the samples but falsely claimed there was no available method of testing for retained gadolinium.

79.     In 2011, Social Security assessed Plaintiff disabled; he was assigned to Medi-Cal.

- 19 -

80.     Starting in 2012, during mandatory arbitration for medical negligence, Kaiser presented numerous medical experts to *refute* his allegation that he suffered Nephrogenic Systemic Fibrosis (NSF)—the only term available at the time for the adverse impact of retained de-chelated Gadolinium on a patient-victim.

81.     Instead, Kaiser, and the legal and medical community at large, argued that a patient must be diagnosed with *"Pre-Existing, severely impaired* renal performance, and categorized as CKD, Class 4 or 5, and/or, be on dialysis, in order to sustain NSF. Plaintiff's own lawyer hired a supposed expert with a dubious reputation who falsely testified Plaintiff did not suffer NSF but instead fabricated his disorders and injuries and suffered Somatization Disorder.

82.     Alas, the Kaiser arbitrator dismissed Plaintiff's complaint and ruled in Kaiser's favor; Plaintiff was "Defensed." 2014, Plaintiff withdrew from Kaiser—after they refused him critical surgeries that the California Department of Social Services ordered performed.

**TRANSFER OF CARE FAILED DUE TO THE SAME DISCRIMINATION:**

83.     2014 through present, Plaintiff sought care from UC Regents and Cedars Sinai. Yet, there, physicians refuted Plaintiff was poisoned by the de-chelated, retained linear GBCA Magnevist and refused to test him for Gadolinium retention. Consequently, he was thrust into untenable positions as he needed their medical services including surgeries but suffered from his opponents overwhelming contempt for his true medical condition. They refused to test him for Gadolinium Retention and refused to include him in on-going support groups and studies for NSF. This oppressive campaign to silence him manifested in an, "Either/Or," demand: "Stop complaining about NSF—because you don't have it—or you will not receive surgeries!"

**THE TIDE OF INTOLERANCE EBBED—ALMOST:**

84.     Early 2018, Plaintiff was moved by four new notable developments. First, he learned the actor Mr. Chuck Norris and his wife, Geena, filed suit for Gadolinium

- 20 -

Deposition Disease, GDD, and this way learned about pharmaceutical product liability. Second, medical providers began discussing GBCA-induced diseases for patients classified along the *entire* spectrum of kidney function from normal to impaired renal function and in all classes of Chronic Kidney Disease, CKD, classes 1 through 5. Third, physicians timidly began to suggest that Plaintiff was "allergic," to Gadolinium. Fourth, prayer.

85.     The overwhelming oppression that excluded Plaintiff from appropriate and timely medical treatment and precluded any form of justice began to wane. The flawed premise that there is only one *restrictively-defined* gadolinium-induced disease, NSF, and only patients with *pre-existing*, *severely impaired* renal performance could contract NSF, began to crumble with the acknowledgment of Gadolinium Deposition Disease, GDD.

86.     As discussed above, Gadolinium is a *notorious* neuro and osteo toxin, and begins to poison its victims within hours. Yet, as late as 2017, the FDA forfeited its credibility when it argued there was no demonstrable proof of causation of injury by toxicity by retained de-chelated gadolinium in the human body for GDD patient-victims.

87.     Yet, their trick is a mere sleight of hand. After decades of unethically denying the disease Gd Tx for anyone but CKD, class 4 and 5 patient-victims, they finally admitted what the rest of the world established: De-chelated gadolinium indeed deposits within its victims' bodies and even traverses the blood-brain barrier and deposits within their brain and spinal cord. Yet, medical professionals continue to protect themselves, the linear GBCAs' manufacturers and their trillion-dollar enterprise by continuing to deny the conspicuous causal relationship between sustained injuries and the linear GBCA. The majority of research into Gadolinium is funded by GBCAs manufacturers and is therefore biased. They oppress the victims of their animus and by the disproportionate power of their office, profession and pharmaceutical lobbying dollar, *they conceal the truth*, and thereby render the disempowered Gd Tx patient-victims, *"invisible."*

- 21 -

**WORD-PLAYS ABOUND AND INADVERTENTLY INCLUDE PLAINTIFF:**

88.    In September 2019, Plaintiff learned that in 2017, Dr. Jeffrey Brent spoke at FDA's MIDAC's 2017 conference. He stated "We know NSF is a disease. It is very clear-cut unambiguous disease caused by gadolinium retention in patients *who have renal failure* ... NSF is unmistakable, easy to diagnose, clear-cut, limited but devastatingly serious clinical condition, limited in the sense of clinical manifestations." (FDA's MIDAC 2017 Conf.) [Emphasis added.]

89.    Dr. Brent slyly employed a contemporaneous revision of the antiquated operative definition that unfortunately dominated the legal and medical symbiotic industries for the preceding ten years and restricted acknowledgment of patient-victims to only those with *pre-existing, severe* renal failure and pre-diagnosed with CKD class 4 and five, *only*.

90.    In September 2019, Plaintiff learned that in August 2019, Judge David G. Campbell, Senior United States District Judge, ceaselessly criticized Plaintiff's experts, but stated, "We have a recognized disease of NSF in *renally-impaired* patients and its accepted link to GBCAs." As with Dr. Brent, his remark is the linguistic equivalent of a sleight of hand, contemporaneously revising the antiquated and discriminatory operative definition that restricted NSF for the preceding ten years to CKD class 4 and 5, patient-victims, *only*. (Case 2:18-cv-01159-DGC, Davis v McKesson Corp., Order 08/02/2019, page 14.) [Emphasis added.]

91.    The original, highly restrictive operative definition of NSF, the only disease recognized by the FDA and medical industry for ten years, excluded Plaintiff based upon a false assertion, and wrongfully denied his disease and thereby substantially aggravated it. Whereas now, it is simply, "renal failure," which clearly includes Plaintiff.

92.    Alas, as recently as 2020, the medical industry and prominent medical centers like UC San Diego continued to abuse, harass, injure, mock and oppress Plaintiff for his claim that he contracted the disease, Gd Tx. Gd Tx is an all-inclusive term that accommodates the varied degree of injury sustained by patient-victims in proportion to the

- 22 -

impact the GBCAs' de-chelated and retained gadolinium has upon them, often but not always proportional to their degree of kidney function, be it pre-existing or "Post-GBCA-Injection" renal performance.

**THIRTEEN YEARS OF RESISTANCE AND OBSTRUCTION:**

93.   For thirteen years from 2009 through the present, the polluters and their protectors, big pharma and the FDA, have yet to acknowledge Plaintiff's range of their man-made disease. The self-serving, self-preserving symbiotic Medical—Pharma—FDA—Legal Defense Industries (MPFL) perpetrate a concerted, overwhelming effort to obstruct patient-victims like Plaintiff. Kaiser, UC Regents and Cedars refused Plaintiff's requests to test for Gadolinium though there was no other cause for the continuing decline in his health. They capitalized upon the vast difference in their resources to exploit Plaintiff's vulnerability and immediate surgical needs, to thwart his search. They refused to perform surgeries that their own physicians prescribed. They threatened to and ultimately "discharged," him, when he would not remain silent. Their drive to protect themselves, their profits and status quo had a deleterious impact upon Plaintiff as it would have upon any patient-victim under the same circumstances.

94.   Providers denied Magnevist inflicted the horrific injuries Plaintiff sustained and denied him appropriate, timely surgeries and allowed him to suffer. They exercised their dominance in a cruel manner in order to protect their profits and to avoid acknowledging that their ongoing use of linear GBCAs may pose an unacceptable risk to all of their patients.

95.   In an insidious manner, they refused to accept Medi-Cal supposedly due to its reduced reimbursement rate but it felt like coercion to Plaintiff to capitulate to their demand to remain silent about Magnevist, its de-chelation and his retention of gadolinium—if he wanted the prescribed surgeries and to survive—a demand he could not morally or physically tolerate.

- 23 -

96.     Plaintiff has not heard of a scientific, consensus-derived term for the medical disease that patients with pre-existing CKD, class 3, sustain from "free" Gadolinium. Therefore, based upon his medical evidence, he identifies as a patient-victim of the all-inclusive, continuity-based logical term, Gadolinium Toxicity, and advances this complaint, accordingly.

**OTHER CAMPAIGNS TO ROUST THE TRUTH:**

**SOME OF THE INFORMATION DEFENDANTS CONCEALED:**

97.     In 1984—prior to FDA approval—the inventors of GBCAs falsely claimed that their product Gd-DTPA did not cross the blood-brain barrier, and that the bonds between the toxic gadolinium and its protective coating did not break down inside the body, and that there would be no toxic gadolinium residue left behind to cause illness.

98.     Yet, since at least 1984, stability differences among GBCAs have been recognized in laboratory (in vitro). Since 1984, deposition of toxic gadolinium in tissues has been described in animal models (in vitro). Peer review articles were published on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences.

99.     In 1988, the FDA approved of Magnevist, the first GBCA to reach the market.

100.    In 1988, it was recognized that gadolinium was breaking free from the bonds in the linear GBCAs as they grew weak under certain conditions and locations within the human body. (Huckle, et al. 2016)

101.    In September 1989, what may have been the first report of toxic gadolinium retention in humans was published, a little over one year after approval of Magnevist. Authors Tien, et al. reported that intercerebral masses "remained enhanced on MRI images obtained 8-days after injection of gadolinium DTPA dimeglumine—Magnevist. Subsequent chemical analysis revealed a high concentration of gadolinium remained in the tissue.

102.   In 1991, Pharmacokinetic studies indicated that gadolinium retention was occurring in people with normal, slightly impaired and moderately impaired renal function. [2]

103.   In 1998, the first major study that showed deposition in patients with renal failure was published. (Huckle, et al. 2016)

104.   In 2004, the first major study that showed deposition in patients with normal renal function was published. (Huckle, et al. 2016)

105.   In 2004, gadolinium was shown to be deposited in the resected femoral heads of patients who had undergone gadolinium-chelate enhanced MRA studies. [3] Since then, studies have continued to indicate that gadolinium remains within patients' bodies long after the suggested half-life.

106.   Over the next eighteen years, more evidence was forthcoming, and research began to flourish regarding the release of toxic gadolinium from the linear contrast agents such as Manevist, and its long-term retention in the bodies of animals and humans.

107.   The laboratory (In Vitro) studies assessing the stability of each GBCA in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents which showed superior stability. The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was cleared/excreted out of the body according to the claimed drug's half-life, before the chelate could release the toxic gadolinium. However, as discussed above, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to

---

[2] Schmann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. Invest Radiol., 1991: 26:975-979.
[3] Gibby WA, Gibby KA, Gibby WA. Comparison of GD-DTPA-BMA (Omniscan) versus GD HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. Invest Radiol., 2004: 39:138-142.

1   be released in the bodies of patients. In addition, a delayed elimination phase of the GBCA
2   would later be discovered.

3       108.   In 2006, the Food and Drug Administration (FDA) voted to issue a black box
4   warning on all gadolinium-based contrast agents. This was prompted by Nephrologists
5   and other scientists connecting the administration of GBCAs, including Magnevist, to the
6   rapidly progressive debilitating and often fatal disease called Nephrogenic Systemic
7   Fibrosis (NSF).

8       109.   In 2012, patients sent several strongly worded letters with scientifically-
9   supported research data to the FDA, warning about the occurrence of gadolinium toxicity
10  in those with normal renal function following injections of GBCAs. Correspondence was
11  confirmed.

12      110.   Symptomatic patients started to obtain documentation of high levels of
13  gadolinium in their blood and urine several days, weeks, months and even years after their
14  exposure to GBCAs. Many patients even had tissue biopsies of various parts of their body
    that showed additional evidence of retained gadolinium years after their exposure.

15      111.   In 2012, Defendants corrected their label to include contraindications for use
16  in patients with kidney disease and acute kidney injury. Yet, Defendants have failed to
17  update their label to reflect the extensive evidence of gadolinium retention in people with
18  normal, slightly impaired and moderately impaired renal function and to warn of the likely
19  probability of the de- chelation that will expose the patient to "free" toxic gadolinium.

20      112.   Because obvious signs of clinical pathology associated with NSF were only
21  "seen," and "acknowledged," in patients who had *severely impaired* renal performance,
22  i.e., CKD, class 4 and 5, it was widely—BUT ERRONEOUSLY—assumed by the public
23  and medical profession alike that people with normal kidney performance or slightly to
24  moderately impaired renal function were not getting sick and there were no other
25  concerns. However, research continued to report evidence that toxic gadolinium was being
26  stored in people with normal, slightly reduced and moderately reduced renal function.

27                                      - 26 -

113.   Although many patients with debilitating symptoms who had normal, slightly impaired and moderately impaired renal function that received injections of GBCA had already been reporting adverse reactions for years to the FDA, manufacturers and poison control, no link between gadolinium and their symptoms were ever officially made public. This is partially because blood and urine testing for gadolinium only became available recently, but it is primarily due to scientific bias. Most physicians would not allow themselves to be aware of any disease that was associated with gadolinium other than NSF, which is said to only occur in patients with pre-existing severe renal impairment and categorized as CKD, class 4 and 5.

114.   The de-evolution of scientific bias that allowed for an evolving admission of a wider pool of patient-victims was slowly and intermittently extended and tested within the scientific community, medical institutions as well as the United States Federal Courts, with the sleight-of-hand semantical substitution of "severe renal failure" and "preexisting CKD, class 4 and 5," with the less restrictive and more inclusive qualifier, "renal failure." As noted above, the vocabulary-substitute gained wider use but without any fanfare, let alone admission of the decades of abuse caused by its linguistic predecessor, NSF, and the symbiotic-industries' bias.

115.   In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of GBCAs up to several years prior. They found that the brain had hyperintense signals in critical areas of the brain. They were very alarming findings.

116.   In 2014, scientists at the Mayo Clinic confirmed these findings when autopsy studies were performed on thirteen (13) diseased individuals, all of whom had normal or near normal renal function and who had received six or more injections of GBCAs in the years prior. Up to 56mcg of gadolinium per gram of desecrated tissue were found within the patients' brains.

- 27 -

117.   As these new findings emerged, the entire radiology community was put on high alert. With several large universities conducting research to further address this concern.

118.   In July 2015, and in direct response to the Mayo Clinic study's findings, the FDA issued a new public safety alert. The FDA is evaluating the risk of brain deposits from repeated use of GBCAs use in MRAs and they now have their National Center for Toxicological Research team working on determining the consequences of these new findings.

119.   In August 2016, the article, "Gadolinium in Humans: A family of Disorders," was published in volume 207.2 of the American Journal of Roentgenology.

120.   In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on label that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

121.   On December 19, 2017, the FDA required a new class warning and other safety measures for all GBCAs for MRAs concerning gadolinium remaining in patients' bodies, including the brain, for months to years after receiving these drugs. Yet, as explained above, they continue to deny a causal relationship between the Gadolinium Deposition Disease and patient-victims' injuries and symptomology.

122.   Gadolinium Toxicity is underreported and underdiagnosed condition because of two decades of linguistically restrictive and discriminatory scientific bias/actions. This is but one example of how the status quo of biased institutional authority and dominance harms the American people and culture—all in the name of profit—and, how those who challenge the misinformation campaign get attacked. Over the past several years, since the link between GBCAs and NSF was acknowledged, patients with normal, slightly impaired and moderately impaired renal performance have been forming advocacy groups and coming forward to create awareness for their condition—a counter-maneuver to their systemic exclusion by the symbiotic medical, pharma and legal defense industries. As

- 28 -

explained above in detail, Plaintiff is one of these many survivors fighting to bring forth the truth and hold the culpable parties accountable.

## DEFENDANTS' KNOWLEDGE AND RESPONSIBILITY TO KNOW AND THE CONSEQUENCE OF THEIR ACTIONS:

123.   The linear GBCA Magnevist that was injected into Plaintiff, was manufactured by the Manufacturing Defendants and distributed by the Distributor Defendants. Manufacturing Defendants knew that their product, Magnevist, did not have very stable bonds and could come apart easily causing significant toxicity in humans.

124.   During the years that Defendants manufactured, marketed, distributed, sold their linear GBCA Magnevist, there have been numerous case reports, studies, assessment, papers, peer review literature, and other clinical data that have described and/or demonstrated three diseases in connection with the use of GBCAs: NSF, GDD and Gadolinium Toxicity. Also, there have been a significant number of publicized complaints and comments from individual patient-victims afflicted with the three diseases and others seeking to help these individuals.

125.   This information was all available to Defendants several years ago, and put them on notice of the issues that give rise to Plaintiff's cause of action alleged herein.

126.   Plaintiff received an MRA. During the time period when Plaintiff received the injection of the linear GBCA, Magnevist, Defendants knew or ought to have known that the use of GBCAs created a risk of serious bodily injury in patients with all degrees of kidney performance including, normal, near normal, slightly impaired, moderately impaired and severely impaired renal function. Yet, Defendants failed to warn Plaintiff and his healthcare providers about the serious health risk associated with GBCA Magnevist, and failed to disclose the fact that there were safer alternatives.

127.   As a direct and proximate result of receiving injections of the linear GBCA Magnevist, manufactured, distributed, marketed and distributed and sold by Defendants, Plaintiff developed Gadolinium Toxicity, the gadolinium-induced disease.

- 29 -

128.   Defendants have repeatedly and consistently failed to advise consumers and/or their medical providers of the causal relationship between linear GBCAs and the disease Gadolinium Toxicity (Gd Tx). Defendants knew or ought to have known of the risk of Gd Tx posed by linear GBCA Magnevist, to individuals in all ranges of kidney function from normal renal performance to severely impaired and obviously including the middle range, CKD, class 3.

129.   Defendants have known about the risks that linear GBCA Magnevist, posed to people with normal, slightly impaired and moderately impaired renal function for many years. Despite the well-documented evidence of gadolinium retention as listed above, Defendants have continuously failed to warn consumers and their medical providers on their product label.

130.   Defendants were also involved in prior litigation (San Francisco Superior Court Complex Civil Litigation and Federal MDL) involving this very product, and made statements about this product denying that it causes the types of injuries alleged in this complaint.

## APPLICATION OF THE DISCOVERY RULE:

131.   Defendants are estopped from asserting a statute of limitations defense because all Defendants concealed from Plaintiff the nature of Plaintiff's injuries and the connection between his injuries and all Defendants' tortious conduct.

132.   The nature of Plaintiff's injuries and damages, and their relationship to the linear GBCA, Magnevist, used in conjunction with MRAs, and Defendants' liability, was not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff, until less than two years before the filing of this complaint.

## PUNITIVE DAMAGES:

133.   Defendants' promises and warranties are false and their breach of warranty is a direct and proximate cause of Plaintiff's injuries and damages as set forth herein. Defendants withheld or misrepresented information required to be submitted under the

- 30 -

agency's regulations, and that withheld information was material and relevant to the harm in question. The FDA traditionally regards state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market and manufacturers have superior access to information about their drugs, especially in the post-marketing phase as new risks emerge. In this context, state tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve as a distinct compensatory function that may motivate injured persons to come forward with information. In keeping with the FDA's premise, the manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Therefore, the FDA long maintains that state law offers additional and important layer of consumer protection that compliments FDA regulation.

134.   Plaintiff seeks punitive damages because Defendants knowingly withheld and misrepresented information required to be submitted under the FDA agencies regulations and that information was material and relevant to the harm in question. Plaintiff's product liability action acts in a fashion akin to a private attorney general, since any damages on his punitive damage claim do not compensate him for his injury, but instead vindicate social interests. If Defendants had furnished the FDA with the complete information they had available to them, the FDA would have responded in a different fashion to Defendants' drug application.

## **FIRST CAUSE OF ACTION**

### **Product Liability: Design Defect and Failure to Warn:**

(By Plaintiff Against All Defendants)

135.   Plaintiff incorporates by reference and realleges each paragraph set forth above.

136.   Defendants' linear gadolinium-based contrast agents GBCA, Magnevist, was defective due to its design and inadequate warnings or instructions for use, both prior to marketing and post-marketing. Defendants knew or should have known that their product

- 31 -

1  created significant risks of serious bodily harm to consumers. Defendants failed to
2  adequately warn consumers and their medical providers of such risks.

3      137.  Because of Defendants' failure to provide adequate warnings with their
4  product, Plaintiff was injected with linear GBCA Magnivest, which Defendants
5  manufactured, designed, sold, supplied, marketed or otherwise introduced into the stream
6  of commerce. Defendants' product is the legal cause of Plaintiff's serious physical injuries,
7  harm, damages and economic loss. Plaintiff will continue to suffer such harm, damages
8  and economic loss in the future.

9      138.  Defendants knew that their product was unsafe and would cause serious
10  physical injury or even death to those who were exposed to the product yet failed to warn
11  those who would be exposed to the product of the serious safety risks of the product. This
12  allegation is sufficient to show despicable conduct carried on with a willful and conscious
13  disregard of the rights and safety of others per California Civil Code Section 3294(c)(1).

14      139.  The foregoing acts, conduct and omissions of Defendants were vile, base,
15  willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious
16  disregard for the health, safety and rights of Plaintiff and other users of Defendants'
17  products, and for the primary purpose of increasing Defendants' profits. As such, Plaintiff
18  is entitled to exemplary damages.

19                      **SECOND CAUSE OF ACTION**
20      **The Americans with Disabilities Act, 42 U.S.C. § 121011 et seq.**
21  (By Plaintiff Against All Defendants)

22      140.  Plaintiff re-alleges and incorporates by reference all preceding allegations in
23  the complaint as though fully set forth herein.

24      141.  Section 302(a) of Title III of the ADA, 42 U.S.C § 12101 et seq., provides:
25  "No individual shall be discriminated against on the basis of disability in the full and equal
26  enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of

- 32 -

27
28

any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

142.   Manufacturing Defendants are a public pharmaceutical company manufacturing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

143.   Distributor Defendants are public distributor and vendor companies distributing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

144.   Under section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny Adaptive Individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

145.   Under section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes among other things: "A failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantage, or accommodations to [Adaptive] individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no [Adaptive] individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

146.   The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff is an Adaptive Individual who has physical

- 33 -

disabilities that substantially limit his major life activities within the meaning of 42 U.S.C. § 12102(1)(A), (2)(A), and suffers exacerbated disabilities and injuries caused by the failure of both Defendants to provide safety policies and warning protocol afforded to others who belong to other classes and are not like-disabled and their failure to disclose safety risks to him and his class that they provided to other patrons of other classes, and their provision of inferior services, inferior to the services provided to those other consumers who are not like-disabled.

147.   Both Manufacturing and Distributor Defendants' actions constitute both intentional and effectuated discrimination and discriminate against Plaintiff on the basis of his disabilities in that Defendants, in their methods of manufacturing, selling and distributing their medical product, Magnevist, have constructed and implemented protection policies and warning protocols that excluded Plaintiff, an Adaptive person with disabilities, due to his disabilities. Their omission of his class from their warnings thereby denied him the same protection policies and warning protocol afforded others. Instead, they enforce a discriminatory definition of the consumers at risk of contracting the notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of potential harm *prior* to the use of their medical product.

148.   Defendants have constructed and implemented protection policies that deny Plaintiff any protection or warning services, make their protection policies governing their goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair protection from harm; and, indeed, injured him, because they enforce and maintain protection and warning services in a manner that discriminated against and excluded Plaintiff due to his disability

149.   Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct and policies, even after being notified of the discrimination that

- 34 -

1 such obstructive protection policies and warning protocols cause. These violations are
2 ongoing.

3      150.   Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set
4 forth and incorporated therein, Plaintiff requests relief as set forth below.

5 **THIRD CAUSE OF ACTION**

6 **California Civil Code § 51 et seq., The Unruh Civil Rights Act**

7 (By Plaintiff Against All Defendants)

8      151.   Plaintiff re-alleges and incorporates by reference all preceding allegations in
9 the complaint as though fully set forth herein.

10      152.   California Civil Code § 51 et seq. guarantees equal access for people with
11 disabilities to accommodations, advantages, facilities, privileges and services of all
12 business establishments of any kind whatsoever. Defendants are systematically violating
13 the Unruh Civil Rights Act, California Civil Code § 51 et seq.

14      153.   Manufacturing and Distributor Defendants are a "business establishments"
15 within the meaning of the California Civil Code § 51 et seq. Defendants generate millions
16 of dollars in revenue from the sale of medical goods in California through their California
17 centers and offices.

18      154.   Manufacturing Defendants manufacture the pharmaceutical product
19 Magnevist while the Distributor Defendants distribute it throughout California. During their
20 business, Defendants have denied Plaintiff, an Adaptive person with disabilities, full-equal-
21 fair goods and services that Defendants make available to other classes including the non-
22 disabled and not like-disabled public. Defendants are denying Adaptive patrons with
23 disabilities services they provide to enabled/non-disabled and not like-disabled patrons.
24 These violations are on-going.

25      155.   Both Manufacturing and Distributor Defendants' actions constitute both
26 intentional and effectuated discrimination and discriminate against Plaintiff on the basis of
27 his disabilities in that Defendants, in their methods of manufacturing, selling and

- 35 -

28

distributing their medical product, Magnevist, have constructed and implemented protection policies and warning protocols that excluded Plaintiff, an Adaptive person with disabilities, due to his disabilities. Their omission of his class from their warnings thereby denied him the same protection policies and warning protocol afforded others. Instead, they enforce a discriminatory definition of the consumers at risk of contracting the notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of potential harm *prior* to the use of their medical product.

156.   Defendants have constructed and implemented protection policies that deny Plaintiff any protection or warning services, make their protection policies governing their goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair protection from harm; and, indeed, injured him, because they enforce and maintain protection and warning services in a manner that discriminated against and excluded Plaintiff due to his disability

157.   Defendants violate the Unruh Civil Rights Act, California Civil Code § 51 et seq. in that the conduct alleged herein constitutes a violation of various provisions of the ADA, 42 U.S.C. § 12101 et seq., as set forth above. Section 51(f) of the California Civil Code provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Civil rights Act. Defendants' actions were and are in violation of the Unruh Civil Rights Act, California Civil Code § 51 et sec., and therefore, Plaintiff is entitled to remedy.

158.   Plaintiff is also entitled to statutory minimum damages pursuant to California Civil Code § 52 for each and every offense and reasonable attorney fees and costs.

///

///

///

///

- 36 -

Deuschel vs. Bayer Healthcare etc.                                        LACSC Case No. 19STCV46368
First Amended Complaint

## FOURTH CAUSE OF ACTION

### Negligence

(By Plaintiff Against All Defendants)

159.   Plaintiff incorporates by reference and realleges each paragraph set forth above.

160.   Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of the linear gadolinium-based contrast agents, GBCA Magnevist. They had a duty to ensure that their product did not pose an unreasonable risk of bodily harm and adverse events.

161.   Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of their linear GBCA, Magnevist, in that they knew or should have known that the product could cause significant bodily harm or death and was not safe for use by certain types of consumers.

162.   Defendants failed to exercise ordinary care in the labeling of their linear GBCA, Magnevist, and failed to issue to consumers and their medical providers adequate warnings concerning the risks of serious bodily injury due to the use of their linear GBCA, Magnevist.

163.   Though Defendants knew or should have known that their linear GBCA Magnevist posed a serious risk of bodily harm to consumers, Defendants unreasonably continued to manufacture and market their defective linear GBCA Magnevist, and failed to exercise reasonable care with respect to post-sale warning and instructions for safe use.

164.   At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care.

165.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

- 37 -

## FIFTH CAUSE OF ACTION

### Breach Of Express Warranty

(By Plaintiff against all Defendants)

166.   Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

167.   Through their product labeling, marketing, advertising, promotion, and educational efforts, including but not limited to creation and control of various aspects of the peer-reviewed medical and scientific literature, Defendants expressly warranted to Plaintiff and the healthcare community that linear GBCAs are safe and fit for their intended uses.

168.   Plaintiff and Plaintiff's healthcare providers read and relied upon Defendants' express warranties.

169.   Defendants breached said warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said express warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects.

170.   Defendants' breach of said express warranties was a factual cause of Plaintiff's injuries and damages as set forth herein. WHEREFORE, for the above reasons, Plaintiff demands judgment in Plaintiff's favor and against the Defendants for an amount in excess of $50,000.00 each, compensatory and punitive damages, incidental and consequential damages, including pain and suffering and mental anguish, delay damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## SIXTH CAUSE OF ACTION

### Breach Of Implied Warranty

(By Plaintiffs against all Defendants)

171. Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

- 38 -

Deuschel vs. Bayer Healthcare etc.                                          LACSC Case No. 19STCV46368
First Amended Complaint

172. Defendants developed, designed, formulated, tested, packaged, labeled, produced, created, marketed, advertised, distributed, and sold their linear GBCAs as safe for use by the public at large, including Plaintiff, who purchased these drugs.

173. Defendants knew the use for which their linear GBCAs were intended and impliedly warranted their linear GBCAs to be of merchantable quality, safe, and fit for a particular purpose.

174. Plaintiff and Plaintiff's healthcare providers relied on the skill and judgment of Defendants, and as such, their implied warranties, in using Defendants' linear GBCAs.

175. Plaintiff and Plaintiff's healthcare providers used Defendants' linear GBCAs for the ordinary purposes for which they were indicated for use and pursuant to Defendants' instructions, labeling, and guidance.

176. Defendants' linear GBCAs were defective and not of merchantable quality or safe or fit for their intended use.

177. Specifically, Defendants' linear GBCAs are unreasonably dangerous, unmerchantable, and unfit for the ordinary purpose for which they are intended and were used because they cause injuries, including but not limited to, retention of gadolinium in organs and tissues (e.g., brain, heart, liver, kidney, bones, and skin), resulting in fibrosis in organs, bone, and skin, and gadolinium's tendency to cross the blood-brain barrier and deposit in the neuronal nuclei of the brain, and foreseeable risks, which Defendants knew or should have known.

178. Defendants had reason to know that Plaintiff would purchase their linear GBCAs for the purpose of diagnostic imaging.

179. Defendants had reason to know that Plaintiff would rely on Defendants' skill or judgment to furnish and produce linear GBCAs in a safe and appropriate manner.

180. Defendants breached said implied warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said implied

- 39 -

warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects. 1

181. Defendants' breach of said implied warranties was a factual cause of Plaintiff's injuries and damages as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

182. Compensatory damages more than the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

183. Past and future medical expenses, income, and other economic damages in an amount to be determined at trial of this action;

184. Punitive damages as to the First, Second and Third Cause of Action on an amount to be determined at trial of this action;

185. Pre-judgment and post-judgment interest;

186. Attorney fees, if applicable, expenses and costs; and

187. Such further relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

188. In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.

DATED:  August 2, 2022                      ATTORNEY AT LAW

By: *Hoyt C Hart II*
HOYT E. HART, II, ESQ.
Attorney for Plaintiff,
MICHAEL DEUSCHEL

- 40 -

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael Deuschel<br>P.O. Box 1694<br>El Segundo, CA 90245<br>TELEPHONE NO.: 323-620-1231    FAX NO.:<br>ATTORNEY FOR *(Name):* Plaintiff Pro Per | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS:
MAILING ADDRESS: 111 North Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90245
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☑ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* two (2)
5. This case ☐ is ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*

Date: December 17, 2019
Michael Deuschel
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER | |
|---|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons -See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | | CASE NUMBER |
|---|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☑ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160 Abstract of Judgment | 2, 6 |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123 Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190 Election Contest | 2 |
| | | ☐ A6110 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☑ 8. ☐ 9. ☐ 10. ☐ 11. | 5601 DeSoto Ave.<br>Woodland Hills, CA 91367<br>Los Angeles County |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Woodland Hills | CA | 91367 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: December 17, 2019

_(SIGNATURE OF ATTORNEY/FILING PARTY)_

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 6

19STCV46368                                              August 11, 2022
**MICHAEL DEUSCHEL vs BAYER HEALTHCARE**                     9:00 AM
**PHARMACEUTICALS INC., et al.**

Judge: Honorable Elihu M. Berle            CSR: None
Judicial Assistant: D. Wortham             ERM: None
Courtroom Assistant: M. Molinar            Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Hoyt E Hart, II via LACC

For Defendant(s): No Appearances

Other Appearance Notes: Michael Deuschel Party via LACC;

**NATURE OF PROCEEDINGS:** Initial Status Conference

The matter is called for hearing.

The Court notes plaintiff filed an amended complaint on August 2, 2022.

Initial Status Conference is continued to 10/06/2022 at 08:30 AM in Department 6 at Spring
Street Courthouse.

The parties are ordered to meet and confer and file a Joint Initial Status Conference Report in
response to the Court's Initial Status Conference Order by September 23, 2022.

Plaintiff is directed to give notice

Minute Order                                              Page 1 of 1



## Superior Court of California, County of Los Angeles

---

### ALTERNATIVE DISPUTE RESOLUTION (ADR)
### INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

LASC1

---

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**

Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

- JAMS, Inc.: **Case Manager (213) 253-9776  mdawson@jamsadr.com**
- Mediation Center of Los Angeles: **Case Manager: (833) 476-9145  info@mediationLA.org**

**These organizations cannot accept every case and they may decline cases at their discretion.**

Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
NOTE: This service is not available for family law, probate or small claims.

b. **Los Angeles County Dispute Resolution Programs**
https://wdacs.lacounty.gov/programs/drp/
- Free, day- of- trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
- Free or low-cost mediations before the day of trial for these and other case types.
- For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. **Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

---

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit **http://www.courts.ca.gov/programs-adr.htm**

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: **www.lacourt.org/division/civil/settlement**

**Los Angeles Superior Court ADR website: www.lacourt.org/division/civil/settlement**
**For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm**

# COPY

## BY FAX

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
~~County of Los Angeles~~

DEC 26 2019

Sherri R. Carter, Executive Officer/Clerk of Court

By _____, Deputy
Steven Drew

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

Bayer Healthcare Pharmaceuticals Inc., Bayer Pharma AG; Bayer Corporation;
Bayer Healthcare LLC, –Additional Parties Attachment Form is Attached–

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Michael Deuschel

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is: | CASE NUMBER (Número del Caso):
(El nombre y dirección de la corte es): | **19STCV46368**
Los Angeles County Superior Court, Stanley Mosk Courthouse
111 North Hill St., Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Michael Deuschel, ~~P.O. Box 1094, El Segundo, CA 90245~~ 906 Hawthorne St. South Pasadena CA 91030

DATE: ~~December 17, 2019~~ DEC 26 2019     Sherri R. Carter, Clerk    Clerk, by STEVEN DREW , Deputy
(Fecha)                                                         (Secretario)                              (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)

[SEAL]

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): **Bayer Healthcare LLC**
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
            ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
            ☒ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
            ☐ other (specify):
4. ☐ by personal delivery on (date)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al. | 19STCV46368 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

McKesson Corporation, McKesson Medical Surgical Inc., Merry X-Ray Chemical Corporation, and Does 1 through 50, inclusive.

Page __1__ of __1__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1 | Hoyt E. Hart II SBN 125088
**ATTORNEY AT LAW**
2 | P.O. Box 675670
Rancho Santa Fe, CA 92067
3 | Tel: 858.756.1636
Fax: 858.756.1407
4 | hoyth@prodigy.net

5 | Michael Deuschel
406 Hawthorne Street
6 | South Pasadena, CA 91030
Tel: 323.620.1231
7 | mdeuschel@yahoo.com

8 | Attorneys for, MICHAEL DEUSCHEL

**FILED**
Superior Court of California
County of Los Angeles

08/02/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Molinar _____ Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

MICHAEL DEUSCHEL,

    Plaintiff,

    vs.

BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PARMA AG, BAYER CORPORATION; BAYER HEALTHCARE, LLC, McKESSON MEDICAL SURGICAL, INC. MERRY X-RAY CHEMICAL CORPORATION, and DOES 1 through 50, Inclusive,

    Defendants.

Case No.: 19STCV46368

**FIRST AMENDED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

    COMES NOW Plaintiff, Michael Deuschel (hereinafter "Plaintiff"), and alleges as follows:

///

///

- 1 -

Deuschel vs. Bayer Healthcare etc.
First Amended Complaint

LACSC Case No. 19STCV46368

Electronically Received 08/02/2022 11:13 AM

**PARTIES:**

*Plaintiff:*

1.      Plaintiff Michael Deuschel is a resident of the city of El Segundo, within Los Angeles County, in the State of California.

2.      Plaintiff suffers from Gadolinium Toxicity (Gd Tx). Gadolinium Toxicity is an incurable, painful disease. Plaintiff contracted Gd Tx when he received a Magnetic Resonance Arthrogram (MRA) using intravenous injections of a gadolinium-based contrast agent (GBCA) known as Magnevist.

*Manufacturing Defendants:*

3.      Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC and Does 1 through 20, inclusive (collectively referred to as the "Manufacturing Defendants"), manufacture, market, and sell Magnevist, a gadolinium-based contrast agent ("GBCA") that was injected into Plaintiff's body.

4.      Defendant Bayer Pharma AG is a foreign company domiciled in Germany. Bayer Pharma AG is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017).

5.      Defendant Bayer Healthcare Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in New Jersey. Defendant Bayer Healthcare Pharmaceuticals Inc.is the Untied States pharmaceuticals unit of Bayer Healthcare LLC. Bayer Healthcare Pharmaceuticals Inc. is engaged in the business of designing, licensing,

- 2 -

1  manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate

2  commerce, either directly or indirectly through third parties or related entities. This court

3  has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction

4  because said Defendant purposely availed itself of the benefits and protections of

5  California's state laws, and Plaintiff's claims arises out of Defendant's forum-related

6  activities. Specifically, Defendant conducted clinical trials of Magnevist within California,

7  which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose

8  v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal.

9  June 27, 2017).

10       6.       Defendant Bayer Corporation is an Indiana corporation with its headquarters

11  located in Pennsylvania. Defendant Bayer Corporation is engaged in the business of

12  designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing

13  Magnevist into interstate commerce, either directly or indirectly through third parties or

14  related entities. This court has personal jurisdiction over said Defendant under the doctrine

15  of specific jurisdiction because said Defendant purposely availed itself of the benefits and

16  protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-

17  related activities. Specifically, Defendant conducted clinical trials of Magnevist within

18  California, which became part of an unbroken chain of events leading to Plaintiff's injury.

19  See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504

20  (N.D. Cal. June 27, 2017). Defendant Bayer Corporation is duly authorized to conduct

21  business in the State of California and does business in Los Angeles County. Said

22  Defendant has elected to establish an agent for service of process in the State of

23  California.

24       7.       Defendant Bayer HealthCare LLC is a Delaware LLC with its headquarters

25  located in New Jersey. Bayer HealthCare LLC is engaged in the business of designing,

26  licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into

27  interstate commerce, either directly or indirectly through third parties or related entities.

- 3 -

1   This court has personal jurisdiction over said Defendant under the doctrine of specific

2   jurisdiction because said Defendant purposely availed itself of the benefits and protections

3   of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related

4   activities. Specifically, Defendant conducted clinical trials of Magnevist within California,

5   which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose

6   v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal.

7   June 27, 2017). Defendant Bayer HealthCare LLC is duly authorized to conduct business

8   in the State of California and does business in Los Angeles County. Said Defendant has

9   elected to establish an agent for service of process in the State of California.

10      8.      Defendants Bayer is a global pharmaceutical company and rakes in more

11  than $40 billion dollars per year. In 2016, Bayer merged with Monsanto to gain a footing in

12  agriculture or "Crop Science." The German based company's parent company IG Farben

13  had extensive ties to the Nazi Third Reich. It built a plant at Auschwitz and used prisoners

14  for slave labor and participated in human experiments on victims of concentration camps,

15  including the famous case of the 10 years old twins, Eva and Miriam. Bayer resolved that

16  lawsuit with a $5 billion fund for the, "Foundation of Remembrance." In 1913, Bayer

17  promoted Heroin use in children. In 1980 Bayer's division Cutter Biological sold HIV-

18  contaminated blood clotting medicines. Cutter made a heat-treated medication for

19  Americans but continued to sell the tainted medication in Argentina and parts of Asia. The

20  medication infected thousands in the U.S. and abroad with HIV and hepatitis-C. Many

21  died. Contemporaneously, Bayer has been repeatedly, successfully sued for defective

22  drugs and products including Yaz/Yasmin, a female hormonal birth control and Essure, the

23  female sterilization device. Here, at all times relevant to this complaint, the Manufacturing

24  Defendants advertised, promoted, marketed, distributed, and sold their linear GBCA

25  Magnevist in California and nationwide.

26      9.      The true names and capacities of those Defendants designated as DOES 1-

27  50 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 1-20

- 4 -

1  manufactured GBCAs that were injected into Plaintiff and/or manufactured MRA machines

2  with which MRAs were performed on Plaintiff using GBCAs. Plaintiff alleges on information

3  and belief that each of these fictitiously named defendants bears some legal responsibility

4  for events and damages set forth in this complaint.

5        10.    Plaintiff alleges on information and belief that DOES 1-20 were and are

6  companies authorized to do and are doing business in the State of California and have

7  regularly conducted business in the County of Los Angeles, State of California.

8        11.    Plaintiff will amend the Complaint if necessary to show the identity of each

9  fictitiously named defendant when they have been ascertained.

10        12.    The Manufacturing Defendants, along with DOES 1-20, are collectively

11  referred to as the Manufacturing Defendants.

*Distributor Defendants*

12        13.    Defendant McKesson Corporation ("McKesson") distributes Magnevist and

13  other GBCAs in California and elsewhere. Plaintiff alleges that McKesson distributed the

14  Magnevist and/or other GBCAs that were injected into Plaintiff.

15        14.    Defendant McKesson Corporation is a Delaware corporation with its principal

16  place of business and headquarters at One Post Street, San Francisco, San Francisco

17  County, California.

18        15.    McKesson Corporation is duly authorized to conduct business in the State

19  of California and does business in Los Angeles County.

20        16.    At all times relevant to this complaint, McKesson Corporation sold Magnevist

21  and other GBCAs in California and elsewhere. Plaintiff alleges that McKesson Medical-

22  Surgical, Inc. distributed the Magnevist and/or other GBCAs that were injected into

23  Plaintiff.

24        17.    Defendant McKesson Medical-Surgical, Inc. is a Virginia corporation with its

25  principal place of business and headquarters at One Post Street, San Francisco, San

26  Francisco County, California.

27        - 5 -

28

18.     Defendant McKesson Medical-Surgical, Inc. is duly authorized to conduct business in the State of California and does business in Los Angeles County.

19.     At all times relevant to this Complaint, Defendant McKesson Medical-Surgical, Inc. sold Magnevist and/or other GBCAs in Los Angeles County and elsewhere.

20.     Defendant Merry X-Ray Chemical Corporation ("Merry X-Ray") distributes Magnevist and/or other GBCAs in California and elsewhere. Plaintiff alleges that Merry X-Ray distributed the Magnevist and/or other GBCAs that were injected into Plaintiff.

21.     Defendant Merry X-Ray Chemical Corporation is a California corporation with its principal place of business and headquarters at 4444Viewridge Avenue, San Diego, California.

22.     Merry X-Ray Chemical Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County.

23.     At all times relevant to this Complaint, Merry-X-Ray sold Magnevist and/or other GBCAs in Los Angeles County.

24.     The true names and capacities of those Defendants designated as DOES 21-30 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 21-30 distributed GBCAs that were injected into Plaintiff. Plaintiff alleges on information and belief that each of these fictitiously named Defendants bear some legal responsibility for the events and damages set forth in this Complaint.

25.     Plaintiff alleges on information and belief that DOES 21-30 were and are companies authorized to do and are doing business in the State of California and have regularly conducted business in the County of Los Angeles, State of California.

26.     Plaintiff will amend this Complaint if necessary to show the identity of each fictitiously named defendant when they have been ascertained.

27.     McKesson, McKesson Medical-Surgical, Inc., and Merry X-Ray, along with DOES 21-30, are collectively referred to as the Distributor Defendants.

- 6 -

28. The Manufacturing Defendants and the Distributor Defendants are collectively referred to as the Defendants.

## JURISDICTION AND VENUE:

29. Jurisdiction and venue are both proper in Los Angeles Superior Court, in the State of California. This Court has personal jurisdiction over all parties named herein, as described above. Plaintiff is a resident of California. Three of the Defendants are residents of the State of California. Many of the acts and omissions related to Defendants liability occurred in California.

30. Diversity jurisdiction, as is required in federal district court for a case of this nature, does not exist here. Diversity jurisdiction requires "complete diversity," which does not exist if any plaintiff is from the same State as any defendant. 28 U.S.C. § 1332. Here, Plaintiff is a California resident. Defendants McKesson Corporation, McKesson Medical-Surgical, Inc., and Merry X-Ray are also California Residents. Therefore, there is not complete diversity of the parties and diversity jurisdiction does not apply.

31. Removal of this case to federal court would be improper due to the lack of diversity. Furthermore, this venue is convenient to the parties and is an appropriate venue for a multiple party product liability action.

## FACTS COMMON TO ALL CAUSES OF ACTION:

## THE SCIENCE OF A PHARMACOLOGICAL CRISIS:

32. This complaint concerns the FDA-approved linear gadolinium-based contrast agent (GBCA) Magnevist administered to patients intravenously by radiologists to enhance the quality of magnetic resonance imaging. When contrast dye is used, the magnetic resonance imaging procedure is referred to as a Magnetic Resonance Arthrogram (MRA).

33. Because Gadolinium is highly paramagnetic, it is effective for use in MRAs, and GBCAs have been developed as a 'safe' means of introducing gadolinium into the body in order to enhance the diagnostic imaging. Gadolinium is a chemical element that

-7-

1   does not naturally occur within the human body. The only known route for gadolinium to

2   enter the human body is injection of the GBCA. Gadolinium is highly toxic.

3       34.   Because raw Gadolinium is highly toxic, it must be coated. GBCAs are

4   actually a composite, or, "chelated" chemical construct. The Gadolinium is bound to a

5   protective outer shell, not unlike M&M candies' interior chocolate is bound by an exterior

6   hard-shell candy so not to melt in your hands. Yet, everyone knows what happens if they

7   are held onto for too long.

8       35.   Chelation is designed to protect the body by keeping the toxic heavy metal

9   from coming into contact with human tissue. There are two types of contrast agents

10  differentiated by their chemical structure: linear and macrocyclic agents. The main

11  difference is that the linear agents do not fully surround the gadolinium ion, whereas the

12  macrocyclic agents form a complete ring around it which creates a much more difficult

13  bond to break. Defendants' Magnevist is a linear agent. Linear GBCAs are far less stable

14  and more prone to separation of the raw Gadolinium from its chelated compound than the

15  macrocyclic GBCAs. Greater safety due to stronger bonds of the macrocyclic contrast

16  agents as compared to their linear contrast counterparts has been well established by

17  scientists. (Huckle, et al. 2016).

18      36.   When GBCAs are in the human body, chelation may separate from

19  gadolinium. This process is called "de-chelation." Once the GBCA is de-chelated, the

20  patient is exposed to the naturally raw, highly toxic Gadolinium, which then binds to tissue

21  or cells in the human biological structure; it even breaches the natural blood-brain-spinal-

22  cord barrier.

23      37.   This bio-chemical transfer process is known as, "Transmetallation." It occurs

24  because essential metals in the body such as copper, iron and zinc compete for GBCA's

25  outer "chelate" layer (Huckle, et al. 2016). Furthermore, emerging science demonstrated

26  the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) becomes very

27  weak and separates easily in low pH conditions such as those found in many

- 8 -

28

compartments of the human body including extracellular fluid spaces. Therefore, chelation fails for a variety of reasons, and soon thereafter, the "free" Gadolinium poisons the patient-victim; s/he suffers Gadolinium Toxicity.

38.     Gadolinium Toxicity (Gd Tx) is a man-made disease. It only occurs in patients who have received a GBCA for an MRA. Once de-chelation starts, not even healthy kidneys can clear/excrete the "free" Gadolinium fast enough to prevent poisoning. Gadolinium Toxicity does not discriminate and extends it reach to all patients exposed to de-chelated linear GBCAs. Consistent with this toxicology, decreased renal performance is not a pre-requisite for contraction of the disease, Gd Tx, though it increases susceptibility.

**RENAL PERFORMANCE, GBCAs AND GADOLINIUM TOXICITY:**

39.     Renal function of the patient is divided into six classes, normal/healthy and then five stages of impairment. Impaired renal function has been correspondingly classified into five categories: mildly impaired Chronic Kidney Disease, class 1 and 2; moderately impaired Chronic Kidney Disease, class 3; and severely impaired Chronic Kidney Disease Class 4 and 5.

40.     Kidneys play a vital role in the clearance/excretion of GBCAs but in themselves do not "cause" the toxicity, which is why the terminology for the deadly end range of Gd Tx, "Nephrogenic Systemic Fibrosis (NSF)" is medically misleading and semantically flawed. [1]     41.     Consistent with Nephrology, patients with reduced renal performance (kidney function) are at risk of reduced/slower clearance/excretion of GBCAs.

---

[1] NSF is a horrible disease where patients' skin and vital organs fibrose, become hardened. It is nick-named the "Rock Disease," because victims incur such severe limitations in their movement, they grow sedentary likes rocks as their skin hardens and scales, appearing "rock-like," while their internal organs suffer the same fate. Over five hundred (500) NSF cases were reported and it is estimated to be well over a thousand non-reported cases. Over 500 lawsuits were filed against GBCA manufacturers. All of them settled before trial except Decker vs. GE (Omniscan), which resulted in a $5 million-dollar verdict for Mr. Decker but not before he died from NSF.

This fact in turn increases the risk of de-chelation of the bonded GBCA occurring within the patient, because extended retention of the GBCA allows more time for de-chelation through Transmetallation to occur. This results in the creation of a new, unintended, toxic Gadolinium compound that can be retained within the body. The de-chelated deposited Gadolinium can remain for weeks, months and even years, while the patient-victim suffers Gd Tx, or awaits the release of the time-bomb.

**THE DEFENDANTS' FALSE INSISTENCES AND OMISSIONS:**

41.   In 1988, the FDA approved Magnevist for public consumption and Defendants and the FDA **insisted** linear GBCA Magnevist was safe for everyone. Yet, Defendants did not share all of its research with the FDA at the time of its approval and during subsequent revisions of its "Black Label Warnings."

42.   In 2007, almost 20 years later, Defendants and the FDA **insisted** only patients at the *end stages of renal disease classified in CKD, Class 4 and 5, with severely compromised kidney function*, were at risk. Indeed, de-chelated linear GBCAs caused the often-fatal end range of Gd Tx, namely, NSF. Yet, through their false insistence and omissions, Defendants and the FDA placed the *majority of patients* at high risk of the broader spectrum of Gd Tx.

43.   Ten years later, December 2017, almost 30 years after its approval, Defendants and the FDA recognized the beginning range of Gd Tx, namely Gadolinium Deposition Disease (GDD) but **insisted** only patients with *normal to mildly impaired renal function, including those classified in CKD, Class 1 and 2*, were at risk. Worse, Defendants and the FDA **insisted** no causal relationship exists between the notorious toxin, Gadolinium, and GDD patient-victims' injuries, whose symptomology may be milder than the devastating NSF but still debilitating.

44.   Now, almost 35 years later, and continuing, as the pharma-sponsored toxic semantics war continues, Defendants and the FDA **insist** the group sandwiched between the two recognized sub-sets of Gd Tx is not worthy of acknowledgement, let alone title.

- 10 -

45.    Notwithstanding their insipid, biased denial of causality, the tenets of logic and science including continuity, based upon his extensive medical evidence, **Plaintiff insists** that patients in the middle of those two recognized end points, not unlike the middle finger saddled between the two sets of outside fingers, *those patients classified in CKD class 3, with moderate impairment*, also suffer the linear GBCA-induced disease, Gd Tx. Indeed, patient-victims with *moderately impaired renal function, CKD, class 3*, develop persistent symptoms of Gd TX that arise minutes/hours/months/years after the administration of the linear GBCA Magnevist.

46.    *Yet, for 35 years and continuing,* Defendants and the FDA **insist** on piecemealing their supposed scientific admissions to slowly reveal Defendants' latest culpability.

47.    *For 35 years and counting,* Defendants and the FDA decided who deserved consideration and through their *false insistences and omissions,* refused to acknowledge the spectrum or continuity of toxicity and corresponding symptomology for the de-chelated, free, raw, highly toxic Gadolinium introduced to the patient-victims by the linear GBCA Magnevist, be it deposited or transitory. Yet, as is typical and consistent with all known tenets of toxicology, the middle range does exist, as did the entire range of susceptibility, all along.

**DEFENDANTS' DISCRIMINATORY AND TOXIC SEMANTICS WAR:**

48.    Defendants not only caused Plaintiff's key disability but for the last thirteen years, they discriminated against him because of it. Their restrictive definition and 13-year campaign to deny Plaintiff a valid diagnosis is discriminatory in that Defendants' animus and blatant denial of valid warning services is based upon and further aggravates Plaintiff's disabilities. Refusal to acknowledge his true disease/cause of disabilities/key disability, in fact caused by their linear GBCA, Magnevist, is a blatant denial of service and failure to fully-equally-fairly accommodate him. Their on-going campaign has had deleterious effect on Plaintiff's health and health care.

- 11 -

49. Contrary to Defendants' *discriminatory, exclusionary and oppressive* false definition of Gd Tx's semantic predecessor, NSF, and Defendants' incessant disinformation campaign, a patient-victim does not have to be diagnosed with *pre-existing, severely impaired* renal performance, nor classified as CKD, class 4 or 5, in order to contract NSF. The toxin will readily pummel the kidneys into submission and sufficiently oppress performance.

50. Gadolinium delivers a deadly combo-punch. The first chemical punch struck Plaintiff's kidneys. In fact, Plaintiff suffered, *"Transient Degradation."* His renal performance temporarily dropped from CKD, class 3, to CKD class 4. He suffered Renal Failure. The second chemical punch poisoned him as the stunned kidneys and stone-restricted urinary system could not clear/excrete the de-chelating GBCA. As the Kaiser radiologist confirmed, the dye was trapped for at least three days in his bladder. Within minutes, de-chelation began and by one hour, the toxin, Gadolinium, was released and poisoned its patient-victim. Gadolinium, and by extrapolation, its manufacturers and distributors profiting from systemized toxic-agent attacks, as well as intimidation and oppression, is/are two-faced terrorists: both suppressant and toxin.

51. NSF, GDD and any and all false insistences and omissions constitute a toxic game of semantics. NSF is the only toxin pathology that omits the known toxin from its terminology—a deception perpetrated by those responsible for the poisoning of patient-victims.

52. As with Lead Poisoning, Bayer's Roundup's Glyphosate cancerous herbicide, or Massengill's famous 1937 Elixir Sulfanilamide, when the FDA was overhauled due to its failings, the entire world, but for the terrorist-culprits, are better served by healthier, transparent semantics and inclusion of the properly identified toxin in the name of the toxicological disease as in this catastrophic iatrogenic injury, therefore better known as Gadolinium Toxicity, Gd Tx.

- 12 -

53.     Medical and scientific communities' reticence to acknowledge the absurdity of intravenously injecting a notorious toxin into humans, humans already ill, or else they would not be receiving MRAs to diagnose their medical conditions, informs the tragic origin of Gd Tx. There also exists industry and FDA bias and institutionalized reluctance to acknowledge there exists a safer option—if it has to be used at all.

### A SUPERIOR SAFER PRODUCT EXISTS:

54.     A superior product that could achieve the same radiological results but place the patient at less health risk is macrocyclic GBCAs. Yet advocacy to replace linear GBCAs with macrocyclic GBCAs sorely lags the evidence. Though the FDA and medical, scientific communities were misled by the manufacturers of linear GBCAs, they grew so individually and collectively complacent and invested in the use of the linear GBCAs, they forfeited the will to protect the public and advocate for use of the safer, readily available macrocyclic GBCA.

55.     In 1992, the FDA approved the first macrocyclic GBCA, ProHance. Hence, macrocyclic GBCAs have long been readily available as alternatives to their linear counterpart. They are more stable, less prone to de-chelation, and represent a safer alternative to liner GBCAs—if they must be used at all. Therefore, Defendants knew or should have known about the different risks and safety between the two types of GBCA products. Yet, for 35 years and counting, they chose not to warn the FDA and medical community and failed to alter the design of the linear GBCA to comport with that of their macrocyclic competitors. Instead, the nearly four decades of patient-victim poisoning is perpetrated for profit—the result of corporate avarice.

### DEFENDANTS' LINEAR GBCA MAGNEVIST IS DEFECTIVE:

56.     Defendants' linear GBCA Magnevist was not reasonably fit, suitable or safe for its intended purpose, i.e., use on ill patients receiving MRAs for medical diagnostic purposes. The substantial incidence and severe degree of injury inherently distinguishes this toxicity crisis from a mere rare occurrence or an occasional accident. It is a medical

- 13 -

disaster of epic proportions with tragic consequences for the patient-victim of the disease, Gadolinium Toxicity. Defendants concealed relevant information during the FDA approval process and subsequent reevaluations and revisions of its Black-Label Warning. Defendants' product deviated from specifications, formulae or performance standards of manufacturing or from otherwise identical units manufactured to the same specifications or formulae (manufacturing defect), failed to contain adequate warning (warning defect), and was designed in a defective manner (design defect).

57.    Defendants' linear GBCA was defective, the defect existed when the product left the defendants' control, and, the defect caused Plaintiff's injury—the reasonably foreseeable user of the defective medical product. Defendants had a duty to warn and it rendered its own product defective—in addition to its design defect—by failing to adequately warn all foreseeable users that the product can cause injury to them. Defendants' failures to warn constitute a breach of duty. They had a duty to warn intended users about any and all risk related to their product that it knew or ought to have known. Yet, Defendants published no such warning.

58.    The risk posed by Defendants' linear GBCA Magnevist outweighs its intended utility, and, the product could have been designed in a readily-available safer alternative manner such as the design of macrocyclic GBCAs, so to minimize the risk of harm. Defendants' failure to implement the known, affordable and available changes to its design and manufacturing practice, namely, design of macrocyclic GBCA, a feasible and safer alternative design, and its omission by Defendants, rendered the linear GBCA Magnevist to be unreasonably unsafe. Defendants drug danger and risk to foreseeable consumer's health are the direct result of its chemical design and active ingredient, Gadolinium. If defendants' linear GBCA Magnevist had been designed without defect, Plaintiff's injuries would have been avoided.

59.    Defendants' linear GBCA Magnevist caused Plaintiff to contract the disease Gd Tx, known as GDD at the beginning stage of the toxicological spectrum and NSF and

- 14 -

1   the end stage of the continuity of poisoning. Plaintiff suffered a complex symptomology

2   detailed below because Defendants failed to warn him of the health risks associated with

3   their medical product.

4       60.   In their course of business, Defendants breeched their expressed warranty.

5   Defendants made an affirmative promise in their description of Magnevist that their

6   product was safe. In the competitive pharmaceutical industry, Defendants' promise was an

7   integral element of their marketing and eventual sale of their product to medical

8   professionals and subsequent use of it in patients during MRAs. Alas, the product fell far

9   short of their promises of utility and safety. They represented that their linear GBCA was

10  generally safe to use on all patients; that the linear GBCA is not any less safe than

11  Macrocyclic GBCAs; that linear GBCAs are contraindicated only in patients with *pre-*

12  *existing, severe chronic renal impairment*; that retention of de-chelated Gadolinium in

13  patients without severe chronic kidney disease is *harmless*.

14      61.   Yet, clinical features of Gadolinium Toxicity include persistent headaches,

15  bone and joint pain, clouded mental activity, cerebral and neuropathic disorders,

16  orthopedic disorders and dermatological disorders, subcutaneous soft-tissue thickening

17  that clinically appears somewhat spongy or rubbery, painful and thickened tendons and

18  ligaments in a comparable distribution; excruciating pain, typically in the distal distribution

19  but may also be in the torso and ribs or generalized, often described as feeling like sharp

20  pins and needles, cutting and burning. Gd Tx often progresses to painful inhibition of the

21  ability to use the arms, legs, hands, feet and other joints. Gd Tx is a progressive disease

    for which there is no known cure.

22              **PLAINTIFF'S JOURNEY OF GD TX HORRORS:**

23      62.   In June 2009, while FDA quibbled over the appropriate black label warning to

24  require the manufacturers/distributors of the linear GBCA Magnevist to apply to their

25  product box—for about a six-week period—when Plaintiff received the MRA and was

26  injected with the linear GBCA Magnevist—there was no black label or an inadequate

                                    - 15 -

27

28

warning on its product box. It did not warn Plaintiff or his medical providers of the danger their product posed to him and patient-victims like him, namely, the risk of contracting Gd Tx for CKD, class 3 patients.

63. Prior to June 12, 2009, Plaintiff completed and submitted his Kaiser Permanente MRI/MRA Questionnaire; he listed his Chronic Kidney Disease, (CKD) class 3. Plaintiff had pre-existing moderately impaired renal dysfunction, CKD, class 3, and a history of kidney stones. He also inquired with the MRI staff and asked if he should receive a blood test to confirm his renal function. They declined and assured him he faced no health risk from the MRA.

64. June 12, 2009, Plaintiff received the MRA to rule out an acoustical neuroma during a differential diagnosis to ascertain the cause of his tinnitus, ringing in the ear. He was intravenously injected with the linear GBCA, Magnevist. Upon the injection, he felt a burning sensation throughout his body. Less than an hour after the injection, Plaintiff collapsed and suffered overwhelming, debilitating symptoms. He returned to the same Kaiser medical center.

65. Yet, Kaiser Permanente immediately initiated an adversarial campaign against Plaintiff. It initially refused to admit Plaintiff into the ER and left him to suffer in excruciating pain until a contingency of fellow ER patients advocated on his behalf for admission.

66. The next day, Kaiser insisted Plaintiff's injury was caused by a one-millimeter kidney stone lodged in his urethra and advised surgery to extract it. He received the surgery but his kidneys continued to fail; his GFR dropped from 52 to 28. Such renal failure is an unusual renal response to stone extraction—something else was wrong. For the week, Kaiser drugged Plaintiff into a semi-conscious state to conceal their fault, when dialysis was in order. (In contrast, two years earlier, Plaintiff received surgery to extract kidney stones that were 5mm in size. His renal performance swiftly returned to their baseline after the stones extraction.)

- 16 -

67.    Plaintiff's initial symptoms included renal failure, excruciating pain, delirium, debilitation, numbness and sharp, painful tingling sensation throughout his body, severe fatigue, restless leg-type syndrome, limb and rib pain, memory loss and cognitive impairment.

68.    In Plaintiff's case, no preexistent disease or subsequently developed disease of an alternate known process is present to account for his symptoms. He experiences symptoms consistent with the known toxic effect of *de-chelated and retained* Gadolinium, Gd Tx.

### PLAINTIFF'S SUSTAINED INJURIES:

69.    Had Plaintiff and/or his medical provider been warned about the risks associated with the linear GBCA Magnevist, he would not have been administered Magnevist and would not have been inflicted with the disease, Gadolinium Toxicity.

70.    As a direct and proximate result of being administered GBCA Magnivest, Plaintiff has been rendered permanently disabled and has suffered and continues to suffer:

(1) *Brain/Head Neurological Injuries* including Cerebral Atrophy; Cranial Nerve Root Damage including Trigeminal and Occipital Neuralgias; Vestibular Disorders, Neuro-Ophthalmological Disorders; Hearing Loss, exacerbated Tinnitus, Atrophied and Scarred Vocal Cords; Oral, dental and jaw injuries; Pituitary Adenoma/Rathe Cyst and sinus polyps;

(2) *Spinal Injuries, both Orthopedic and Neurological Injuries* including Adhesive Arachnoiditis, Cervical Vertebral and Intervertebral Disc Degradation and Bilateral Peripheral Radiculopathy; Dorsal Arachnoid Web and resulting severe thoracic spinal cord compression; Schmorl's Nodes; Tarlov Cysts; Hemangioma; Herniated Discs; Sacroiliitis;

(3) *Heart Disorders* including Sick Sinus Node Syndrome and Chronotropic Incompetence;

(4) *Vascular Disorders* including Deep Venus Reflux Disease, arterial blockage and varicocele;

- 17 -

(5) *Pulmonary Disorders* including Restricted Breathings;

(6) *Orthopedic Disorders and Injuries* including Osteoporosis; Osteoarthritis; Bilateral Shoulder and Hip Injuries; Bone and Joint Pain;

(7) *Systemic and Tissue Disorders and Injuries* including Ankylosing Spondylitis; calcified tendons; carpal tunnel and cubital ulnar nerve impingement; stenosing tenosynovitis; dermatological/fibrotic disorders with ulcerated rashes, excessive scarring and deformed skin.

71.     From 2009 through 2022, as a direct and proximate result of being administered GBCA Magnevist, Plaintiff has received about forty major surgeries and about sixty minor procedures including two brain surgeries, revision cranioplasty; five neurostimulator surgeries, three vocal cord surgeries; two nasal-polyp surgeries; multiple oral surgeries; two cardiological implant surgeries; four cervical spine surgeries; four pelvic surgeries; three lower abdominal surgeries; bilateral varicocelectomies, bilateral carpal tunnel surgeries.

72.     More than 50% of his surgeries are delayed, on average, for 3.75 years, while providers deny him the appropriate, timely surgeries due to bias, disbelief and Medi-Cal's abysmally low reduced reimbursement rate, extending his suffering to abhorrent levels of torture.

73.     As a direct and proximate result of being administered linear GBCA Magnevist, Plaintiff has been prescribed about eleven more surgeries, including: (1) cervical spine revision surgery—denied for 2 ½ years, (2) thoracic spinal cord surgery—denied for 5 years, (3/4) bilateral shoulder surgeries—denied for 9 years; (5/6) bilateral elbow surgeries—denied for 8 years, and (7/8) bilateral hip surgeries—denied for 9 years; (9) neurostimulator replacement surgery—denied for 5 years; (10) oral surgeries—denied for 9 years; and (11) bunion surgery—denied for 2 years. To treat Plaintiff's exacerbated disabilities caused by Gd Tx disease, he has received and is pending approximately 111 procedures.

- 18 -

74.    As a direct and proximate result of being administered GBCA Magnevist, Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future and has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

### THE CAMPAIGN TO OPPRESS PLAINTIFF:

75.    June 12, 2009 through August 10, 2010, Kaiser conspired against Plaintiff and lied to him about the chemical they injected into him during the MRA. In the attempt to expire the California one-year statute of limitation for medical negligence, for the fourteen months following the tragic injection, they repeatedly falsely asserted they administered an *iodine-based-contrast-dye* on June 12, 2009.

76.    August 2010, Plaintiff obtained the real Radiology report and learned Kaiser injected him with the linear *Gadolinium-Based-Contrast-Agent,* Magnevist. Kaiser's physicians concealed a second critical fact for the same fourteen months: Three days after the Magnevist injection, the radiologist confirmed the contrast dye remained trapped in Plaintiff's bladder.

77.    The GBCA's chelation began to break-down after only a few hours, poisoning Plaintiff, promptly. This explains why he balled up in a fetal position in his hospital bed and howled in pain for seven days.

78.    From 2009 through 2013, Kaiser's Nephrologists, Allergists, Dermatologists, Endocrinologists, Orthopedists, Primary Care Providers and Toxicologists at three separate medical centers refused Plaintiff testing of gadolinium in either his blood, skin or bone specimens that were extracted from him during his surgeries. Kaiser confirmed they retained the samples but falsely claimed there was no available method of testing for retained gadolinium.

79.    In 2011, Social Security assessed Plaintiff disabled; he was assigned to Medi-Cal.

- 19 -

80.     Starting in 2012, during mandatory arbitration for medical negligence, Kaiser presented numerous medical experts to *refute* his allegation that he suffered Nephrogenic Systemic Fibrosis (NSF)—the only term available at the time for the adverse impact of retained de-chelated Gadolinium on a patient-victim.

81.     Instead, Kaiser, and the legal and medical community at large, argued that a patient must be diagnosed with *"Pre-Existing, severely impaired* renal performance, and categorized as CKD, Class 4 or 5, and/or, be on dialysis, in order to sustain NSF. Plaintiff's own lawyer hired a supposed expert with a dubious reputation who falsely testified Plaintiff did not suffer NSF but instead fabricated his disorders and injuries and suffered Somatization Disorder.

82.     Alas, the Kaiser arbitrator dismissed Plaintiff's complaint and ruled in Kaiser's favor; Plaintiff was "Defensed." 2014, Plaintiff withdrew from Kaiser—after they refused him critical surgeries that the California Department of Social Services ordered performed.

**TRANSFER OF CARE FAILED DUE TO THE SAME DISCRIMINATION:**

83.     2014 through present, Plaintiff sought care from UC Regents and Cedars Sinai. Yet, there, physicians refuted Plaintiff was poisoned by the de-chelated, retained linear GBCA Magnevist and refused to test him for Gadolinium retention. Consequently, he was thrust into untenable positions as he needed their medical services including surgeries but suffered from his opponents overwhelming contempt for his true medical condition. They refused to test him for Gadolinium Retention and refused to include him in on-going support groups and studies for NSF. This oppressive campaign to silence him manifested in an, "Either/Or," demand: "Stop complaining about NSF—because you don't have it—or you will not receive surgeries!"

**THE TIDE OF INTOLERANCE EBBED—ALMOST:**

84.     Early 2018, Plaintiff was moved by four new notable developments. First, he learned the actor Mr. Chuck Norris and his wife, Geena, filed suit for Gadolinium

- 20 -

Deposition Disease, GDD, and this way learned about pharmaceutical product liability. Second, medical providers began discussing GBCA-induced diseases for patients classified along the *entire* spectrum of kidney function from normal to impaired renal function and in all classes of Chronic Kidney Disease, CKD, classes 1 through 5. Third, physicians timidly began to suggest that Plaintiff was "allergic," to Gadolinium. Fourth, prayer.

85.    The overwhelming oppression that excluded Plaintiff from appropriate and timely medical treatment and precluded any form of justice began to wane. The flawed premise that there is only one *restrictively-defined* gadolinium-induced disease, NSF, and <u>only</u> patients with *pre-existing, severely impaired* renal performance could contract NSF, began to crumble with the acknowledgment of Gadolinium Deposition Disease, GDD.

86.    As discussed above, Gadolinium is a *notorious* neuro and osteo toxin, and begins to poison its victims within hours. Yet, as late as 2017, the FDA forfeited its credibility when it argued there was no demonstrable proof of causation of injury by toxicity by retained de-chelated gadolinium in the human body for GDD patient-victims.

87.    Yet, their trick is a mere sleight of hand. After decades of unethically denying the disease Gd Tx for anyone but CKD, class 4 and 5 patient-victims, they finally admitted what the rest of the world established: De-chelated gadolinium indeed deposits within its victims' bodies and even traverses the blood-brain barrier and deposits within their brain and spinal cord. Yet, medical professionals continue to protect themselves, the linear GBCAs' manufacturers and their trillion-dollar enterprise by continuing to deny the conspicuous causal relationship between sustained injuries and the linear GBCA. The majority of research into Gadolinium is funded by GBCAs manufacturers and is therefore biased. They oppress the victims of their animus and by the disproportionate power of their office, profession and pharmaceutical lobbying dollar, *they conceal the truth*, and thereby render the disempowered Gd Tx patient-victims, *"invisible."*

Deuschel vs. Bayer Healthcare etc.                                LACSC Case No. 19STCV46368
First Amended Complaint

**WORD-PLAYS ABOUND AND INADVERTENTLY INCLUDE PLAINTIFF:**

88.    In September 2019, Plaintiff learned that in 2017, Dr. Jeffrey Brent spoke at FDA's MIDAC's 2017 conference. He stated "We know NSF is a disease. It is very clear-cut unambiguous disease caused by gadolinium retention in patients *who have renal failure* ... NSF is unmistakable, easy to diagnose, clear-cut, limited but devastatingly serious clinical condition, limited in the sense of clinical manifestations." (FDA's MIDAC 2017 Conf.) [Emphasis added.]

89.    Dr. Brent slyly employed a contemporaneous revision of the antiquated operative definition that unfortunately dominated the legal and medical symbiotic industries for the preceding ten years and restricted acknowledgment of patient-victims to only those with *pre-existing, severe* renal failure and pre-diagnosed with CKD class 4 and five, *only*.

90.    In September 2019, Plaintiff learned that in August 2019, Judge David G. Campbell, Senior United States District Judge, ceaselessly criticized Plaintiff's experts, but stated, "We have a recognized disease of NSF in *renally-impaired* patients and its accepted link to GBCAs." As with Dr. Brent, his remark is the linguistic equivalent of a sleight of hand, contemporaneously revising the antiquated and discriminatory operative definition that restricted NSF for the preceding ten years to CKD class 4 and 5, patient-victims, *only*. (Case 2:18-cv-01159-DGC, Davis v McKesson Corp., Order 08/02/2019, page 14.) [Emphasis added.]

91.    The original, highly restrictive operative definition of NSF, the only disease recognized by the FDA and medical industry for ten years, <u>excluded Plaintiff based upon a false assertion</u>, and wrongfully denied his disease and thereby substantially aggravated it. Whereas now, it is simply, "renal failure," which clearly includes Plaintiff.

92.    Alas, as recently as 2020, the medical industry and prominent medical centers like UC San Diego continued to abuse, harass, injure, mock and oppress Plaintiff for his claim that he contracted the disease, Gd Tx. Gd Tx is an all-inclusive term that accommodates the varied degree of injury sustained by patient-victims in proportion to the

- 22 -

1  impact the GBCAs' de-chelated and retained gadolinium has upon them, often but not
2  always proportional to their degree of kidney function, be it pre-existing or "Post-GBCA-
3  Injection" renal performance.

4  **THIRTEEN YEARS OF RESISTANCE AND OBSTRUCTION:**

5  93.   For thirteen years from 2009 through the present, the polluters and their
6  protectors, big pharma and the FDA, have yet to acknowledge Plaintiff's range of their
7  man-made disease. The self-serving, self-preserving symbiotic Medical—Pharma—FDA—
8  Legal Defense Industries (MPFL) perpetrate a concerted, overwhelming effort to obstruct
9  patient-victims like Plaintiff. Kaiser, UC Regents and Cedars refused Plaintiff's requests to
   test for Gadolinium though there was no other cause for the continuing decline in his
10 health. They capitalized upon the vast difference in their resources to exploit Plaintiff's
11 vulnerability and immediate surgical needs, to thwart his search. They refused to perform
12 surgeries that their own physicians prescribed. They threatened to and ultimately
13 "discharged," him, when he would not remain silent. Their drive to protect themselves,
14 their profits and status quo had a deleterious impact upon Plaintiff as it would have upon
15 any patient-victim under the same circumstances.

16 94.   Providers denied Magnevist inflicted the horrific injuries Plaintiff sustained
17 and denied him appropriate, timely surgeries and allowed him to suffer. <u>They exercised</u>
18 <u>their dominance in a cruel manner in order to protect their profits and to avoid</u>
19 <u>acknowledging that their ongoing use of linear GBCAs may pose an unacceptable risk to</u>
20 <u>all of their patients.</u>

21 95.   In an insidious manner, they refused to accept Medi-Cal supposedly due to
22 its reduced reimbursement rate but it felt like coercion to Plaintiff to capitulate to their
23 demand to remain silent about Magnevist, its de-chelation and his retention of
24 gadolinium—if he wanted the prescribed surgeries and to survive—a demand he could not
25 morally or physically tolerate.

26

27  - 23 -

28

96.     Plaintiff has not heard of a scientific, consensus-derived term for the medical disease that patients with pre-existing CKD, class 3, sustain from "free" Gadolinium. Therefore, based upon his medical evidence, he identifies as a patient-victim of the all-inclusive, continuity-based logical term, Gadolinium Toxicity, and advances this complaint, accordingly.

**OTHER CAMPAIGNS TO ROUST THE TRUTH:**

**SOME OF THE INFORMATION DEFENDANTS CONCEALED:**

97.     In 1984—prior to FDA approval—the inventors of GBCAs falsely claimed that their product Gd-DTPA did not cross the blood-brain barrier, and that the bonds between the toxic gadolinium and its protective coating did not break down inside the body, and that there would be no toxic gadolinium residue left behind to cause illness.

98.     Yet, since at least 1984, stability differences among GBCAs have been recognized in laboratory (in vitro). Since 1984, deposition of toxic gadolinium in tissues has been described in animal models (in vitro). Peer review articles were published on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences.

99.     In 1988, the FDA approved of Magnevist, the first GBCA to reach the market.

100.    In 1988, it was recognized that gadolinium was breaking free from the bonds in the linear GBCAs as they grew weak under certain conditions and locations within the human body. (Huckle, et al. 2016)

101.    In September 1989, what may have been the first report of toxic gadolinium retention in humans was published, a little over one year after approval of Magnevist. Authors Tien, et al. reported that intercerebral masses "remained enhanced on MRI images obtained 8-days after injection of gadolinium DTPA dimeglumine—Magnevist. Subsequent chemical analysis revealed a high concentration of gadolinium remained in the tissue.

- 24 -

102.    In 1991, Pharmacokinetic studies indicated that gadolinium retention was occurring in people with normal, slightly impaired and moderately impaired renal function. [2]

103.    In 1998, the first major study that showed deposition in patients with renal failure was published. (Huckle, et al. 2016)

104.    In 2004, the first major study that showed deposition in patients with normal renal function was published. (Huckle, et al. 2016)

105.    In 2004, gadolinium was shown to be deposited in the resected femoral heads of patients who had undergone gadolinium-chelate enhanced MRA studies. [3] Since then, studies have continued to indicate that gadolinium remains within patients' bodies long after the suggested half-life.

106.    Over the next eighteen years, more evidence was forthcoming, and research began to flourish regarding the release of toxic gadolinium from the linear contrast agents such as Manevist, and its long-term retention in the bodies of animals and humans.

107.    The laboratory (in Vitro) studies assessing the stability of each GBCA in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents which showed superior stability. The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was cleared/excreted out of the body according to the claimed drug's half-life, before the chelate could release the toxic gadolinium. However, as discussed above, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to

---

[2] Schmann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. Invest Radiol., 1991: 26:975-979.
[3] Gibby WA, Gibby KA, Gibby WA. Comparison of GD-DTPA-BMA (Omniscan) versus GD HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. Invest Radiol., 2004: 39:138-142.

1    be released in the bodies of patients. In addition, a delayed elimination phase of the GBCA

2    would later be discovered.

3         108.   In 2006, the Food and Drug Administration (FDA) voted to issue a black box

4    warning on all gadolinium-based contrast agents. This was prompted by Nephrologists

5    and other scientists connecting the administration of GBCAs, including Magnevist, to the

6    rapidly progressive debilitating and often fatal disease called Nephrogenic Systemic

7    Fibrosis (NSF).

8         109.   In 2012, patients sent several strongly worded letters with scientifically-

9    supported research data to the FDA, warning about the occurrence of gadolinium toxicity

10   in those with normal renal function following injections of GBCAs. Correspondence was

11   confirmed.

12        110.   Symptomatic patients started to obtain documentation of high levels of

13   gadolinium in their blood and urine several days, weeks, months and even years after their

14   exposure to GBCAs. Many patients even had tissue biopsies of various parts of their body

15   that showed additional evidence of retained gadolinium years after their exposure.

16        111.   In 2012, Defendants corrected their label to include contraindications for use

17   in patients with kidney disease and acute kidney injury. Yet, Defendants have failed to

18   update their label to reflect the extensive evidence of gadolinium retention in people with

19   normal, slightly impaired and moderately impaired renal function and to warn of the likely

     probability of the de- chelation that will expose the patient to "free" toxic gadolinium.

20        112.   Because obvious signs of clinical pathology associated with NSF were only

21   "seen," and "acknowledged," in patients who had *severely impaired* renal performance,

22   i.e., CKD, class 4 and 5, it was widely—BUT ERRONEOUSLY—assumed by the public

23   and medical profession alike that people with normal kidney performance or slightly to

24   moderately impaired renal function were not getting sick and there were no other

25   concerns. However, research continued to report evidence that toxic gadolinium was being

26   stored in people with normal, slightly reduced and moderately reduced renal function.

27                                          - 26 -

113.   Although many patients with debilitating symptoms who had normal, slightly impaired and moderately impaired renal function that received injections of GBCA had already been reporting adverse reactions for years to the FDA, manufacturers and poison control, no link between gadolinium and their symptoms were ever officially made public. This is partially because blood and urine testing for gadolinium only became available recently, but it is primarily due to scientific bias. Most physicians would not allow themselves to be aware of any disease that was associated with gadolinium other than NSF, which is said to only occur in patients with pre-existing severe renal impairment and categorized as CKD, class 4 and 5.

114.   The de-evolution of scientific bias that allowed for an evolving admission of a wider pool of patient-victims was slowly and intermittently extended and tested within the scientific community, medical institutions as well as the United States Federal Courts, with the sleight-of-hand semantical substitution of "severe renal failure" and "preexisting CKD, class 4 and 5," with the less restrictive and more inclusive qualifier, "renal failure." As noted above, the vocabulary-substitute gained wider use but without any fanfare, let alone admission of the decades of abuse caused by its linguistic predecessor, NSF, and the symbiotic-industries' bias.

115.   In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of GBCAs up to several years prior. They found that the brain had hyperintense signals in critical areas of the brain. They were very alarming findings.

116.   In 2014, scientists at the Mayo Clinic confirmed these findings when autopsy studies were performed on thirteen (13) diseased individuals, all of whom had normal or near normal renal function and who had received six or more injections of GBCAs in the years prior. Up to 56mcg of gadolinium per gram of desecrated tissue were found within the patients' brains.

- 27 -

117.    As these new findings emerged, the entire radiology community was put on high alert. With several large universities conducting research to further address this concern.

118.    In July 2015, and in direct response to the Mayo Clinic study's findings, the FDA issued a new public safety alert. The FDA is evaluating the risk of brain deposits from repeated use of GBCAs use in MRAs and they now have their National Center for Toxicological Research team working on determining the consequences of these new findings.

119.    In August 2016, the article, "Gadolinium in Humans: A family of Disorders," was published in volume 207.2 of the American Journal of Roentgenology.

120.    In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on label that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

121.    On December 19, 2017, the FDA required a new class warning and other safety measures for all GBCAs for MRAs concerning gadolinium remaining in patients' bodies, including the brain, for months to years after receiving these drugs. Yet, as explained above, they continue to deny a causal relationship between the Gadolinium Deposition Disease and patient-victims' injuries and symptomology.

122.    Gadolinium Toxicity is underreported and underdiagnosed condition because of two decades of linguistically restrictive and discriminatory scientific bias/actions. This is but one example of how the status quo of biased institutional authority and dominance harms the American people and culture—all in the name of profit—and, how those who challenge the misinformation campaign get attacked. Over the past several years, since the link between GBCAs and NSF was acknowledged, patients with normal, slightly impaired and moderately impaired renal performance have been forming advocacy groups and coming forward to create awareness for their condition—a counter-maneuver to their systemic exclusion by the symbiotic medical, pharma and legal defense industries. As

- 28 -

explained above in detail, Plaintiff is one of these many survivors fighting to bring forth the truth and hold the culpable parties accountable.

### DEFENDANTS' KNOWLEDGE AND RESPONSIBILITY TO KNOW
### AND THE CONSEQUENCE OF THEIR ACTIONS:

123. The linear GBCA Magnevist that was injected into Plaintiff, was manufactured by the Manufacturing Defendants and distributed by the Distributor Defendants. Manufacturing Defendants knew that their product, Magnevist, did not have very stable bonds and could come apart easily causing significant toxicity in humans.

124. During the years that Defendants manufactured, marketed, distributed, sold their linear GBCA Magnevist, there have been numerous case reports, studies, assessment, papers, peer review literature, and other clinical data that have described and/or demonstrated three diseases in connection with the use of GBCAs: NSF, GDD and Gadolinium Toxicity. Also, there have been a significant number of publicized complaints and comments from individual patient-victims afflicted with the three diseases and others seeking to help these individuals.

125. This information was all available to Defendants several years ago, and put them on notice of the issues that give rise to Plaintiff's cause of action alleged herein.

126. Plaintiff received an MRA. During the time period when Plaintiff received the injection of the linear GBCA, Magnevist, Defendants knew or ought to have known that the use of GBCAs created a risk of serious bodily injury in patients with all degrees of kidney performance including, normal, near normal, slightly impaired, moderately impaired and severely impaired renal function. Yet, Defendants failed to warn Plaintiff and his healthcare providers about the serious health risk associated with GBCA Magnevist, and failed to disclose the fact that there were safer alternatives.

127. As a direct and proximate result of receiving injections of the linear GBCA Magnevist, manufactured, distributed, marketed and distributed and sold by Defendants, Plaintiff developed Gadolinium Toxicity, the gadolinium-induced disease.

- 29 -

128.   Defendants have repeatedly and consistently failed to advise consumers and/or their medical providers of the causal relationship between linear GBCAs and the disease Gadolinium Toxicity (Gd Tx). Defendants knew or ought to have known of the risk of Gd Tx posed by linear GBCA Magnevist, to individuals in all ranges of kidney function from normal renal performance to severely impaired and obviously including the middle range, CKD, class 3.

129.   Defendants have known about the risks that linear GBCA Magnevist, posed to people with normal, slightly impaired and moderately impaired renal function for many years. Despite the well-documented evidence of gadolinium retention as listed above, Defendants have continuously failed to warn consumers and their medical providers on their product label.

130.   Defendants were also involved in prior litigation (San Francisco Superior Court Complex Civil Litigation and Federal MDL) involving this very product, and made statements about this product denying that it causes the types of injuries alleged in this complaint.

### APPLICATION OF THE DISCOVERY RULE:

131.   Defendants are estopped from asserting a statute of limitations defense because all Defendants concealed from Plaintiff the nature of Plaintiff's injuries and the connection between his injuries and all Defendants' tortious conduct.

132.   The nature of Plaintiff's injuries and damages, and their relationship to the linear GBCA, Magnevist, used in conjunction with MRAs, and Defendants' liability, was not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff, until less than two years before the filing of this complaint.

### PUNITIVE DAMAGES:

133.   Defendants' promises and warranties are false and their breach of warranty is a direct and proximate cause of Plaintiff's injuries and damages as set forth herein. Defendants withheld or misrepresented information required to be submitted under the

- 30 -

1   agency's regulations, and that withheld information was material and relevant to the harm

2   in question. The FDA traditionally regards state law as a complementary form of drug

3   regulation. The FDA has limited resources to monitor the 11,000 drugs on the market and

4   manufacturers have superior access to information about their drugs, especially in the

5   post-marketing phase as new risks emerge. In this context, state tort suits uncover

6   unknown drug hazards and provide incentives for drug manufacturers to disclose safety

7   risks promptly. They also serve as a distinct compensatory function that may motivate

8   injured persons to come forward with information. In keeping with the FDA's premise, the

9   manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times.

10  Therefore, the FDA long maintains that state law offers additional and important layer of

11  consumer protection that compliments FDA regulation.

12         134.   Plaintiff seeks punitive damages because Defendants knowingly withheld

13  and misrepresented information required to be submitted under the FDA agencies

14  regulations and that information was material and relevant to the harm in question.

15  Plaintiff's product liability action acts in a fashion akin to a private attorney general, since

16  any damages on his punitive damage claim do not compensate him for his injury, but

17  instead vindicate social interests. If Defendants had furnished the FDA with the complete

18  information they had available to them, the FDA would have responded in a different

19  fashion to Defendants' drug application.

**FIRST CAUSE OF ACTION**

**Product Liability: Design Defect and Failure to Warn:**

(By Plaintiff Against All Defendants)

         135.   Plaintiff incorporates by reference and realleges each paragraph set forth

above.

         136.   Defendants' linear gadolinium-based contrast agents GBCA, Magnevist, was

defective due to its design and inadequate warnings or instructions for use, both prior to

marketing and post-marketing. Defendants knew or should have known that their product

- 31 -

created significant risks of serious bodily harm to consumers. Defendants failed to adequately warn consumers and their medical providers of such risks.

137.   Because of Defendants' failure to provide adequate warnings with their product, Plaintiff was injected with linear GBCA Magnivest, which Defendants manufactured, designed, sold, supplied, marketed or otherwise introduced into the stream of commerce. Defendants' product is the legal cause of Plaintiff's serious physical injuries, harm, damages and economic loss. Plaintiff will continue to suffer such harm, damages and economic loss in the future.

138.   Defendants knew that their product was unsafe and would cause serious physical injury or even death to those who were exposed to the product yet failed to warn those who would be exposed to the product of the serious safety risks of the product. This allegation is sufficient to show despicable conduct carried on with a willful and conscious disregard of the rights and safety of others per California Civil Code Section 3294(c)(1).

139.   The foregoing acts, conduct and omissions of Defendants were vile, base, willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious disregard for the health, safety and rights of Plaintiff and other users of Defendants' products, and for the primary purpose of increasing Defendants' profits. As such, Plaintiff is entitled to exemplary damages.

## SECOND CAUSE OF ACTION

## The Americans with Disabilities Act, 42 U.S.C. § 121011 et seq.

(By Plaintiff Against All Defendants)

140.   Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

141.   Section 302(a) of Title III of the ADA, 42 U.S.C § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of

- 32 -

any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

142. Manufacturing Defendants are a public pharmaceutical company manufacturing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

143. Distributor Defendants are public distributor and vendor companies distributing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

144. Under section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny Adaptive Individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

145. Under section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes among other things: "A failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantage, or accommodations to [Adaptive] individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no [Adaptive] individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

146. The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff is an Adaptive Individual who has physical

- 33 -

Deuschel vs. Bayer Healthcare etc.
First Amended Complaint

LACSC Case No. 19STCV46368

disabilities that substantially limit his major life activities within the meaning of 42 U.S.C. § 12102(1)(A), (2)(A), and suffers exacerbated disabilities and injuries caused by the failure of both Defendants to provide safety policies and warning protocol afforded to others who belong to other classes and are not like-disabled and their failure to disclose safety risks to him and his class that they provided to other patrons of other classes, and their provision of inferior services, inferior to the services provided to those other consumers who are not like-disabled.

147.   Both Manufacturing and Distributor Defendants' actions constitute both intentional and effectuated discrimination and discriminate against Plaintiff on the basis of his disabilities in that Defendants, in their methods of manufacturing, selling and distributing their medical product, Magnevist, have constructed and implemented protection policies and warning protocols that excluded Plaintiff, an Adaptive person with disabilities, due to his disabilities. Their omission of his class from their warnings thereby denied him the same protection policies and warning protocol afforded others. Instead, they enforce a discriminatory definition of the consumers at risk of contracting the notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of potential harm *prior* to the use of their medical product.

148.   Defendants have constructed and implemented protection policies that deny Plaintiff any protection or warning services, make their protection policies governing their goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair protection from harm; and, indeed, injured him, because they enforce and maintain protection and warning services in a manner that discriminated against and excluded Plaintiff due to his disability

149.   Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct and policies, even after being notified of the discrimination that

- 34 -

1   such obstructive protection policies and warning protocols cause. These violations are
2   ongoing.

3       150.   Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set
4   forth and incorporated therein, Plaintiff requests relief as set forth below.

5   **THIRD CAUSE OF ACTION**

6   **California Civil Code § 51 et seq., The Unruh Civil Rights Act**

7   (By Plaintiff Against All Defendants)

8       151.   Plaintiff re-alleges and incorporates by reference all preceding allegations in
9   the complaint as though fully set forth herein.

10       152.   California Civil Code § 51 et seq. guarantees equal access for people with
11   disabilities to accommodations, advantages, facilities, privileges and services of all
12   business establishments of any kind whatsoever. Defendants are systematically violating
13   the Unruh Civil Rights Act, California Civil Code § 51 et seq.

    153.   Manufacturing and Distributor Defendants are a "business establishments"
14   within the meaning of the California Civil Code § 51 et seq. Defendants generate millions
15   of dollars in revenue from the sale of medical goods in California through their California
16   centers and offices.

17       154.   Manufacturing  Defendants  manufacture  the  pharmaceutical  product
18   Magnevist while the Distributor Defendants distribute it throughout California. During their
19   business, Defendants have denied Plaintiff, an Adaptive person with disabilities, full-equal-
20   fair goods and services that Defendants make available to other classes including the non-
21   disabled and not like-disabled public. Defendants are denying Adaptive patrons with
22   disabilities services they provide to enabled/non-disabled and not like-disabled patrons.
23   These violations are on-going.

24       155.   Both Manufacturing and Distributor Defendants' actions constitute both
25   intentional and effectuated discrimination and discriminate against Plaintiff on the basis of
26   his disabilities in that Defendants, in their methods of manufacturing, selling and

- 35 -

27

distributing their medical product, Magnevist, have constructed and implemented protection policies and warning protocols that excluded Plaintiff, an Adaptive person with disabilities, due to his disabilities. Their omission of his class from their warnings thereby denied him the same protection policies and warning protocol afforded others. Instead, they enforce a discriminatory definition of the consumers at risk of contracting the notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of potential harm *prior* to the use of their medical product.

156.   Defendants have constructed and implemented protection policies that deny Plaintiff any protection or warning services, make their protection policies governing their goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair protection from harm; and, indeed, injured him, because they enforce and maintain protection and warning services in a manner that discriminated against and excluded Plaintiff due to his disability

157.   Defendants violate the Unruh Civil Rights Act, California Civil Code § 51 et seq. in that the conduct alleged herein constitutes a violation of various provisions of the ADA, 42 U.S.C. § 12101 et seq., as set forth above. Section 51(f) of the California Civil Code provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Civil rights Act. Defendants' actions were and are in violation of the Unruh Civil Rights Act, California Civil Code § 51 et sec., and therefore, Plaintiff is entitled to remedy.

158.   Plaintiff is also entitled to statutory minimum damages pursuant to California Civil Code § 52 for each and every offense and reasonable attorney fees and costs.

///

///

///

///

- 36 -

## FOURTH CAUSE OF ACTION

### Negligence

(By Plaintiff Against All Defendants)

159.   Plaintiff incorporates by reference and realleges each paragraph set forth above.

160.   Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of the linear gadolinium-based contrast agents, GBCA Magnevist. They had a duty to ensure that their product did not pose an unreasonable risk of bodily harm and adverse events.

161.   Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of their linear GBCA, Magnevist, in that they knew or should have known that the product could cause significant bodily harm or death and was not safe for use by certain types of consumers.

162.   Defendants failed to exercise ordinary care in the labeling of their linear GBCA, Magnevist, and failed to issue to consumers and their medical providers adequate warnings concerning the risks of serious bodily injury due to the use of their linear GBCA, Magnevist.

163.   Though Defendants knew or should have known that their linear GBCA Magnevist posed a serious risk of bodily harm to consumers, Defendants unreasonably continued to manufacture and market their defective linear GBCA Magnevist, and failed to exercise reasonable care with respect to post-sale warning and instructions for safe use.

164.   At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care.

165.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

- 37 -

**FIFTH CAUSE OF ACTION**

**Breach Of Express Warranty**

(By Plaintiff against all Defendants)

166.   Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

167.   Through their product labeling, marketing, advertising, promotion, and educational efforts, including but not limited to creation and control of various aspects of the peer-reviewed medical and scientific literature, Defendants expressly warranted to Plaintiff and the healthcare community that linear GBCAs are safe and fit for their intended uses.

168.   Plaintiff and Plaintiff's healthcare providers read and relied upon Defendants' express warranties.

169.   Defendants breached said warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said express warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects.

170.   Defendants' breach of said express warranties was a factual cause of Plaintiff's injuries and damages as set forth herein. WHEREFORE, for the above reasons, Plaintiff demands judgment in Plaintiff's favor and against the Defendants for an amount in excess of $50,000.00 each, compensatory and punitive damages, incidental and consequential damages, including pain and suffering and mental anguish, delay damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

**SIXTH CAUSE OF ACTION**

**Breach Of Implied Warranty**

(By Plaintiffs against all Defendants)

171. Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

- 38 -

172. Defendants developed, designed, formulated, tested, packaged, labeled, produced, created, marketed, advertised, distributed, and sold their linear GBCAs as safe for use by the public at large, including Plaintiff, who purchased these drugs.

173. Defendants knew the use for which their linear GBCAs were intended and impliedly warranted their linear GBCAs to be of merchantable quality, safe, and fit for a particular purpose.

174. Plaintiff and Plaintiff's healthcare providers relied on the skill and judgment of Defendants, and as such, their implied warranties, in using Defendants' linear GBCAs.

175. Plaintiff and Plaintiff's healthcare providers used Defendants' linear GBCAs for the ordinary purposes for which they were indicated for use and pursuant to Defendants' instructions, labeling, and guidance.

176. Defendants' linear GBCAs were defective and not of merchantable quality or safe or fit for their intended use.

177. Specifically, Defendants' linear GBCAs are unreasonably dangerous, unmerchantable, and unfit for the ordinary purpose for which they are intended and were used because they cause injuries, including but not limited to, retention of gadolinium in organs and tissues (e.g., brain, heart, liver, kidney, bones, and skin), resulting in fibrosis in organs, bone, and skin, and gadolinium's tendency to cross the blood-brain barrier and deposit in the neuronal nuclei of the brain, and foreseeable risks, which Defendants knew or should have known.

178. Defendants had reason to know that Plaintiff would purchase their linear GBCAs for the purpose of diagnostic imaging.

179. Defendants had reason to know that Plaintiff would rely on Defendants' skill or judgment to furnish and produce linear GBCAs in a safe and appropriate manner.

180. Defendants breached said implied warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said implied

- 39 -

warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects. 1

181. Defendants' breach of said implied warranties was a factual cause of Plaintiff's injuries and damages as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

182. Compensatory damages more than the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

183. Past and future medical expenses, income, and other economic damages in an amount to be determined at trial of this action;

184. Punitive damages as to the First, Second and Third Cause of Action on an amount to be determined at trial of this action;

185. Pre-judgment and post-judgment interest;

186. Attorney fees, if applicable, expenses and costs; and

187. Such further relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

188. In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.


DATED: August 2, 2022                    ATTORNEY AT LAW


By: *Hoyt E Hart II*
HOYT E. HART, II, ESQ.
Attorney for Plaintiff,
MICHAEL DEUSCHEL

- 40 -

Deuschel vs. Bayer Healthcare etc.                    LACSC Case No. 19STCV46368
First Amended Complaint

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Michael Deuschel<br>P.O. Box 1694<br>El Segundo, CA 90245<br>TELEPHONE NO.: 323-620-1231     FAX NO.:<br>ATTORNEY FOR *(Name)*: Plaintiff Pro Per | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS:
MAILING ADDRESS: 111 North Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90245
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [✓] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[✓] monetary  b.[ ] nonmonetary; declaratory or injunctive relief  c.[✓] punitive
4. Number of causes of action *(specify)*: two (2)
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 17, 2019
Michael Deuschel

_____          ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach–Seller
    Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award
    (*not unpaid taxes*)
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint
    Case (*non-tort/non-complex*)
  Other Civil Complaint
    (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases -- unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death -- Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons -See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al.

CASE NUMBER

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | | | |
| Asset Forfeiture (05) | ☐ A6108 | Asset Forfeiture Case | 2, 3, 6 |
| Petition re Arbitration (11) | ☐ A6115 | Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| Writ of Mandate (02) | ☐ A6151 | Writ - Administrative Mandamus | 2, 8 |
| | ☐ A6152 | Writ - Mandamus on Limited Court Case Matter | 2 |
| | ☐ A6153 | Writ - Other Limited Court Case Review | 2 |
| Other Judicial Review (39) | ☐ A6150 | Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | | | |
| Antitrust/Trade Regulation (03) | ☐ A6003 | Antitrust/Trade Regulation | 1, 2, 8 |
| Construction Defect (10) | ☐ A6007 | Construction Defect | 1, 2, 3 |
| Claims Involving Mass Tort (40) | ☐ A6006 | Claims Involving Mass Tort | 1, 2, 8 |
| Securities Litigation (28) | ☐ A6035 | Securities Litigation Case | 1, 2, 8 |
| Toxic Tort Environmental (30) | ☑ A6036 | Toxic Tort/Environmental | 1, 2, 3, 8 |
| Insurance Coverage Claims from Complex Case (41) | ☐ A6014 | Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | | | |
| Enforcement of Judgment (20) | ☐ A6141 | Sister State Judgment | 2, 5, 11 |
| | ☐ A6160 | Abstract of Judgment | 2, 6 |
| | ☐ A6107 | Confession of Judgment (non-domestic relations) | 2, 9 |
| | ☐ A6140 | Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | ☐ A6114 | Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | ☐ A6112 | Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | | | |
| RICO (27) | ☐ A6033 | Racketeering (RICO) Case | 1, 2, 8 |
| Other Complaints (Not Specified Above) (42) | ☐ A6030 | Declaratory Relief Only | 1, 2, 8 |
| | ☐ A6040 | Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | ☐ A6011 | Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | ☐ A6000 | Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | | | |
| Partnership Corporation Governance (21) | ☐ A6113 | Partnership and Corporate Governance Case | 2, 8 |
| Other Petitions (Not Specified Above) (43) | ☐ A6121 | Civil Harassment With Damages | 2, 3, 9 |
| | ☐ A6123 | Workplace Harassment With Damages | 2, 3, 9 |
| | ☐ A6124 | Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | ☐ A6190 | Election Contest | 2 |
| | ☐ A6110 | Petition for Change of Name/Change of Gender | 2, 7 |
| | ☐ A6170 | Petition for Relief from Late Claim Law | 2, 3, 8 |
| | ☐ A6100 | Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

**Step 4:  Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☑ 8. ☐ 9. ☐ 10. ☐ 11. | 5601 DeSoto Ave.<br>Woodland Hills, CA 91367<br>Los Angeles County |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Woodland Hills | CA | 91367 |

**Step 5:  Certification of Assignment:** I certify that this case is properly filed in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: <u>December 17, 2019</u>

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5.  Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Spring Street Courthouse, Department 6

19STCV46368                                                          August 11, 2022
**MICHAEL DEUSCHEL vs BAYER HEALTHCARE**                                    9:00 AM
**PHARMACEUTICALS INC., et al.**

Judge: Honorable Elihu M. Berle          CSR: None
Judicial Assistant: D. Wortham           ERM: None
Courtroom Assistant: M. Molinar          Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Hoyt E Hart, II via LACC

For Defendant(s):  No Appearances

Other Appearance Notes: Michael Deuschel Party via LACC;

**NATURE OF PROCEEDINGS:** Initial Status Conference

The matter is called for hearing.

The Court notes plaintiff filed an amended complaint on August 2, 2022.

Initial Status Conference is continued to 10/06/2022 at 08:30 AM in Department 6 at Spring Street Courthouse.

The parties are ordered to meet and confer and file a Joint Initial Status Conference Report in response to the Court's Initial Status Conference Order by September 23, 2022.

Plaintiff is directed to give notice



# Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.
   
   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

- JAMS, Inc.: **Case Manager (213) 253-9776   mdawson@jamsadr.com**
- Mediation Center of Los Angeles: **Case Manager: (833) 476-9145   info@mediationLA.org**

These organizations cannot accept every case and they may decline cases at their discretion.
Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
NOTE: This service is not available for family law, probate or small claims.

b. **Los Angeles County Dispute Resolution Programs**
https://wdacs.lacounty.gov/programs/drp/
- Free, day- of- trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
- Free or low-cost mediations before the day of trial for these and other case types.
- For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit
http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. **Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit **http://www.courts.ca.gov/programs-adr.htm**

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: **www.lacourt.org/division/civil/settlement**

**Los Angeles Superior Court ADR website:  www.lacourt.org/division/civil/settlement**
**For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm**

# COPY

## BY FAX

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
~~County of Los Angeles~~

DEC 26 2019

Sherri R. Carter, Executive Officer/Clerk of Court

By _____, Deputy
Steven Drew

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

Bayer Healthcare Pharmaceuticals Inc., Bayer Pharma AG; Bayer Corporation;
~~Bayer Healthcare LLC,~~ Additional Parties Attachment Form is Attached

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Michael Deuschel

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):

**CASE NUMBER (Número del Caso): 19STCV46368**

Los Angeles County Superior Court, Stanley Mosk Courthouse
111 North Hill St., Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Michael Deuschel, ~~P.O. Box 1034, El Segundo, CA 90245~~ 406 Hawthorne St. South Pasadena CA 91030

| DATE: ~~December 17,~~ DEC 26 2019 | Clerk, Sherri R. Carter, Clerk | , Deputy |
|---|---|---|
| (Fecha) | (Secretario) STEVEN DREW | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): **Bayer Healthcare Pharmaceuticals Inc.**

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**SUM-200(A)**

| SHORT TITLE:<br>__ Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al. | CASE NUMBER:<br>19STCV46368 |
| --- | --- |

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

McKesson Corporation, McKesson Medical Surgical Inc., Merry X-Ray Chemical Corporation, and Does 1 through 50, inclusive.

Page __1__ of __1__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  Hoyt E. Hart II SBN 125088
   **ATTORNEY AT LAW**
2  P.O. Box 675670
   Rancho Santa Fe, CA 92067
3  Tel:  858.756.1636
   Fax: 858.756.1407
4  hoyth@prodigy.net

5  Michael Deuschel
   406 Hawthorne Street
6  South Pasadena, CA 91030
   Tel:  323.620.1231
7  mdeuschel@yahoo.com

8  Attorneys for, MICHAEL DEUSCHEL

9

**FILED**
Superior Court of California
County of Los Angeles

08/02/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Molinar _____ Deputy

10          **SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

11          **COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

12

13  MICHAEL DEUSCHEL,                          Case No.: 19STCV46368

14          Plaintiff,

15      vs.                                   **FIRST AMENDED COMPLAINT FOR DAMAGES**

16  BAYER HEALTHCARE
    PHARMACEUTICALS, INC., BAYER
17  PARMA AG, BAYER CORPORATION;
    BAYER HEALTHCARE, LLC, McKESSON    **DEMAND FOR JURY TRIAL**
18  MEDICAL SURGICAL, INC. MERRY X-
    RAY CHEMICAL CORPORATION, and
19  DOES 1 through 50, Inclusive,

20          Defendants.

21

22

23          COMES NOW Plaintiff, Michael Deuschel (hereinafter "Plaintiff"), and alleges as

24  follows:

25  ///

26  ///

27                                          - 1 -

    Deuschel vs. Bayer Healthcare etc.              LACSC Case No. 19STCV46368
28  First Amended Complaint

Electronically Received 08/02/2022 11:13 AM

**PARTIES:**

*Plaintiff:*

1.      Plaintiff Michael Deuschel is a resident of the city of El Segundo, within Los Angeles County, in the State of California.

2.      Plaintiff suffers from Gadolinium Toxicity (Gd Tx). Gadolinium Toxicity is an incurable, painful disease. Plaintiff contracted Gd Tx when he received a Magnetic Resonance Arthrogram (MRA) using intravenous injections of a gadolinium-based contrast agent (GBCA) known as Magnevist.

*Manufacturing Defendants:*

3.      Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC and Does 1 through 20, inclusive (collectively referred to as the "Manufacturing Defendants"), manufacture, market, and sell Magnevist, a gadolinium-based contrast agent ("GBCA") that was injected into Plaintiff's body.

4.      Defendant Bayer Pharma AG is a foreign company domiciled in Germany. Bayer Pharma AG is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017).

5.      Defendant Bayer Healthcare Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in New Jersey. Defendant Bayer Healthcare Pharmaceuticals Inc.is the Untied States pharmaceuticals unit of Bayer Healthcare LLC. Bayer Healthcare Pharmaceuticals Inc. is engaged in the business of designing, licensing,

- 2 -

manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017).

6. Defendant Bayer Corporation is an Indiana corporation with its headquarters located in Pennsylvania. Defendant Bayer Corporation is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction because said Defendant purposely availed itself of the benefits and protections of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related activities. Specifically, Defendant conducted clinical trials of Magnevist within California, which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal. June 27, 2017). Defendant Bayer Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County. Said Defendant has elected to establish an agent for service of process in the State of California.

7. Defendant Bayer HealthCare LLC is a Delaware LLC with its headquarters located in New Jersey. Bayer HealthCare LLC is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Magnevist into interstate commerce, either directly or indirectly through third parties or related entities.

- 3 -

1   This court has personal jurisdiction over said Defendant under the doctrine of specific

2   jurisdiction because said Defendant purposely availed itself of the benefits and protections

3   of California's state laws, and Plaintiff's claims arises out of Defendant's forum-related

4   activities. Specifically, Defendant conducted clinical trials of Magnevist within California,

5   which became part of an unbroken chain of events leading to Plaintiff's injury. See Dubose

6   v Bristol-Myers Squibb Co., No. 17-cv-00244, 2017 U.S. Dist. LEXIS 99504 (N.D. Cal.

7   June 27, 2017). Defendant Bayer HealthCare LLC is duly authorized to conduct business

8   in the State of California and does business in Los Angeles County. Said Defendant has

9   elected to establish an agent for service of process in the State of California.

10       8.    Defendants Bayer is a global pharmaceutical company and rakes in more

11   than $40 billion dollars per year. In 2016, Bayer merged with Monsanto to gain a footing in

12   agriculture or "Crop Science." The German based company's parent company IG Farben

13   had extensive ties to the Nazi Third Reich. It built a plant at Auschwitz and used prisoners

14   for slave labor and participated in human experiments on victims of concentration camps,

15   including the famous case of the 10 years old twins, Eva and Miriam. Bayer resolved that

16   lawsuit with a $5 billion fund for the, "Foundation of Remembrance." In 1913, Bayer

17   promoted Heroin use in children. In 1980 Bayer's division Cutter Biological sold HIV-

18   contaminated blood clotting medicines. Cutter made a heat-treated medication for

19   Americans but continued to sell the tainted medication in Argentina and parts of Asia. The

20   medication infected thousands in the U.S. and abroad with HIV and hepatitis-C. Many

21   died. Contemporaneously, Bayer has been repeatedly, successfully sued for defective

22   drugs and products including Yaz/Yasmin, a female hormonal birth control and Essure, the

23   female sterilization device. Here, at all times relevant to this complaint, the Manufacturing

24   Defendants advertised, promoted, marketed, distributed, and sold their linear GBCA

25   Magnevist in California and nationwide.

26       9.    The true names and capacities of those Defendants designated as DOES 1-

27   50 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 1-20

- 4 -

manufactured GBCAs that were injected into Plaintiff and/or manufactured MRA machines with which MRAs were performed on Plaintiff using GBCAs. Plaintiff alleges on information and belief that each of these fictitiously named defendants bears some legal responsibility for events and damages set forth in this complaint.

10.    Plaintiff alleges on information and belief that DOES 1-20 were and are companies authorized to do and are doing business in the State of California and have regularly conducted business in the County of Los Angeles, State of California.

11.    Plaintiff will amend the Complaint if necessary to show the identity of each fictitiously named defendant when they have been ascertained.

12.    The Manufacturing Defendants, along with DOES 1-20, are collectively referred to as the Manufacturing Defendants.

***Distributor Defendants***

13.    Defendant McKesson Corporation ("McKesson") distributes Magnevist and other GBCAs in California and elsewhere. Plaintiff alleges that McKesson distributed the Magnevist and/or other GBCAs that were injected into Plaintiff.

14.    Defendant McKesson Corporation is a Delaware corporation with its principal place of business and headquarters at One Post Street, San Francisco, San Francisco County, California.

15.    McKesson Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County.

16.    At all times relevant to this complaint, McKesson Corporation sold Magnevist and other GBCAs in California and elsewhere. Plaintiff alleges that McKesson Medical-Surgical, Inc. distributed the Magnevist and/or other GBCAs that were injected into Plaintiff.

17.    Defendant McKesson Medical-Surgical, Inc. is a Virginia corporation with its principal place of business and headquarters at One Post Street, San Francisco, San Francisco County, California.

- 5 -

18.     Defendant McKesson Medical-Surgical, Inc. is duly authorized to conduct business in the State of California and does business in Los Angeles County.

19.     At all times relevant to this Complaint, Defendant McKesson Medical-Surgical, Inc. sold Magnevist and/or other GBCAs in Los Angeles County and elsewhere.

20.     Defendant Merry X-Ray Chemical Corporation ("Merry X-Ray") distributes Magnevist and/or other GBCAs in California and elsewhere. Plaintiff alleges that Merry X-Ray distributed the Magnevist and/or other GBCAs that were injected into Plaintiff.

21.     Defendant Merry X-Ray Chemical Corporation is a California corporation with its principal place of business and headquarters at 4444Viewridge Avenue, San Diego, California.

22.     Merry X-Ray Chemical Corporation is duly authorized to conduct business in the State of California and does business in Los Angeles County.

23.     At all times relevant to this Complaint, Merry-X-Ray sold Magnevist and/or other GBCAs in Los Angeles County.

24.     The true names and capacities of those Defendants designated as DOES 21-30 are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 21-30 distributed GBCAs that were injected into Plaintiff. Plaintiff alleges on information and belief that each of these fictitiously named Defendants bear some legal responsibility for the events and damages set forth in this Complaint.

25.     Plaintiff alleges on information and belief that DOES 21-30 were and are companies authorized to do and are doing business in the State of California and have regularly conducted business in the County of Los Angeles, State of California.

26.     Plaintiff will amend this Complaint if necessary to show the identity of each fictitiously named defendant when they have been ascertained.

27.     McKesson, McKesson Medical-Surgical, Inc., and Merry X-Ray, along with DOES 21-30, are collectively referred to as the Distributor Defendants.

- 6 -

28.   The Manufacturing Defendants and the Distributor Defendants are collectively referred to as the Defendants.

### JURISDICTION AND VENUE:

29.   Jurisdiction and venue are both proper in Los Angeles Superior Court, in the State of California. This Court has personal jurisdiction over all parties named herein, as described above. Plaintiff is a resident of California. Three of the Defendants are residents of the State of California. Many of the acts and omissions related to Defendants liability occurred in California.

30.   Diversity jurisdiction, as is required in federal district court for a case of this nature, does not exist here. Diversity jurisdiction requires "complete diversity," which does not exist if any plaintiff is from the same State as any defendant. 28 U.S.C. § 1332. Here, Plaintiff is a California resident. Defendants McKesson Corporation, McKesson Medical-Surgical, Inc., and Merry X-Ray are also California Residents. Therefore, there is not complete diversity of the parties and diversity jurisdiction does not apply.

31.   Removal of this case to federal court would be improper due to the lack of diversity. Furthermore, this venue is convenient to the parties and is an appropriate venue for a multiple party product liability action.

### FACTS COMMON TO ALL CAUSES OF ACTION:

### THE SCIENCE OF A PHARMACOLOGICAL CRISIS:

32.   This complaint concerns the FDA-approved linear gadolinium-based contrast agent (GBCA) Magnevist administered to patients intravenously by radiologists to enhance the quality of magnetic resonance imaging. When contrast dye is used, the magnetic resonance imaging procedure is referred to as a Magnetic Resonance Arthrogram (MRA).

33.   Because Gadolinium is highly paramagnetic, it is effective for use in MRAs, and GBCAs have been developed as a 'safe' means of introducing gadolinium into the body in order to enhance the diagnostic imaging. Gadolinium is a chemical element that

- 7 -

1  does not naturally occur within the human body. The only known route for gadolinium to

2  enter the human body is injection of the GBCA. Gadolinium is highly toxic.

3       34.   Because raw Gadolinium is highly toxic, it must be coated. GBCAs are

4  actually a composite, or, "chelated" chemical construct. The Gadolinium is bound to a

5  protective outer shell, not unlike M&M candies' interior chocolate is bound by an exterior

6  hard-shell candy so not to melt in your hands. Yet, everyone knows what happens if they

7  are held onto for too long.

8       35.   Chelation is designed to protect the body by keeping the toxic heavy metal

9  from coming into contact with human tissue. There are two types of contrast agents

10  differentiated by their chemical structure: linear and macrocyclic agents. The main

11  difference is that the linear agents do not fully surround the gadolinium ion, whereas the

12  macrocyclic agents form a complete ring around it which creates a much more difficult

13  bond to break. Defendants' Magnevist is a linear agent. Linear GBCAs are far less stable

14  and more prone to separation of the raw Gadolinium from its chelated compound than the

15  macrocyclic GBCAs. Greater safety due to stronger bonds of the macrocyclic contrast

16  agents as compared to their linear contrast counterparts has been well established by

17  scientists. (Huckle, et al. 2016).

18       36.   When GBCAs are in the human body, chelation may separate from

19  gadolinium. This process is called "de-chelation." Once the GBCA is de-chelated, the

20  patient is exposed to the naturally raw, highly toxic Gadolinium, which then binds to tissue

21  or cells in the human biological structure; it even breaches the natural blood-brain-spinal-

22  cord barrier.

23       37.   This bio-chemical transfer process is known as, "Transmetallation." It occurs

24  because essential metals in the body such as copper, iron and zinc compete for GBCA's

25  outer "chelate" layer (Huckle, et al. 2016). Furthermore, emerging science demonstrated

26  the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) becomes very

27  weak and separates easily in low pH conditions such as those found in many

- 8 -

compartments of the human body including extracellular fluid spaces. Therefore, chelation fails for a variety of reasons, and soon thereafter, the "free" Gadolinium poisons the patient-victim; s/he suffers Gadolinium Toxicity.

38.     Gadolinium Toxicity (Gd Tx) is a man-made disease. It only occurs in patients who have received a GBCA for an MRA. Once de-chelation starts, not even healthy kidneys can clear/excrete the "free" Gadolinium fast enough to prevent poisoning. Gadolinium Toxicity does not discriminate and extends it reach to all patients exposed to de-chelated linear GBCAs. Consistent with this toxicology, decreased renal performance is not a pre-requisite for contraction of the disease, Gd Tx, though it increases susceptibility.

**RENAL PERFORMANCE, GBCAs AND GADOLINIUM TOXICITY:**

39.     Renal function of the patient is divided into six classes, normal/healthy and then five stages of impairment. Impaired renal function has been correspondingly classified into five categories: mildly impaired Chronic Kidney Disease, class 1 and 2; moderately impaired Chronic Kidney Disease, class 3; and severely impaired Chronic Kidney Disease Class 4 and 5.

40.     Kidneys play a vital role in the clearance/excretion of GBCAs but in themselves do not "cause" the toxicity, which is why the terminology for the deadly end range of Gd Tx, "Nephrogenic Systemic Fibrosis (NSF)" is medically misleading and semantically flawed. [1]    41.     Consistent with Nephrology, patients with reduced renal performance (kidney function) are at risk of reduced/slower clearance/excretion of GBCAs.

_____

[1] NSF is a horrible disease where patients' skin and vital organs fibrose, become hardened. It is nick-named the "Rock Disease," because victims incur such severe limitations in their movement, they grow sedentary likes rocks as their skin hardens and scales, appearing "rock-like," while their internal organs suffer the same fate. Over five hundred (500) NSF cases were reported and it is estimated to be well over a thousand non-reported cases. Over 500 lawsuits were filed against GBCA manufacturers. All of them settled before trial except Decker vs. GE (Omniscan), which resulted in a $5 million-dollar verdict for Mr. Decker but not before he died from NSF.

- 9 -

1  This fact in turn increases the risk of de-chelation of the bonded GBCA occurring within
2  the patient, because extended retention of the GBCA allows more time for de-chelation
3  through Transmetallation to occur. This results in the creation of a new, unintended, toxic
4  Gadolinium compound that can be retained within the body. The de-chelated deposited
5  Gadolinium can remain for weeks, months and even years, while the patient-victim suffers
6  Gd Tx, or awaits the release of the time-bomb.

7  **THE DEFENDANTS' FALSE INSISTENCES AND OMISSIONS:**

8  41.   In 1988, the FDA approved Magnevist for public consumption and
9  Defendants and the FDA *insisted* linear GBCA Magnevist was safe for everyone. Yet,
10 Defendants did not share all of its research with the FDA at the time of its approval and
11 during subsequent revisions of its "Black Label Warnings."

12 42.   In 2007, almost 20 years later, Defendants and the FDA *insisted* only
   patients at the *end stages of renal disease classified in CKD, Class 4 and 5, with severely*
13 *compromised kidney function*, were at risk. Indeed, de-chelated linear GBCAs caused the
14 often-fatal end range of Gd Tx, namely, NSF. Yet, through their false insistence and
15 omissions, Defendants and the FDA placed the *majority of patients* at high risk of the
16 broader spectrum of Gd Tx.

17 43.   Ten years later, December 2017, almost 30 years after its approval,
18 Defendants and the FDA recognized the beginning range of Gd Tx, namely Gadolinium
19 Deposition Disease (GDD) but *insisted* only patients with *normal to mildly impaired renal*
20 *function, including those classified in CKD, Class 1 and 2*, were at risk. Worse, Defendants
21 and the FDA *insisted* no causal relationship exists between the notorious toxin,
22 Gadolinium, and GDD patient-victims' injuries, whose symptomology may be milder than
23 the devastating NSF but still debilitating.

24 44.   Now, almost 35 years later, and continuing, as the pharma-sponsored toxic
25 semantics war continues, Defendants and the FDA *insist* the group sandwiched between
26 the two recognized sub-sets of Gd Tx is not worthy of acknowledgement, let alone title.

- 10 -

27
28

45.     Notwithstanding their insipid, biased denial of causality, the tenets of logic and science including continuity, based upon his extensive medical evidence, **Plaintiff insists** that patients in the middle of those two recognized end points, not unlike the middle finger saddled between the two sets of outside fingers, *those patients classified in CKD class 3, with moderate impairment*, also suffer the linear GBCA-induced disease, Gd Tx. Indeed, patient-victims with *moderately impaired renal function, CKD, class 3*, develop persistent symptoms of Gd TX that arise minutes/hours/months/years after the administration of the linear GBCA Magnevist.

46.     *Yet, for 35 years and continuing*, Defendants and the FDA **insist** on piecemealing their supposed scientific admissions to slowly reveal Defendants' latest culpability.

47.     *For 35 years and counting,* Defendants and the FDA decided who deserved consideration and through their *false insistences and omissions*, refused to acknowledge the spectrum or continuity of toxicity and corresponding symptomology for the de-chelated, free, raw, highly toxic Gadolinium introduced to the patient-victims by the linear GBCA Magnevist, be it deposited or transitory. Yet, as is typical and consistent with all known tenets of toxicology, the middle range does exist, as did the entire range of susceptibility, all along.

**DEFENDANTS' DISCRIMINATORY AND TOXIC SEMANTICS WAR:**

48.     Defendants not only caused Plaintiff's key disability but for the last thirteen years, they discriminated against him because of it. Their restrictive definition and 13-year campaign to deny Plaintiff a valid diagnosis is discriminatory in that Defendants' animus and blatant denial of valid warning services is based upon and further aggravates Plaintiff's disabilities. Refusal to acknowledge his true disease/cause of disabilities/key disability, in fact caused by their linear GBCA, Magnevist, is a blatant denial of service and failure to fully-equally-fairly accommodate him. Their on-going campaign has had deleterious effect on Plaintiff's health and health care.

- 11 -

49.     Contrary to Defendants' *discriminatory, exclusionary and oppressive* false definition of Gd Tx's semantic predecessor, NSF, and Defendants' incessant disinformation campaign, a patient-victim does not have to be diagnosed with *pre-existing, severely impaired* renal performance, nor classified as CKD, class 4 or 5, in order to contract NSF. The toxin will readily pummel the kidneys into submission and sufficiently oppress performance.

50.     Gadolinium delivers a deadly combo-punch. The first chemical punch struck Plaintiff's kidneys. In fact, Plaintiff suffered, *"Transient Degradation."* His renal performance temporarily dropped from CKD, class 3, to CKD class 4. He suffered Renal Failure. The second chemical punch poisoned him as the stunned kidneys and stone-restricted urinary system could not clear/excrete the de-chelating GBCA. As the Kaiser radiologist confirmed, the dye was trapped for at least three days in his bladder. Within minutes, de-chelation began and by one hour, the toxin, Gadolinium, was released and poisoned its patient-victim. Gadolinium, and by extrapolation, its manufacturers and distributors profiting from systemized toxic-agent attacks, as well as intimidation and oppression, is/are two-faced terrorists: both suppressant and toxin.

51.     NSF, GDD and any and all false insistences and omissions constitute a toxic game of semantics. NSF is the only toxin pathology that omits the known toxin from its terminology—a deception perpetrated by those responsible for the poisoning of patient-victims.

52.     As with Lead Poisoning, Bayer's Roundup's Glyphosate cancerous herbicide, or Massengill's famous 1937 Elixir Sulfanilamide, when the FDA was overhauled due to its failings, the entire world, but for the terrorist-culprits, are better served by healthier, transparent semantics and inclusion of the properly identified toxin in the name of the toxicological disease as in this catastrophic iatrogenic injury, therefore better known as Gadolinium Toxicity, Gd Tx.

- 12 -

53.     Medical and scientific communities' reticence to acknowledge the absurdity of intravenously injecting a notorious toxin into humans, humans already ill, or else they would not be receiving MRAs to diagnose their medical conditions, informs the tragic origin of Gd Tx. There also exists industry and FDA bias and institutionalized reluctance to acknowledge there exists a safer option—if it has to be used at all.

**A SUPERIOR SAFER PRODUCT EXISTS:**

54.     A superior product that could achieve the same radiological results but place the patient at less health risk is macrocyclic GBCAs. Yet advocacy to replace linear GBCAs with macrocyclic GBCAs sorely lags the evidence. Though the FDA and medical, scientific communities were misled by the manufacturers of linear GBCAs, they grew so individually and collectively complacent and invested in the use of the linear GBCAs, they forfeited the will to protect the public and advocate for use of the safer, readily available macrocyclic GBCA.

55.     In 1992, the FDA approved the first macrocyclic GBCA, ProHance. Hence, macrocyclic GBCAs have long been readily available as alternatives to their linear counterpart. They are more stable, less prone to de-chelation, and represent a safer alternative to liner GBCAs—if they must be used at all. Therefore, Defendants knew or should have known about the different risks and safety between the two types of GBCA products. Yet, for 35 years and counting, they chose not to warn the FDA and medical community and failed to alter the design of the linear GBCA to comport with that of their macrocyclic competitors. Instead, the nearly four decades of patient-victim poisoning is perpetrated for profit—the result of corporate avarice.

**DEFENDANTS' LINEAR GBCA MAGNEVIST IS DEFECTIVE:**

56.     Defendants' linear GBCA Magnevist was not reasonably fit, suitable or safe for its intended purpose, i.e., use on ill patients receiving MRAs for medical diagnostic purposes. The substantial incidence and severe degree of injury inherently distinguishes this toxicity crisis from a mere rare occurrence or an occasional accident. It is a medical

- 13 -

disaster of epic proportions with tragic consequences for the patient-victim of the disease, Gadolinium Toxicity. Defendants concealed relevant information during the FDA approval process and subsequent reevaluations and revisions of its Black-Label Warning. Defendants' product deviated from specifications, formulae or performance standards of manufacturing or from otherwise identical units manufactured to the same specifications or formulae (manufacturing defect), failed to contain adequate warning (warning defect), and was designed in a defective manner (design defect).

57.     Defendants' linear GBCA was defective, the defect existed when the product left the defendants' control, and, the defect caused Plaintiff's injury—the reasonably foreseeable user of the defective medical product. Defendants had a duty to warn and it rendered its own product defective—in addition to its design defect—by failing to adequately warn all foreseeable users that the product can cause injury to them. Defendants' failures to warn constitute a breach of duty. They had a duty to warn intended users about any and all risk related to their product that it knew or ought to have known. Yet, Defendants published no such warning.

58.     The risk posed by Defendants' linear GBCA Magnevist outweighs its intended utility, and, the product could have been designed in a readily-available safer alternative manner such as the design of macrocyclic GBCAs, so to minimize the risk of harm. Defendants' failure to implement the known, affordable and available changes to its design and manufacturing practice, namely, design of macrocyclic GBCA, a feasible and safer alternative design, and its omission by Defendants, rendered the linear GBCA Magnevist to be unreasonably unsafe. Defendants drug danger and risk to foreseeable consumer's health are the direct result of its chemical design and active ingredient, Gadolinium. If defendants' linear GBCA Magnevist had been designed without defect, Plaintiff's injuries would have been avoided.

59.     Defendants' linear GBCA Magnevist caused Plaintiff to contract the disease Gd Tx, known as GDD at the beginning stage of the toxicological spectrum and NSF and

- 14 -

1    the end stage of the continuity of poisoning. Plaintiff suffered a complex symptomology

2    detailed below because Defendants failed to warn him of the health risks associated with

3    their medical product.

4         60.   In their course of business, Defendants breeched their expressed warranty.

5    Defendants made an affirmative promise in their description of Magnevist that their

6    product was safe. In the competitive pharmaceutical industry, Defendants' promise was an

7    integral element of their marketing and eventual sale of their product to medical

8    professionals and subsequent use of it in patients during MRAs. Alas, the product fell far

9    short of their promises of utility and safety. They represented that their linear GBCA was

10   generally safe to use on all patients; that the linear GBCA is not any less safe than

11   Macrocyclic GBCAs; that linear GBCAs are contraindicated only in patients with *pre-*

12   *existing, severe chronic renal impairment*; that retention of de-chelated Gadolinium in

     patients without severe chronic kidney disease is *harmless*.

13        61.   Yet, clinical features of Gadolinium Toxicity include persistent headaches,

14   bone and joint pain, clouded mental activity, cerebral and neuropathic disorders,

15   orthopedic disorders and dermatological disorders, subcutaneous soft-tissue thickening

16   that clinically appears somewhat spongy or rubbery, painful and thickened tendons and

17   ligaments in a comparable distribution; excruciating pain, typically in the distal distribution

18   but may also be in the torso and ribs or generalized, often described as feeling like sharp

19   pins and needles, cutting and burning. Gd Tx often progresses to painful inhibition of the

20   ability to use the arms, legs, hands, feet and other joints. Gd Tx is a progressive disease

21   for which there is no known cure.

22            **PLAINTIFF'S JOURNEY OF GD TX HORRORS:**

23        62.   In June 2009, while FDA quibbled over the appropriate black label warning to

24   require the manufacturers/distributors of the linear GBCA Magnevist to apply to their

25   product box—for about a six-week period—when Plaintiff received the MRA and was

26   injected with the linear GBCA Magnevist—there was no black label or an inadequate

- 15 -

27

28

1  warning on its product box. It did not warn Plaintiff or his medical providers of the danger
2  their product posed to him and patient-victims like him, namely, the risk of contracting Gd
3  Tx for CKD, class 3 patients.

4      63.    Prior to June 12, 2009, Plaintiff completed and submitted his Kaiser
5  Permanente MRI/MRA Questionnaire; he listed his Chronic Kidney Disease, (CKD) class
6  3. Plaintiff had pre-existing moderately impaired renal dysfunction, CKD, class 3, and a
7  history of kidney stones. He also inquired with the MRI staff and asked if he should receive
8  a blood test to confirm his renal function. They declined and assured him he faced no
9  health risk from the MRA.

10     64.    June 12, 2009, Plaintiff received the MRA to rule out an acoustical neuroma
11 during a differential diagnosis to ascertain the cause of his tinnitus, ringing in the ear. He
12 was intravenously injected with the linear GBCA, Magnevist. Upon the injection, he felt a
13 burning sensation throughout his body. Less than an hour after the injection, Plaintiff
14 collapsed and suffered overwhelming, debilitating symptoms. He returned to the same
15 Kaiser medical center.

16     65.    Yet, Kaiser Permanente immediately initiated an adversarial campaign
17 against Plaintiff. It initially refused to admit Plaintiff into the ER and left him to suffer in
18 excruciating pain until a contingency of fellow ER patients advocated on his behalf for
   admission.

19     66.    The next day, Kaiser insisted Plaintiff's injury was caused by a one-millimeter
20 kidney stone lodged in his urethra and advised surgery to extract it. He received the
21 surgery but his kidneys continued to fail; his GFR dropped from 52 to 28. Such renal
22 failure is an unusual renal response to stone extraction—something else was wrong. For
23 the week, Kaiser drugged Plaintiff into a semi-conscious state to conceal their fault, when
24 dialysis was in order. (In contrast, two years earlier, Plaintiff received surgery to extract
25 kidney stones that were 5mm in size. His renal performance swiftly returned to their
26 baseline after the stones extraction.)

27                                      - 16 -

67.     Plaintiff's initial symptoms included renal failure, excruciating pain, delirium, debilitation, numbness and sharp, painful tingling sensation throughout his body, severe fatigue, restless leg-type syndrome, limb and rib pain, memory loss and cognitive impairment.

68.     In Plaintiff's case, no preexistent disease or subsequently developed disease of an alternate known process is present to account for his symptoms. He experiences symptoms consistent with the known toxic effect of *de-chelated and retained* Gadolinium, Gd Tx.

## PLAINTIFF'S SUSTAINED INJURIES:

69.     Had Plaintiff and/or his medical provider been warned about the risks associated with the linear GBCA Magnevist, he would not have been administered Magnevist and would not have been inflicted with the disease, Gadolinium Toxicity.

70.     As a direct and proximate result of being administered GBCA Magnivest, Plaintiff has been rendered permanently disabled and has suffered and continues to suffer:

(1) *Brain/Head Neurological Injuries* including Cerebral Atrophy; Cranial Nerve Root Damage including Trigeminal and Occipital Neuralgias; Vestibular Disorders, Neuro-Ophthalmological Disorders; Hearing Loss, exacerbated Tinnitus, Atrophied and Scarred Vocal Cords; Oral, dental and jaw injuries; Pituitary Adenoma/Rathe Cyst and sinus polyps;

(2) *Spinal Injuries, both Orthopedic and Neurological Injuries* including Adhesive Arachnoiditis, Cervical Vertebral and Intervertebral Disc Degradation and Bilateral Peripheral Radiculopathy; Dorsal Arachnoid Web and resulting severe thoracic spinal cord compression; Schmorl's Nodes; Tarlov Cysts; Hemangioma; Herniated Discs; Sacroiliitis;

(3) *Heart Disorders* including Sick Sinus Node Syndrome and Chronotropic Incompetence;

(4) *Vascular Disorders* including Deep Venus Reflux Disease, arterial blockage and varicocele;

- 17 -

(5) *Pulmonary Disorders* including Restricted Breathings;

(6) *Orthopedic Disorders and Injuries* including Osteoporosis; Osteoarthritis; Bilateral Shoulder and Hip Injuries; Bone and Joint Pain;

(7) *Systemic and Tissue Disorders and Injuries* including Ankylosing Spondylitis; calcified tendons; carpal tunnel and cubital ulnar nerve impingement; stenosing tenosynovitis; dermatological/fibrotic disorders with ulcerated rashes, excessive scarring and deformed skin.

71.    From 2009 through 2022, as a direct and proximate result of being administered GBCA Magnevist, Plaintiff has received about forty major surgeries and about sixty minor procedures including two brain surgeries, revision cranioplasty; five neurostimulator surgeries, three vocal cord surgeries; two nasal-polyp surgeries; multiple oral surgeries; two cardiological implant surgeries; four cervical spine surgeries; four pelvic surgeries; three lower abdominal surgeries; bilateral varicocelectomies, bilateral carpal tunnel surgeries.

72.    More than 50% of his surgeries are delayed, on average, for 3.75 years, while providers deny him the appropriate, timely surgeries due to bias, disbelief and Medi-Cal's abysmally low reduced reimbursement rate, extending his suffering to abhorrent levels of torture.

73.    As a direct and proximate result of being administered linear GBCA Magnevist, Plaintiff has been prescribed about eleven more surgeries, including: (1) cervical spine revision surgery—denied for 2 ½ years, (2) thoracic spinal cord surgery—denied for 5 years, (3/4) bilateral shoulder surgeries—denied for 9 years; (5/6) bilateral elbow surgeries—denied for 8 years, and (7/8) bilateral hip surgeries—denied for 9 years; (9) neurostimulator replacement surgery—denied for 5 years; (10) oral surgeries—denied for 9 years; and (11) bunion surgery—denied for 2 years. To treat Plaintiff's exacerbated disabilities caused by Gd Tx disease, he has received and is pending approximately 111 procedures.

- 18 -

74.    As a direct and proximate result of being administered GBCA Magnevist, Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future and has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

### THE CAMPAIGN TO OPPRESS PLAINTIFF:

75.    June 12, 2009 through August 10, 2010, Kaiser conspired against Plaintiff and lied to him about the chemical they injected into him during the MRA. In the attempt to expire the California one-year statute of limitation for medical negligence, for the fourteen months following the tragic injection, they repeatedly falsely asserted they administered an *iodine-based-contrast-dye* on June 12, 2009.

76.    August 2010, Plaintiff obtained the real Radiology report and learned Kaiser injected him with the linear *Gadolinium-Based-Contrast-Agent,* Magnevist. Kaiser's physicians concealed a second critical fact for the same fourteen months: Three days after the Magnevist injection, the radiologist confirmed the contrast dye remained trapped in Plaintiff's bladder.

77.    The GBCA's chelation began to break-down after only a few hours, poisoning Plaintiff, promptly. This explains why he balled up in a fetal position in his hospital bed and howled in pain for seven days.

78.    From 2009 through 2013, Kaiser's Nephrologists, Allergists, Dermatologists, Endocrinologists, Orthopedists, Primary Care Providers and Toxicologists at three separate medical centers refused Plaintiff testing of gadolinium in either his blood, skin or bone specimens that were extracted from him during his surgeries. Kaiser confirmed they retained the samples but falsely claimed there was no available method of testing for retained gadolinium.

79.    In 2011, Social Security assessed Plaintiff disabled; he was assigned to Medi-Cal.

- 19 -

80.     Starting in 2012, during mandatory arbitration for medical negligence, Kaiser presented numerous medical experts to *refute* his allegation that he suffered Nephrogenic Systemic Fibrosis (NSF)—the only term available at the time for the adverse impact of retained de-chelated Gadolinium on a patient-victim.

81.     Instead, Kaiser, and the legal and medical community at large, argued that a patient must be diagnosed with *"Pre-Existing, severely impaired* renal performance, and categorized as CKD, Class 4 or 5, and/or, be on dialysis, in order to sustain NSF. Plaintiff's own lawyer hired a supposed expert with a dubious reputation who falsely testified Plaintiff did not suffer NSF but instead fabricated his disorders and injuries and suffered Somatization Disorder.

82.     Alas, the Kaiser arbitrator dismissed Plaintiff's complaint and ruled in Kaiser's favor; Plaintiff was "Defensed." 2014, Plaintiff withdrew from Kaiser—after they refused him critical surgeries that the California Department of Social Services ordered performed.

**TRANSFER OF CARE FAILED DUE TO THE SAME DISCRIMINATION:**

83.     2014 through present, Plaintiff sought care from UC Regents and Cedars Sinai. Yet, there, physicians refuted Plaintiff was poisoned by the de-chelated, retained linear GBCA Magnevist and refused to test him for Gadolinium retention. Consequently, he was thrust into untenable positions as he needed their medical services including surgeries but suffered from his opponents overwhelming contempt for his true medical condition. They refused to test him for Gadolinium Retention and refused to include him in on-going support groups and studies for NSF. This oppressive campaign to silence him manifested in an, "Either/Or," demand: "Stop complaining about NSF—because you don't have it—or you will not receive surgeries!"

**THE TIDE OF INTOLERANCE EBBED—ALMOST:**

84.     Early 2018, Plaintiff was moved by four new notable developments. First, he learned the actor Mr. Chuck Norris and his wife, Geena, filed suit for Gadolinium

- 20 -

Deposition Disease, GDD, and this way learned about pharmaceutical product liability. Second, medical providers began discussing GBCA-induced diseases for patients classified along the *entire* spectrum of kidney function from normal to impaired renal function and in all classes of Chronic Kidney Disease, CKD, classes 1 through 5. Third, physicians timidly began to suggest that Plaintiff was "allergic," to Gadolinium. Fourth, prayer.

85.    The overwhelming oppression that excluded Plaintiff from appropriate and timely medical treatment and precluded any form of justice began to wane. The flawed premise that there is only one *restrictively-defined* gadolinium-induced disease, NSF, and only patients with *pre-existing*, *severely impaired* renal performance could contract NSF, began to crumble with the acknowledgment of Gadolinium Deposition Disease, GDD.

86.    As discussed above, Gadolinium is a *notorious* neuro and osteo toxin, and begins to poison its victims within hours. Yet, as late as 2017, the FDA forfeited its credibility when it argued there was no demonstrable proof of causation of injury by toxicity by retained de-chelated gadolinium in the human body for GDD patient-victims.

87.    Yet, their trick is a mere sleight of hand. After decades of unethically denying the disease Gd Tx for anyone but CKD, class 4 and 5 patient-victims, they finally admitted what the rest of the world established: De-chelated gadolinium indeed deposits within its victims' bodies and even traverses the blood-brain barrier and deposits within their brain and spinal cord. Yet, medical professionals continue to protect themselves, the linear GBCAs' manufacturers and their trillion-dollar enterprise by continuing to deny the conspicuous causal relationship between sustained injuries and the linear GBCA. The majority of research into Gadolinium is funded by GBCAs manufacturers and is therefore biased. They oppress the victims of their animus and by the disproportionate power of their office, profession and pharmaceutical lobbying dollar, *they conceal the truth*, and thereby render the disempowered Gd Tx patient-victims, *"invisible."*

- 21 -

**WORD-PLAYS ABOUND AND INADVERTENTLY INCLUDE PLAINTIFF:**

88.     In September 2019, Plaintiff learned that in 2017, Dr. Jeffrey Brent spoke at FDA's MIDAC's 2017 conference. He stated "We know NSF is a disease. It is very clear-cut unambiguous disease caused by gadolinium retention in patients *who have renal failure* ... NSF is unmistakable, easy to diagnose, clear-cut, limited but devastatingly serious clinical condition, limited in the sense of clinical manifestations." (FDA's MIDAC 2017 Conf.) [Emphasis added.]

89.     Dr. Brent slyly employed a contemporaneous revision of the antiquated operative definition that unfortunately dominated the legal and medical symbiotic industries for the preceding ten years and restricted acknowledgment of patient-victims to only those with *pre-existing, severe* renal failure and pre-diagnosed with CKD class 4 and five, *only*.

90.     In September 2019, Plaintiff learned that in August 2019, Judge David G. Campbell, Senior United States District Judge, ceaselessly criticized Plaintiff's experts, but stated, "We have a recognized disease of NSF in *renally-impaired* patients and its accepted link to GBCAs." As with Dr. Brent, his remark is the linguistic equivalent of a sleight of hand, contemporaneously revising the antiquated and discriminatory operative definition that restricted NSF for the preceding ten years to CKD class 4 and 5, patient-victims, *only*. (Case 2:18-cv-01159-DGC, Davis v McKesson Corp., Order 08/02/2019, page 14.) [Emphasis added.]

91.     The original, highly restrictive operative definition of NSF, the only disease recognized by the FDA and medical industry for ten years, excluded Plaintiff based upon a false assertion, and wrongfully denied his disease and thereby substantially aggravated it. Whereas now, it is simply, "renal failure," which clearly includes Plaintiff.

92.     Alas, as recently as 2020, the medical industry and prominent medical centers like UC San Diego continued to abuse, harass, injure, mock and oppress Plaintiff for his claim that he contracted the disease, Gd Tx. Gd Tx is an all-inclusive term that accommodates the varied degree of injury sustained by patient-victims in proportion to the

- 22 -

impact the GBCAs' de-chelated and retained gadolinium has upon them, often but not always proportional to their degree of kidney function, be it pre-existing or "Post-GBCA-Injection" renal performance.

**THIRTEEN YEARS OF RESISTANCE AND OBSTRUCTION:**

93.    For thirteen years from 2009 through the present, the polluters and their protectors, big pharma and the FDA, have yet to acknowledge Plaintiff's range of their man-made disease. The self-serving, self-preserving symbiotic Medical—Pharma—FDA—Legal Defense Industries (MPFL) perpetrate a concerted, overwhelming effort to obstruct patient-victims like Plaintiff. Kaiser, UC Regents and Cedars refused Plaintiff's requests to test for Gadolinium though there was no other cause for the continuing decline in his health. They capitalized upon the vast difference in their resources to exploit Plaintiff's vulnerability and immediate surgical needs, to thwart his search. They refused to perform surgeries that their own physicians prescribed. They threatened to and ultimately "discharged," him, when he would not remain silent. Their drive to protect themselves, their profits and status quo had a deleterious impact upon Plaintiff as it would have upon any patient-victim under the same circumstances.

94.    Providers denied Magnevist inflicted the horrific injuries Plaintiff sustained and denied him appropriate, timely surgeries and allowed him to suffer. <u>They exercised their dominance in a cruel manner in order to protect their profits and to avoid acknowledging that their ongoing use of linear GBCAs may pose an unacceptable risk to all of their patients.</u>

95.    In an insidious manner, they refused to accept Medi-Cal supposedly due to its reduced reimbursement rate but it felt like coercion to Plaintiff to capitulate to their demand to remain silent about Magnevist, its de-chelation and his retention of gadolinium—if he wanted the prescribed surgeries and to survive—a demand he could not morally or physically tolerate.

- 23 -

96.     Plaintiff has not heard of a scientific, consensus-derived term for the medical disease that patients with pre-existing CKD, class 3, sustain from "free" Gadolinium. Therefore, based upon his medical evidence, he identifies as a patient-victim of the all-inclusive, continuity-based logical term, Gadolinium Toxicity, and advances this complaint, accordingly.

## OTHER CAMPAIGNS TO ROUST THE TRUTH:

## SOME OF THE INFORMATION DEFENDANTS CONCEALED:

97.     In 1984—prior to FDA approval—the inventors of GBCAs falsely claimed that their product Gd-DTPA did not cross the blood-brain barrier, and that the bonds between the toxic gadolinium and its protective coating did not break down inside the body, and that there would be no toxic gadolinium residue left behind to cause illness.

98.     Yet, since at least 1984, stability differences among GBCAs have been recognized in laboratory (in vitro). Since 1984, deposition of toxic gadolinium in tissues has been described in animal models (in vitro). Peer review articles were published on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences.

99.     In 1988, the FDA approved of Magnevist, the first GBCA to reach the market.

100.    In 1988, it was recognized that gadolinium was breaking free from the bonds in the linear GBCAs as they grew weak under certain conditions and locations within the human body. (Huckle, et al. 2016)

101.    In September 1989, what may have been the first report of toxic gadolinium retention in humans was published, a little over one year after approval of Magnevist. Authors Tien, et al. reported that intercerebral masses "remained enhanced on MRI images obtained 8-days after injection of gadolinium DTPA dimeglumine—Magnevist. Subsequent chemical analysis revealed a high concentration of gadolinium remained in the tissue.

- 24 -

Deuschel vs. Bayer Healthcare etc.
First Amended Complaint

LACSC Case No. 19STCV46368

102.    In 1991, Pharmacokinetic studies indicated that gadolinium retention was occurring in people with normal, slightly impaired and moderately impaired renal function. [2]

103.    In 1998, the first major study that showed deposition in patients with renal failure was published. (Huckle, et al. 2016)

104.    In 2004, the first major study that showed deposition in patients with normal renal function was published. (Huckle, et al. 2016)

105.    In 2004, gadolinium was shown to be deposited in the resected femoral heads of patients who had undergone gadolinium-chelate enhanced MRA studies. [3] Since then, studies have continued to indicate that gadolinium remains within patients' bodies long after the suggested half-life.

106.    Over the next eighteen years, more evidence was forthcoming, and research began to flourish regarding the release of toxic gadolinium from the linear contrast agents such as Manevist, and its long-term retention in the bodies of animals and humans.

107.    The laboratory (in Vitro) studies assessing the stability of each GBCA in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents which showed superior stability. The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was cleared/excreted out of the body according to the claimed drug's half-life, before the chelate could release the toxic gadolinium. However, as discussed above, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to

---

[2] Schmann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. Invest Radiol., 1991: 26:975-979.
[3] Gibby WA, Gibby KA, Gibby WA. Comparison of GD-DTPA-BMA (Omniscan) versus GD HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. Invest Radiol., 2004: 39:138-142.

- 25 -

be released in the bodies of patients. In addition, a delayed elimination phase of the GBCA would later be discovered.

108.    In 2006, the Food and Drug Administration (FDA) voted to issue a black box warning on all gadolinium-based contrast agents. This was prompted by Nephrologists and other scientists connecting the administration of GBCAs, including Magnevist, to the rapidly progressive debilitating and often fatal disease called Nephrogenic Systemic Fibrosis (NSF).

109.    In 2012, patients sent several strongly worded letters with scientifically-supported research data to the FDA, warning about the occurrence of gadolinium toxicity in those with normal renal function following injections of GBCAs. Correspondence was confirmed.

110.    Symptomatic patients started to obtain documentation of high levels of gadolinium in their blood and urine several days, weeks, months and even years after their exposure to GBCAs. Many patients even had tissue biopsies of various parts of their body that showed additional evidence of retained gadolinium years after their exposure.

111.    In 2012, Defendants corrected their label to include contraindications for use in patients with kidney disease and acute kidney injury. Yet, Defendants have failed to update their label to reflect the extensive evidence of gadolinium retention in people with normal, slightly impaired and moderately impaired renal function and to warn of the likely probability of the de- chelation that will expose the patient to "free" toxic gadolinium.

112.    Because obvious signs of clinical pathology associated with NSF were only "seen," and "acknowledged," in patients who had *severely impaired* renal performance, i.e., CKD, class 4 and 5, it was widely—BUT ERRONEOUSLY—assumed by the public and medical profession alike that people with normal kidney performance or slightly to moderately impaired renal function were not getting sick and there were no other concerns. However, research continued to report evidence that toxic gadolinium was being stored in people with normal, slightly reduced and moderately reduced renal function.

- 26 -

113.   Although many patients with debilitating symptoms who had normal, slightly impaired and moderately impaired renal function that received injections of GBCA had already been reporting adverse reactions for years to the FDA, manufacturers and poison control, no link between gadolinium and their symptoms were ever officially made public. This is partially because blood and urine testing for gadolinium only became available recently, but it is primarily due to scientific bias. Most physicians would not allow themselves to be aware of any disease that was associated with gadolinium other than NSF, which is said to only occur in patients with pre-existing severe renal impairment and categorized as CKD, class 4 and 5.

114.   The de-evolution of scientific bias that allowed for an evolving admission of a wider pool of patient-victims was slowly and intermittently extended and tested within the scientific community, medical institutions as well as the United States Federal Courts, with the sleight-of-hand semantical substitution of "severe renal failure" and "preexisting CKD, class 4 and 5," with the less restrictive and more inclusive qualifier, "renal failure." As noted above, the vocabulary-substitute gained wider use but without any fanfare, let alone admission of the decades of abuse caused by its linguistic predecessor, NSF, and the symbiotic-industries' bias.

115.   In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of GBCAs up to several years prior. They found that the brain had hyperintense signals in critical areas of the brain. They were very alarming findings.

116.   In 2014, scientists at the Mayo Clinic confirmed these findings when autopsy studies were performed on thirteen (13) diseased individuals, all of whom had normal or near normal renal function and who had received six or more injections of GBCAs in the years prior. Up to 56mcg of gadolinium per gram of desecrated tissue were found within the patients' brains.

- 27 -

117.   As these new findings emerged, the entire radiology community was put on high alert. With several large universities conducting research to further address this concern.

118.   In July 2015, and in direct response to the Mayo Clinic study's findings, the FDA issued a new public safety alert. The FDA is evaluating the risk of brain deposits from repeated use of GBCAs use in MRAs and they now have their National Center for Toxicological Research team working on determining the consequences of these new findings.

119.   In August 2016, the article, "Gadolinium in Humans: A family of Disorders," was published in volume 207.2 of the American Journal of Roentgenology.

120.   In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on label that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

121.   On December 19, 2017, the FDA required a new class warning and other safety measures for all GBCAs for MRAs concerning gadolinium remaining in patients' bodies, including the brain, for months to years after receiving these drugs. Yet, as explained above, they continue to deny a causal relationship between the Gadolinium Deposition Disease and patient-victims' injuries and symptomology.

122.   Gadolinium Toxicity is underreported and underdiagnosed condition because of two decades of linguistically restrictive and discriminatory scientific bias/actions. This is but one example of how the status quo of biased institutional authority and dominance harms the American people and culture—all in the name of profit—and, how those who challenge the misinformation campaign get attacked. Over the past several years, since the link between GBCAs and NSF was acknowledged, patients with normal, slightly impaired and moderately impaired renal performance have been forming advocacy groups and coming forward to create awareness for their condition—a counter-maneuver to their systemic exclusion by the symbiotic medical, pharma and legal defense industries. As

- 28 -

1    explained above in detail, Plaintiff is one of these many survivors fighting to bring forth the

2    truth and hold the culpable parties accountable.

3                    **DEFENDANTS' KNOWLEDGE AND RESPONSIBILITY TO KNOW**

4                         **AND THE CONSEQUENCE OF THEIR ACTIONS:**

5        123.   The   linear   GBCA   Magnevist   that   was   injected   into   Plaintiff,   was

6    manufactured   by   the   Manufacturing   Defendants   and   distributed   by   the   Distributor

7    Defendants. Manufacturing Defendants knew that their product, Magnevist, did not have

8    very stable bonds and could come apart easily causing significant toxicity in humans.

9        124.   During the years that Defendants manufactured, marketed, distributed, sold

10   their   linear   GBCA   Magnevist,   there   have   been   numerous   case   reports,   studies,

11   assessment, papers, peer review literature, and other clinical data that have described

12   and/or demonstrated three diseases in connection with the use of GBCAs: NSF, GDD and

13   Gadolinium Toxicity. Also, there have been a significant number of publicized complaints

14   and comments from individual patient-victims afflicted with the three diseases and others

15   seeking to help these individuals.

16       125.   This information was all available to Defendants several years ago, and put

17   them on notice of the issues that give rise to Plaintiff's cause of action alleged herein.

18       126.   Plaintiff received an MRA. During the time period when Plaintiff received the

19   injection of the linear GBCA, Magnevist, Defendants knew or ought to have known that the

20   use of GBCAs created a risk of serious bodily injury in patients with all degrees of kidney

21   performance including, normal, near normal, slightly impaired, moderately impaired and

22   severely impaired renal function. Yet, Defendants failed to warn Plaintiff and his healthcare

23   providers about the serious health risk associated with GBCA Magnevist, and failed to

     disclose the fact that there were safer alternatives.

24       127.   As a direct and proximate result of receiving injections of the linear GBCA

25   Magnevist, manufactured, distributed, marketed and distributed and sold by Defendants,

26   Plaintiff developed Gadolinium Toxicity, the gadolinium-induced disease.

27                                          - 29 -

28

128. Defendants have repeatedly and consistently failed to advise consumers and/or their medical providers of the causal relationship between linear GBCAs and the disease Gadolinium Toxicity (Gd Tx). Defendants knew or ought to have known of the risk of Gd Tx posed by linear GBCA Magnevist, to individuals in all ranges of kidney function from normal renal performance to severely impaired and obviously including the middle range, CKD, class 3.

129. Defendants have known about the risks that linear GBCA Magnevist, posed to people with normal, slightly impaired and moderately impaired renal function for many years. Despite the well-documented evidence of gadolinium retention as listed above, Defendants have continuously failed to warn consumers and their medical providers on their product label.

130. Defendants were also involved in prior litigation (San Francisco Superior Court Complex Civil Litigation and Federal MDL) involving this very product, and made statements about this product denying that it causes the types of injuries alleged in this complaint.

## APPLICATION OF THE DISCOVERY RULE:

131. Defendants are estopped from asserting a statute of limitations defense because all Defendants concealed from Plaintiff the nature of Plaintiff's injuries and the connection between his injuries and all Defendants' tortious conduct.

132. The nature of Plaintiff's injuries and damages, and their relationship to the linear GBCA, Magnevist, used in conjunction with MRAs, and Defendants' liability, was not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff, until less than two years before the filing of this complaint.

## PUNITIVE DAMAGES:

133. Defendants' promises and warranties are false and their breach of warranty is a direct and proximate cause of Plaintiff's injuries and damages as set forth herein. Defendants withheld or misrepresented information required to be submitted under the

- 30 -

agency's regulations, and that withheld information was material and relevant to the harm in question. The FDA traditionally regards state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market and manufacturers have superior access to information about their drugs, especially in the post-marketing phase as new risks emerge. In this context, state tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve as a distinct compensatory function that may motivate injured persons to come forward with information. In keeping with the FDA's premise, the manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Therefore, the FDA long maintains that state law offers additional and important layer of consumer protection that compliments FDA regulation.

134.   Plaintiff seeks punitive damages because Defendants knowingly withheld and misrepresented information required to be submitted under the FDA agencies regulations and that information was material and relevant to the harm in question. Plaintiff's product liability action acts in a fashion akin to a private attorney general, since any damages on his punitive damage claim do not compensate him for his injury, but instead vindicate social interests. If Defendants had furnished the FDA with the complete information they had available to them, the FDA would have responded in a different fashion to Defendants' drug application.

## FIRST CAUSE OF ACTION

### Product Liability: Design Defect and Failure to Warn:

(By Plaintiff Against All Defendants)

135.   Plaintiff incorporates by reference and realleges each paragraph set forth above.

136.   Defendants' linear gadolinium-based contrast agents GBCA, Magnevist, was defective due to its design and inadequate warnings or instructions for use, both prior to marketing and post-marketing. Defendants knew or should have known that their product

- 31 -

1  created significant risks of serious bodily harm to consumers. Defendants failed to
2  adequately warn consumers and their medical providers of such risks.

3       137.   Because of Defendants' failure to provide adequate warnings with their
4  product, Plaintiff was injected with linear GBCA Magnivest, which Defendants
5  manufactured, designed, sold, supplied, marketed or otherwise introduced into the stream
6  of commerce. Defendants' product is the legal cause of Plaintiff's serious physical injuries,
7  harm, damages and economic loss. Plaintiff will continue to suffer such harm, damages
8  and economic loss in the future.

9       138.   Defendants knew that their product was unsafe and would cause serious
10 physical injury or even death to those who were exposed to the product yet failed to warn
11 those who would be exposed to the product of the serious safety risks of the product. This
12 allegation is sufficient to show despicable conduct carried on with a willful and conscious
13 disregard of the rights and safety of others per California Civil Code Section 3294(c)(1).

14      139.   The foregoing acts, conduct and omissions of Defendants were vile, base,
15 willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious
16 disregard for the health, safety and rights of Plaintiff and other users of Defendants'
17 products, and for the primary purpose of increasing Defendants' profits. As such, Plaintiff
18 is entitled to exemplary damages.

19 **SECOND CAUSE OF ACTION**
20 **The Americans with Disabilities Act, 42 U.S.C. § 121011 et seq.**
21 (By Plaintiff Against All Defendants)

22      140.   Plaintiff re-alleges and incorporates by reference all preceding allegations in
23 the complaint as though fully set forth herein.

24      141.   Section 302(a) of Title III of the ADA, 42 U.S.C § 12101 et seq., provides:
25 "No individual shall be discriminated against on the basis of disability in the full and equal
26 enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of

- 32 -

28

any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

142.   Manufacturing Defendants are a public pharmaceutical company manufacturing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

143.   Distributor Defendants are public distributor and vendor companies distributing and selling medical products to the public and a place of public accommodation within the definition of Title III of the ADA 42 U.S.C § 1281(7).

144.   Under section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny Adaptive individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

145.   Under section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes among other things: "A failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantage, or accommodations to [Adaptive] individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no [Adaptive] individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

146.   The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff is an Adaptive individual who has physical

- 33 -

Deuschel vs. Bayer Healthcare etc.
First Amended Complaint

LACSC Case No. 19STCV46368

disabilities that substantially limit his major life activities within the meaning of 42 U.S.C. §
12102(1)(A), (2)(A), and suffers exacerbated disabilities and injuries caused by the failure
of both Defendants to provide safety policies and warning protocol afforded to others who
belong to other classes and are not like-disabled and their failure to disclose safety risks to
him and his class that they provided to other patrons of other classes, and their provision
of inferior services, inferior to the services provided to those other consumers who are not
like-disabled.

147.   Both Manufacturing and Distributor Defendants' actions constitute both
intentional and effectuated discrimination and discriminate against Plaintiff on the basis of
his disabilities in that Defendants, in their methods of manufacturing, selling and
distributing their medical product, Magnevist, have constructed and implemented
protection policies and warning protocols that excluded Plaintiff, an Adaptive person with
disabilities, due to his disabilities. Their omission of his class from their warnings thereby
denied him the same protection policies and warning protocol afforded others. Instead,
they enforce a discriminatory definition of the consumers at risk of contracting the
notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic
Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of
potential harm *prior* to the use of their medical product.

148.   Defendants have constructed and implemented protection policies that deny
Plaintiff any protection or warning services, make their protection policies governing their
goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair
protection from harm; and, indeed, injured him, because they enforce and maintain
protection and warning services in a manner that discriminated against and excluded
Plaintiff due to his disability

149.   Defendants have failed to take any prompt and equitable steps to remedy its
discriminatory conduct and policies, even after being notified of the discrimination that

- 34 -

1  such obstructive protection policies and warning protocols cause. These violations are

2  ongoing.

3       150.    Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set

4  forth and incorporated therein, Plaintiff requests relief as set forth below.

5                                   **THIRD CAUSE OF ACTION**

6         **California Civil Code § 51 et seq., The Unruh Civil Rights Act**

7  (By Plaintiff Against All Defendants)

8       151.    Plaintiff re-alleges and incorporates by reference all preceding allegations in

9  the complaint as though fully set forth herein.

10       152.    California Civil Code § 51 et seq. guarantees equal access for people with

11  disabilities to accommodations, advantages, facilities, privileges and services of all

12  business establishments of any kind whatsoever. Defendants are systematically violating

   the Unruh Civil Rights Act, California Civil Code § 51 et seq.

13       153.    Manufacturing and Distributor Defendants are a "business establishments"

14  within the meaning of the California Civil Code § 51 et seq. Defendants generate millions

15  of dollars in revenue from the sale of medical goods in California through their California

16  centers and offices.

17       154.    Manufacturing Defendants manufacture the pharmaceutical product

18  Magnevist while the Distributor Defendants distribute it throughout California. During their

19  business, Defendants have denied Plaintiff, an Adaptive person with disabilities, full-equal-

20  fair goods and services that Defendants make available to other classes including the non-

21  disabled and not like-disabled public. Defendants are denying Adaptive patrons with

22  disabilities services they provide to enabled/non-disabled and not like-disabled patrons.

23  These violations are on-going.

24       155.    Both Manufacturing and Distributor Defendants' actions constitute both

25  intentional and effectuated discrimination and discriminate against Plaintiff on the basis of

26  his disabilities in that Defendants, in their methods of manufacturing, selling and

27                                          - 35 -

distributing their medical product, Magnevist, have constructed and implemented protection policies and warning protocols that excluded Plaintiff, an Adaptive person with disabilities, due to his disabilities. Their omission of his class from their warnings thereby denied him the same protection policies and warning protocol afforded others. Instead, they enforce a discriminatory definition of the consumers at risk of contracting the notorious disease caused by their product, Magenvist, namely Nephrogenic Systemic Fibrosis. Yet, laws require Defendants to protect *all* consumers and to warn them of potential harm *prior* to the use of their medical product.

156.    Defendants have constructed and implemented protection policies that deny Plaintiff any protection or warning services, make their protection policies governing their goods and services inaccessible to Plaintiff and prohibit him from enjoying full-equal-fair protection from harm; and, indeed, injured him, because they enforce and maintain protection and warning services in a manner that discriminated against and excluded Plaintiff due to his disability

157.    Defendants violate the Unruh Civil Rights Act, California Civil Code § 51 et seq. in that the conduct alleged herein constitutes a violation of various provisions of the ADA, 42 U.S.C. § 12101 et seq., as set forth above. Section 51(f) of the California Civil Code provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Civil rights Act. Defendants' actions were and are in violation of the Unruh Civil Rights Act, California Civil Code § 51 et sec., and therefore, Plaintiff is entitled to remedy.

158.    Plaintiff is also entitled to statutory minimum damages pursuant to California Civil Code § 52 for each and every offense and reasonable attorney fees and costs.

///

///

///

///

- 36 -

**FOURTH CAUSE OF ACTION**

**Negligence**

(By Plaintiff Against All Defendants)

159.   Plaintiff incorporates by reference and realleges each paragraph set forth above.

160.   Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of the linear gadolinium-based contrast agents, GBCA Magnevist. They had a duty to ensure that their product did not pose an unreasonable risk of bodily harm and adverse events.

161.   Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of their linear GBCA, Magnevist, in that they knew or should have known that the product could cause significant bodily harm or death and was not safe for use by certain types of consumers.

162.   Defendants failed to exercise ordinary care in the labeling of their linear GBCA, Magnevist, and failed to issue to consumers and their medical providers adequate warnings concerning the risks of serious bodily injury due to the use of their linear GBCA, Magnevist.

163.   Though Defendants knew or should have known that their linear GBCA Magnevist posed a serious risk of bodily harm to consumers, Defendants unreasonably continued to manufacture and market their defective linear GBCA Magnevist, and failed to exercise reasonable care with respect to post-sale warning and instructions for safe use.

164.   At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care.

165.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

- 37 -

## FIFTH CAUSE OF ACTION

### Breach Of Express Warranty

(By Plaintiff against all Defendants)

166.    Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

167.    Through their product labeling, marketing, advertising, promotion, and educational efforts, including but not limited to creation and control of various aspects of the peer-reviewed medical and scientific literature, Defendants expressly warranted to Plaintiff and the healthcare community that linear GBCAs are safe and fit for their intended uses.

168.    Plaintiff and Plaintiff's healthcare providers read and relied upon Defendants' express warranties.

169.    Defendants breached said warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said express warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects.

170.    Defendants' breach of said express warranties was a factual cause of Plaintiff's injuries and damages as set forth herein. WHEREFORE, for the above reasons, Plaintiff demands judgment in Plaintiff's favor and against the Defendants for an amount in excess of $50,000.00 each, compensatory and punitive damages, incidental and consequential damages, including pain and suffering and mental anguish, delay damages, attorney's fees and costs of suit in an amount to be determined upon the trial of this matter.

## SIXTH CAUSE OF ACTION

### Breach Of Implied Warranty

(By Plaintiffs against all Defendants)

171. Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each of the foregoing paragraphs and allegations.

- 38 -

172. Defendants developed, designed, formulated, tested, packaged, labeled, produced, created, marketed, advertised, distributed, and sold their linear GBCAs as safe for use by the public at large, including Plaintiff, who purchased these drugs.

173. Defendants knew the use for which their linear GBCAs were intended and impliedly warranted their linear GBCAs to be of merchantable quality, safe, and fit for a particular purpose.

174. Plaintiff and Plaintiff's healthcare providers relied on the skill and judgment of Defendants, and as such, their implied warranties, in using Defendants' linear GBCAs.

175. Plaintiff and Plaintiff's healthcare providers used Defendants' linear GBCAs for the ordinary purposes for which they were indicated for use and pursuant to Defendants' instructions, labeling, and guidance.

176. Defendants' linear GBCAs were defective and not of merchantable quality or safe or fit for their intended use.

177. Specifically, Defendants' linear GBCAs are unreasonably dangerous, unmerchantable, and unfit for the ordinary purpose for which they are intended and were used because they cause injuries, including but not limited to, retention of gadolinium in organs and tissues (e.g., brain, heart, liver, kidney, bones, and skin), resulting in fibrosis in organs, bone, and skin, and gadolinium's tendency to cross the blood-brain barrier and deposit in the neuronal nuclei of the brain, and foreseeable risks, which Defendants knew or should have known.

178. Defendants had reason to know that Plaintiff would purchase their linear GBCAs for the purpose of diagnostic imaging.

179. Defendants had reason to know that Plaintiff would rely on Defendants' skill or judgment to furnish and produce linear GBCAs in a safe and appropriate manner.

180. Defendants breached said implied warranties by delivering to Plaintiff and Plaintiff's healthcare providers linear GBCAs that did not conform to said implied

- 39 -

warranties, insofar as they are not safe or fit for their intended uses and may produce serious side effects. 1

181. Defendants' breach of said implied warranties was a factual cause of Plaintiff's injuries and damages as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

182.   Compensatory damages more than the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

183.   Past and future medical expenses, income, and other economic damages in an amount to be determined at trial of this action;

184.   Punitive damages as to the First, Second and Third Cause of Action on an amount to be determined at trial of this action;

185.   Pre-judgment and post-judgment interest;

186.   Attorney fees, if applicable, expenses and costs; and

187.   Such further relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

188.   In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.

DATED: August 2, 2022                    ATTORNEY AT LAW

By: _Hoyt E Hart II_

HOYT E. HART, II, ESQ.
Attorney for Plaintiff,
MICHAEL DEUSCHEL

- 40 -

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael Deuschel<br>P.O. Box 1694<br>El Segundo, CA 90245<br>TELEPHONE NO.: 323-620-1231   FAX NO.:<br>ATTORNEY FOR *(Name):* Plaintiff Pro Per | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS:
MAILING ADDRESS: 111 North Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90245
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Michael Deuschel v. Bayer Healthcare Pharmaceuticals Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>*(Cal. Rules of Court, rule 3.402)* | DEPT: | JUDGE: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>*(Cal. Rules of Court, rules 3.400–3.403)* |
|---|---|---|
| ☐ Auto (22)<br>☐ Uninsured motorist (46) | ☐ Breach of contract/warranty (06)<br>☐ Rule 3.740 collections (09) | ☐ Antitrust/Trade regulation (03)<br>☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | ☐ Other collections (09)<br>☐ Insurance coverage (18) | ☐ Mass tort (40)<br>☐ Securities litigation (28) |
| ☐ Asbestos (04)<br>☐ Product liability (24) | ☐ Other contract (37)<br>**Real Property** | ☑ Environmental/Toxic tort (30)<br>☐ Insurance coverage claims arising from the |
| ☐ Medical malpractice (45)<br>☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse<br>condemnation (14) | above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07)<br>☐ Civil rights (08) | ☐ Other real property (26)<br>**Unlawful Detainer** | ☐ Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint** |
| ☐ Defamation (13)<br>☐ Fraud (16) | ☐ Commercial (31)<br>☐ Residential (32) | ☐ RICO (27)<br>☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19)<br>☐ Professional negligence (25) | ☐ Drugs (38)<br>**Judicial Review** | **Miscellaneous Civil Petition** |
| ☐ Other non-PI/PD/WD tort (35)<br>**Employment** | ☐ Asset forfeiture (05)<br>☐ Petition re: arbitration award (11) | ☐ Partnership and corporate governance (21)<br>☐ Other petition *(not specified above)* (43) |
| ☐ Wrongful termination (36)<br>☐ Other employment (15) | ☐ Writ of mandate (02)<br>☐ Other judicial review (39) | |

2. This case ☐ is ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4. Number of causes of action *(specify):* two (2)
5. This case ☐ is ☑ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 17, 2019
Michael Deuschel
_____        ▶ _____
(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

### CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court,**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons –<br>See Step 3 Above |
|---|---|---|
| Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

*Auto Tort* (rows 1–2)
*Other Personal Injury/Property Damage/Wrongful Death Tort* (rows 3–6)

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation     Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer- Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 2 of 4

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2, 8<br>2<br>2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2, 5, 11<br>2, 6<br>2, 9<br>2, 8<br>2, 8<br>2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8<br>2, 8<br>1, 2, 8<br>1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages<br>☐ A6123  Workplace Harassment With Damages<br>☐ A6124  Elder/Dependent Adult Abuse Case With Damages<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name/Change of Gender<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2, 3, 9<br>2, 3, 9<br>2, 3, 9<br>2<br>2, 7<br>2, 3, 8<br>2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Michael Deuschel v Bayer Healthcare Pharmaceuticals Inc, et al. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☑ 8. ☐ 9. ☐ 10. ☐ 11. | 5601 DeSoto Ave.<br>Woodland Hills, CA 91367<br>Los Angeles County |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Woodland Hills | CA | 91367 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: December 17, 2019

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/16
For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

Local Rule 2.3
Page 4 of 4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 6

**19STCV46368**                                              August 11, 2022
**MICHAEL DEUSCHEL vs BAYER HEALTHCARE**                        9:00 AM
**PHARMACEUTICALS INC., et al.**

Judge: Honorable Elihu M. Berle              CSR: None
Judicial Assistant: D. Wortham               ERM: None
Courtroom Assistant: M. Molinar              Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Hoyt E Hart, II via LACC

For Defendant(s):  No Appearances

Other Appearance Notes: Michael Deuschel Party via LACC;

**NATURE OF PROCEEDINGS:** Initial Status Conference

The matter is called for hearing.

The Court notes plaintiff filed an amended complaint on August 2, 2022.

Initial Status Conference is continued to 10/06/2022 at 08:30 AM in Department 6 at Spring Street Courthouse.

The parties are ordered to meet and confer and file a Joint Initial Status Conference Report in response to the Court's Initial Status Conference Order by September 23, 2022.

Plaintiff is directed to give notice



# Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

**a.   The Civil Mediation Vendor Resource List**

Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

- JAMS, Inc.: **Case Manager (213) 253-9776  mdawson@jamsadr.com**
- Mediation Center of Los Angeles: **Case Manager: (833) 476-9145  info@mediationLA.org**

**These organizations cannot accept every case and they may decline cases at their discretion.**

Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.

NOTE: This service is not available for family law, probate or small claims.

**b.   Los Angeles County Dispute Resolution Programs**

https://wdacs.lacounty.gov/programs/drp/

- Free, day- of- trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
- Free or low-cost mediations before the day of trial for these and other case types.
- For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

**c.   Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit **http://www.courts.ca.gov/programs-adr.htm**

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: **www.lacourt.org/division/civil/settlement**

**Los Angeles Superior Court ADR website:  www.lacourt.org/division/civil/settlement**

**For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm**